## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Andre Moore,

       Plaintiff,

v.

Officer Tony Partyka, in his individual
capacity, Officer Neal Walsh, in his
individual capacity, Officer John Doe
No. 1, in his individual capacity, and
Officer John Doe No. 2, in his individual
capacity,

       Defendants.

Judge _____
Civil File No. _____

**COMPLAINT**

**Jury Trial Demanded**

### INTRODUCTION

This complaint arises out of multiple civil rights violations against Plaintiff Andre Moore by three Minneapolis Police officers, Tony Partyka, Neal Walsh, and other officers whose identity has not yet been verified and who are referred to herein as John Doe No. 1 and John Doe No. 2 (collectively, with Partyka and Walsh, "Defendants").

Defendants violated Moore's civil rights—for the first time—by unnecessarily and recklessly using excessive force to pull Moore from his vehicle, throw him to the ground, deliver multiple knee and elbow strikes to his face and body, and then pull him by his hair along the ground although Moore had followed Defendants' instructions and had not made any sudden or threatening movements of any kind. This egregious conduct occurred pursuant to a so-called "traffic stop" that in fact took place in front of Moore's friend's

1

home when Moore had parked there after having driven just blocks from his home. As a result of Defendants' unlawful and excessive force, Moore suffered a broken nose and multiple cuts, bruises, and abrasions to his face and body, among other injuries.

Officer Partyka violated Moore's civil rights again several months later as retribution for Moore's complaints to the Minneapolis police department about Defendants' appalling conduct summarized above. In a premediated act of revenge, Partyka fabricated and/or misrepresented evidence to a Hennepin County judge in order to falsely obtain a search warrant for Moore's residence. Partyka, a beat cop who had absolutely no prior experience doing investigations of any kind, obtained the warrant by falsely telling the judge that he had found baggies containing drugs in a trash bin outside Moore's residence and that a so-called confidential and reliable source had observed Moore selling drugs at the property. The warrant was later thrown out when it turned out that the baggies were in fact completely empty and had no trace of drugs and Partyka had no explanation for why his application for search warrant stated that the baggies contained a powdery substance. Unfortunately for Moore, the warrant was only quashed after he had unjustly been forced to spend over seven months in jail when he was arrested after the illegal search of his residence.

This action is for money damages brought pursuant to 42 U.S.C. § 1983 to redress the deprivation of Moore's civil rights by Defendants, while they were acting under the color of state law. Defendants shocking and egregious conduct violated Moore's rights under the Fourth Amendment of the United States Constitution to be free from

39738091.4

unreasonable searches and unnecessary and senseless violence at the hands of peace officers.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over federal questions pursuant to 28 U.S.C. § 1331, and specifically has jurisdiction over civil actions to redress the deprivation of any right secured by the United States Constitution or Act of Congress guaranteeing equal rights including claims under 42 U.S.C §§ 1983 and 1988. See 28 U.S.C. § 1343.

2.      The action arises under the United States Constitution as applied to state and local authorities through 42 U.S.C. § 1983.

3.      This Court is a proper venue pursuant to 28 U.S.C. §1391(b) because all of the events giving rise to the action occurred within the District of Minnesota and all of the parties reside in the District of Minnesota.

## THE PARTIES

4.      Andre Moore is, and has been at all time relevant hereto, a citizen of the United States and the State of Minnesota, residing in Minneapolis within Hennepin County. He was 48 and 49 years old respectively at the time of the incidents described in this Complaint.

5.      Upon information and belief, Tony Partyka is, and was at all times material relevant to the case, a citizen of the United States and the State of Minnesota.

6.      Upon information and belief, Partyka is, and was at all relevant times, employed by the Minneapolis Police Department ("MPD") as a duly appointed and sworn police officer.

39738091.4

7.      Upon information and belief, Neal Walsh is, and was at all times material relevant to the case, a citizen of the United States and the State of Minnesota.

8.      Upon information and belief, Walsh is, and was at all relevant times, employed by the MPD as a duly appointed and sworn police officer.

9.      Upon information and belief, John Doe No. 1 is and was at all times relevant, a citizen of the United States and the State of Minnesota.

10.     Upon information and belief, John Doe No. 1 is, and was at all relevant times, employed by the MPD as a duly appointed and sworn police officer.

11.     Upon information and belief, John Doe No. 2 is and was at all times relevant, a citizen of the United States and the State of Minnesota.

12.     Upon information and belief, John Doe No. 2 is, and was at all relevant times, employed by the MPD as a duly appointed and sworn police officer.

## FACTUAL ALLEGATIONS

**A. Defendants' use excessive force to illegally and unnecessarily restrain Moore pursuant to a routine traffic stop.**

13.     On December 7, 2019 at approximately 12:20 a.m., the Officers Partyka and Brandon Knuth were on patrol near Lowry Avenue North and Colfax Avenue North in Minneapolis.

14.     Moore was driving with one passenger between his home located at 2821 Colfax Ave. N. Minneapolis, Minnesota 55411 to his passenger's home located at 3306 Bryant Ave. N. Minneapolis, Minnesota, 55412. The distance between the homes is one half mile.

4

15.    In police report detailing the incident, Partyka and his partner Knuth claim to have observed Moore's vehicle stop at a stop sign and then belatedly signal a left turn. The officers then observed Moore park the vehicle. Partyka claims to have recognized Moore as a someone for whom there was an outstanding arrest warrant, when in fact no such warrant existed at the time.

16.    Knuth and Partyka nonetheless choose to conduct a suspicious vehicle stop. When the officers approached, Moore rolled down the window and had his hands on the wheel, demonstrating to the officers that nothing was in his hands.

17.    Knuth claimed to smell alcohol emanating from the vehicle and observe an open container he suspected to be alcohol, and he ordered Moore out of the vehicle.

18.    Moore then attempted to unfasten his seatbelt to get out of the car. As he did so, Knuth and Partyka accused Moore of reaching down towards the waistband area of his pants. Knuth ordered Moore to put his hands up, and Moore immediately complied.

19.    Although Moore promptly complied with their orders, the officers disregarded his compliance and rapidly screamed commands at Moore, including not to reach or they would tase him.

20.    At this point Partyka, and pulled out his taser, placed it against Moore's chest and told him that he would tase Moore if he did not put his hands up. Moore attempted to comply with the officer's commands and put his hands up multiple times.

21.    While this occurred, two more officers, Dirk Spee and Neal Walsh, had arrived on the scene. Spee, like Partyka, disregarded Moore's compliance and pulled his gun and pressed it against the back of Moore's head, although Partyka still had his taser

pressed to Moore's chest. Spee also applied various pressure point maneuvers and pulled on Moore's hair contorting Moore's neck.

22.    Moore was unable to move with the officers thus restraining him, and he froze. Partyka, Spee, and two other officers nonetheless chose to open the driver's side door and forcibly remove Moore from the vehicle. The officers pulled Moore from the vehicle and threw him to the ground.

23.    Immediately after Moore was thrown to the ground, Partyka delivered three or four elbow strikes to Moore's left shoulder area and then kneeled on Moore's torso. Spee then kneeled on Moore's legs. With Moore sprawled on the ground and the full weight of both Partyka and Spee on his back and legs, he was fully restrained and rendered almost completely unable to move any part of his body. A third officer, possibly Knuth, then also began kneeling on Moore's torso with Partyka.

24.    As a result of the haphazard and completely unnecessary and aggressive manner that the officers had thrown Moore to the ground, his right arm had become pinned underneath his body.

25.    The officers ordered Moore to remove his right hand from underneath his body. Moore attempted to comply with the officers' commands, but as was completely obvious to anyone and everyone at the time, he physically could not do so because the three officers on top of him.

26.    Purportedly in response to Moore's alleged "failure" to comply with the officers' impossible orders to remove his hand from underneath the weight of his own

body plus three other grown men, Walsh held down Moore's head against the pavement and subsequently delivered three powerful knee strikes to Moore's face.

27.     Walsh's knee strikes to Moore's head rendered Moore temporarily unconscious. While Moore was unconscious and thus completely immobilized, John Doe No. 1 pulled Moore *by the hair* and dragged him along the ground. The below photograph taken by the police at the scene demonstrates the severity of Moore's facial injuries:



28.　　The officers then handcuffed Moore, placed him under arrest, and conducted a search incident to arrest.

29.　　At this point Partyka entered Moore's vehicle and drove it several blocks away. The other officers followed with Moore detained in the back of one of the police vehicles. The officers then searched the interior of Moore's vehicle and conducted a body search of Moore.

30.　　No alcoholic beverage was found on Moore or in his vehicle.

31.　　No weapon was found on Moore or in his vehicle.

32.　　Officers not only searched the interior of Moore's vehicle but also opened several compartments including two areas that could only be accessed when the doors were open and the glove compartment as well as the trunk of Moore's vehicle.

33.　　The officers had no search warrant and therefore their only legal authority to search was to search incident to arrest.

34.　　The police eventually impounded Moore's vehicle and he had to pay several hundred dollars to get it back.

35.　　Moore was brought to a police chemical testing facility where Officer Justin Schmidt observed that Moore had several obvious injuries and both of Moore's eyes were nearly sworn shut to the point where Schmidt could not see Moore's pupils.

36.　　Moore tested as having a .00 blood alcohol content in the breathalyzer administered at the precinct. Schmidt did not find probable cause to conduct a blood draw for alcohol content despite Partyka's insistence.

37.    Partyka then took Moore to the Hennepin County Jail but was denied admission because of his injuries.

38.    Moore was then taken to Hennepin County Medical Center for evaluation and treatment of his facial injuries. After receiving first aid and treatment Moore was cleared from Hennepin County Medical center and booked in Hennepin County Jail for "Obstruction of the Legal Process," a misdemeanor offense that was later dismissed.

39.    Immediately upon leaving jail the next morning, Moore received treatment at North Memorial Health for his injuries, which consisted of a left eye nearly swollen shut, blurred vision in the swollen eye, nasal bone fractures, numerous painful abrasions on his face, left knee pain, back pain, and neck pain.

**B. Moore's excessive force complaints are ignored and by the police department.**

40.    On or about two days later, Moore went to the Fourth police precinct to file an excessive force complaint for the events of December 7, 2019.

41.    When he asked the officer attending the desk about how to submit an excessive force complaint, the officer handed Moore a blank sheet of printer paper and told to fill out his complaint.

42.    Moore wrote down his complaint which included specific complaints against Partyka and handed it back to the officer at the desk. He included his name, phone number, and address so that he could be contacted for further details corroborating the incident.

43.    No one from the police department ever contacted Moore in connection with his complaint.

44.     On or about a week after submitting the complaint, Moore called the precinct for an update. On or about one week after the phone call, Moore went back to the precinct to file another complaint.

45.     This time, Moore was handed a document that appeared to him to be an official complaint form. Moore filled out the document, including his name, phone number, address, and description of the incident and handed it back to the police.

46.     Once again, nobody from the department contacted him to investigate his complaint.

47.     On information and belief, both complaint forms were intentionally destroyed by the police before they were submitted for investigation.

**C.  Partyka illegally obtains a search warrant for Moore's residence.**

48.     At all times relevant to this complaint, Partyka was and had been a patrol officer. He was not and never had been an investigator or detective, and he was not assigned to any unit specifically tasked with investigating drug crimes.

49.     During Partyka's entire career prior to February 7, 2020, he had applied for just two search warrants, both of which were routine requests for blood draws pursuant to arrests for suspected DWI offenses.

50.     Yet, within weeks of Moore's two attempts to submit complaints in connection with the appalling use of excessive force by Defendants, including himself, Partyka began an "investigation" of Moore on February 7, 2020. In an apparent reflection of the level of professionalism with which Partyka approached the investigation, and

perhaps his job as a police officer, he titled the investigation file that he opened "Moore Money Moore Problems."

51.    On February 13, 2020, Partyka submitted an application for a search warrant.

52.    In the application, Partyka claimed to have received information from a "confidential reliable informant" that Moore had been dealing heroin and methamphetamines out of his home at 2821 Colfax, although the "information" did not include any dates, times, or description whatsoever of when the alleged drug sales had occurred.

53.    According to Partyka, the informant gave a vague description of Moore's body type and race, but he never positively identified a photograph of Moore.

54.    Probably not coincidentally, the height and weight description allegedly provided by the "informant" exactly matched the information on Moore's drivers' license, which Partyka had access to as a result of his arrest of Moore three months before.

55.    Partyka did not take any action to verify any of the information that he had allegedly received from the alleged informant, such as conducting surveillance of Moore's residence.

56.    Partyka then claims to have conducted a trash pull from a garbage can at Moore's duplex at 2821 Colfax.

57.    Partyka knew the address to be a duplex observed at the time of the trash pull that the house had two separate gas meters. As such, there were two garbage bins and one recycling bin located at the address. None of the bins were marked to indicate which unit the trash came from.

58.     In the search warrant application, Partyka claimed to have found two clear plastic baggies with white substance in one of the unmarked bins.

59.     Partyka later submitted baggies that he claimed were those that he found in one of the unmarked bins at Moore's residence for testing and the submitted baggies tested positive for methamphetamines. Partyka did not have the baggies tested for fingerprints or DNA.

60.     Partyka claims to have later conducted a second trash pull from a garbage can at 2821 Colfax.

61.     Partyka claimed in the warrant application that the second pull included a piece of paper that purportedly came from the sheriff's office with Moore's name on it as well as a one gallon resealable baggie that allegedly contained white powder and other plastic tear-off baggies.

62.     The document listing Moore's name was not an official county document but instead a printed copy from the jail roster which is publicly available information through a simple internet search.

63.     In his search warrant application Partyka described the document as paperwork from the sheriff's office addressed to Moore.

64.     In addition to the document and baggies, the evidence bag from the second trash pull also contained a letter addressed to "Jennifer Johnson" at the same 2821 Colfax Avenue North address. Partyka omitted from the search warrant application the fact that the trash bin that he claims to have searched contained mail addressed to another person at Moore's address.

39738091.4

65.     Partyka did not submit any of the baggies from the second alleged trash pull for testing of any kind.

66.     A Hennepin County judge issued a search warrant of 2821 Colfax Ave. N. based on Partyka's representations described above.

67.     Police conducted a search pursuant to the warrant on February 13, 2020.

68.     In connection with the search, Moore was arrested and subsequently charged with violating Minnesota Statute Sections 152.021.2b(1) and 624.713.1(2). Moore did not have the means to obtain a bond to post bail, and he was therefore incarcerated at the Hennepin County Jail for the next seven months while he attempted to challenge validity of the search and defend himself from the charges.

**D. Charges Dismissed because of Illegal Search and Seizure.**

69.     After Moore had been incarcerated for several months, his public defender succeeded in bringing a motion to challenge the validity of the search warrant based on the fact that several important pieces of information were omitted or misrepresented by Partyka from the application for search warrant, including his failure to take steps to determine which trash bin belonged to the duplex unit occupied by Moore, his inaccurate description of the allegedly official sheriff's office document, and his failure to disclose that mail addressed to another person was allegedly found in the second trash pull.

70.     Judge Paul Scoggin presided over the suppression hearing, where Partyka was questioned about the evidence that supported the warrant and its provenance.

71.     Partyka admitted under oath that the baggies that he had allegedly found at the second trash pull had nothing in them at all, though the application for the warrant states

13

that they contained "white powder." Partyka had no explanation for the apparent misrepresentation in response to Judge Scoggin's questions about the discrepancy.

72.     Judge Scoggin also ordered Partyka to submit the confidential file on Partyka's alleged informant that Partyka was required to maintain according to the department's standard procedures to his office for in camera review and verification of the Partyka's claim that the informant was a confidential reliable source of actionable information.

73.     Partyka did not deliver the requested file to Judge Scoggin.

74.     On information and belief, Partyka could not deliver the file because no such informant exists.

75.     Based on Partyka's multiple material misrepresentations and omissions in the warrant application, Judge Scoggin held that no probable cause existed for the warrant and that the search was conducted in in violation of Moore's Fourth Amendment rights.

76.     In so holding, the Court wrote that Partyka's description of white powder in the baggies of the second trash pull was "made in reckless disregard for the truth" and that Partyka had no explanation for why his warrant application alleged that the bags contained powder when they in fact did not.

77.     The Court further stated that Partyka's decision to include these false facts in his warrant application was "a material misrepresentation and, at a minimum, a reckless disregard for truth."

78.     The Court also made specific comment on Partyka's diminished credibility after the suppression hearing. In addition to the misrepresentation about the nonexistent

white powder, the judge also noted that Partyka made other incredible statements at the hearing, including Partyka's estimate that he was personally responsible for the seizure of fifty illegal firearms in Minneapolis in 2020, which number represented approximately 40% of the firearms seized in the fourth precinct that year.

79.    The Court determined that if the information about the white powder from the second trash pull had not been included in the warrant application, the application would have lacked probable cause to support a warrant.

80.    Because there was no probable cause for the warrant the Court ordered that the evidence that was allegedly obtained pursuant to the search of Moore's residence be thrown out.

81.    The charges against Moore were subsequently dismissed because there was no evidence to support them, and Moore was released from jail after having over seven months in jail.

**COUNT I**
**43 U.S.C. § 1983**
**Excessive Force**
**Against Walsh**

82.    Moore incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

83.    Moore's civil rights were violated when Walsh used excessive force after Moore was already immobilized. 42 U.S.C. § 1983.

84.    "By the plain terms of § 1983, two – and only two – allegations are required in order to state a cause of action under that statute. First, the plaintiff must allege that some

person has deprived him of a federal right. Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law." *Gomez v. Toledo*, 446 U.S. 635, 640 (1980).

85.     Walsh acted under the color of law, in uniform under the authority of the City of Minneapolis, when he delivered multiple knee strikes to Moore's face and head.

86.     Walsh arrived at the scene after Partyka and Knuth commenced an altercation with Moore, who was complying with the officers' commands.

87.     At the time that Walsh was involved in restraining Moore, three officers were kneeling on top of Moore with their full body weight.

88.     Nonetheless, Walsh delivered multiple knee strikes to Moore's head while he was lying on the ground immobilized.

89.     Walsh's actions were unnecessarily excessive and brutal for the situation at hand.

90.     Under the circumstances, a reasonable officer would not have delivered head strikes to an immobilized person.

91.     The conduct by officer Walsh constituted excessive force in violation of the Fourth Amendment of the United States Constitution.

92.     Walsh's conduct caused severe physical harm to Moore's head and face, including a broken nose and bruising that caused severe swelling.

93.     Moore also suffered emotional harm as a result of Walsh's conduct.

94.     Moore is entitled to compensatory damages for his injuries in an amount to be proven at trial in excess of $75,000.

16

95.    Moore is entitled to punitive damages for Walsh's conduct as it was cone with willful malice or with reckless or careless indifference to Moore's constitutional rights. *See Smith v. Wade*, 461 U.S. 30, 56 (1983).

96.    Moore is entitled to reasonable attorney's fees for the vindication of his rights. 42 U.S.C. § 1988(b).

## COUNT II
## 43 U.S.C. § 1983
## Excessive Force
## Against John Doe No. 1

97.    Moore incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

98.    Moore's civil rights were violated when John Doe No. 1 used excessive force after Moore was already immobilized. 42 U.S.C. § 1983.

99.    Walsh and John Doe No. 1 acted under the color of law, in uniform under the authority of the City of Minneapolis, when he dragged Moore along the ground by his hair.

100.    John Doe No. 1 arrived at the scene after Partyka and Knuth commenced an altercation with Moore, who was complying with the officers' commands.

101.    By the time John Doe No. 1 was involved in restraining Moore, he had been effectively immobilized as a result of the force applied by other officers, including but not limited to the knee strikes to the face and head delivered by Walsh.

102.    Nonetheless, John Doe No. 1 grabbed Moore by the hair and dragged him along the ground.

39738091.4

103.    John Doe No. 1's conduct in dragging Moore by the hair served no legitimate law enforcement purpose whatsoever, and were unnecessarily excessive and brutal for the situation at hand.

104.    Under the circumstances, a reasonable officer would not have grabbed an immobilized person by the hair and dragged him along the ground.

105.    The conduct by John Doe No. 1 constituted excessive force in violation of the Fourth Amendment of the United States Constitution.

106.    John Doe No. 1's conduct caused severe physical harm to Moore's head and face, including a broken nose and bruising that caused severe swelling.

107.    Moore also suffered emotional harm as a result of John Doe No. 1's conduct.

108.    Moore is entitled to compensatory damages for his injuries in an amount to be proven at trial in excess of $75,000.

109.    Moore is entitled to punitive damages for John Doe No. 1's conduct as it was done with willful malice or with reckless or careless indifference to Moore's constitutional rights. *See Smith*, 461 U.S. 30 at 56.

110.    Moore is entitled to reasonable attorney's fees for the vindication of his rights. 42 U.S.C. § 1988(b).

**COUNT III**
**43 U.S.C. § 1983**
**Illegal Search of the Trunk of Moore's Vehicle**
**Against All Defendants**

111.    Moore incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

39738091.4

112.    After Moore was in the custody of the police, the officers drove Moore's vehicle to new location stating that the area of the arrest had become hostile because of local citizens coming out of their homes and voicing concern.

113.    Several officers, including Defendants continued a search incident to arrest of the interior of Moore's vehicle for alleged weapons or alcohol.

114.    No weapons or alcohol were found within the vehicle.

115.    Partyka and John Doe No. 2 continued to search within closed compartments of the vehicle including the glove compartment, heater ducts and door panels that could only be accessed when the passenger or driver doors were open, and the trunk.

116.    The searches of these closed areas extended beyond the legal search incident to arrest of the interior of Moore's vehicle.

117.    Moore had no ability to open closed compartments, particularly the trunk, in order to stash weapons or contraband.

118.    Moore was in custody at the time of the search and there can be no reasonable justification to say the officers were in danger if they did not immediately search the closed compartments without a warrant.

119.    The officers did not have probable cause to search closed areas for evidence of a crime.

120.    The search cannot reasonably be considered an inventory search nor fall under community caretaking which must be "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 252, 2528 (1973).

39738091.4

121.    The officers were in search of evidence to support their unfounded claims that Moore had a weapon rather than taking any administerial inventory of the vehicle's contents.

122.    The vehicle was not impounded in any traditional sense for the police to conduct a standardized inventory procedure.

123.    The fact that Partyka drove Moore's vehicle to a new location without checking the odometer or gas tank demonstrates that the officers had no concern for protecting Moore's property or protect themselves from disputes over lost or damaged further demonstrates that the search was not an inventory search.

124.    At the new location one officer remarked that they needed to search Moore's person again to see if he had a weapon.

125.    When officers act "in bad faith or for the sole purpose of investigation," an inventory search is invalid. *Colorado v. Bertine*, 479 U.S. 367, 373, 107 S. Ct. 738(1987)

126.    Any purported inventory search was simply "a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4, 110 S. Ct. 1632 (1990).

127.    The warrantless search, without any other justification, of the closed compartments of Moore's vehicle were in violation of the Fourth Amendment.

128.    Even assuming the car was legitimately impounded for the purposes of an inventory search, the warrantless search of heater ducts and door panels was pers se unreasonable and in violation of the Fourth Amendment.

129.    Partyka and John Doe No. 2 conducted their illegal search under the color of state law while in uniform and on behalf of the Minneapolis Police Department.

130.    Moore is entitled to nominal damages for the violation of his Fourth Amendment rights by Partyka and John Doe No. 2. *Carey v. Piphus*, 435 U.S. 247, 266–67 (1978).

131.    Moore is entitled to punitive damages for the illegal search was conducted with willful malice or with reckless or careless indifference to Moore's constitutional rights.

132.    Moore is entitled reasonable attorney's fees for the vindication of his rights.

**COUNT IV**
**43 U.S.C. § 1983**
**Illegal Search of Moore's Home**
**Against Partyka**

133.    Moore incorporates and re-alleges all preceding paragraphs as though fully pleaded herein

134.    Partyka's investigation of Moore including his application for search warrant were conducted under the color of state law on behalf of the Minneapolis Police Department.

135.    Partyka's omissions and misrepresentation in his application for search warrant were made in reckless disregard for the truth.

136.    Partyka's reckless actions directly led to a judge granting a warrant that lacked probable cause in violation of Moore's Fourth Amendment rights. *Franks v. Delaware*, 438 U.S. 154, 172 (1978).

39738091.4

137.   As a result of the illegal search, Moore was arrested without grounds and incarcerated in the Hennepin County Jail for over seven months.

138.   Moore suffered emotional harm during his incarceration.

139.   Moore is entitled to compensatory damages for his injuries in an amount to be proven at trial in excess of $75,000.

140.   Moore is entitled to punitive damages because Partyka's omissions and misrepresentations were conducted with willful malice or with reckless or careless indifference to Moore's constitutional rights.

141.   Moore is entitled to reasonable attorney's fees for the vindication of his rights.

**PLAINTIFF DEMANDS A JURY TRIAL FOR ALL ISSUES OF FACT HEREIN.**

PRAYER FOR RELIEF

WHEREFORE, Plaintiff Andre Moore prays for judgment against Defendants as follows:

1. As to Count I, a money judgment against Defendant Neal Walsh for compensatory and punitive damages together with costs and disbursements, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest.

2. As to Count II, a money judgment against Defendant John Doe No. 1 for compensatory and punitive damages together with costs and disbursements,

39738091.4

including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest.

3. As to Count III, a money judgment against Defendants Tony Partyka and John Doe No. 2 for nominal and punitive damages together with costs and disbursements, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest.

4. As to Count III, a money judgement against Defendant Tony Partyka compensatory and punitive damages together with costs and disbursements, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest.

Dated:  May 27, 2022

**SAUL EWING ARNSTEIN & LEHR LLP**

By:   _s/  Matthew Veenstra_
Matthew Veenstra (MN #0392517)
Courtland Merrill (MN #0311984)
Douglas Anderson (MN #0402494)
33 South Sixth Street, Suite 4750
Minneapolis, MN  55402
Telephone:  (612) 225-2800
matthew.veenstra@saul.com
courtland.merrill@saul.com
douglas.anderson@saul.com

*Attorneys for Plaintiff*