## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Andre Moore,

      Plaintiff,

v.

Officer Tony Partyka, in his individual
capacity, Officer Neal Walsh, in his
individual capacity, Officer John Doe
No. 1, in his individual capacity, and
Officer John Doe No. 2, in his individual
capacity, and the City of Minneapolis,

      Defendants.

Senior Judge Paul A. Magnuson
Civil File No. 22-cv-1477-PAM/TNL

**AMENDED COMPLAINT**

**Jury Trial Demanded**

## INTRODUCTION

This complaint arises out of multiple civil rights violations in December 2019 and February 2020 against Plaintiff Andre Moore by four Minneapolis Police officers, Tony Partyka, Neal Walsh, and two other officers whose identity has not yet been verified and who are referred to herein as John Doe No. 1 and John Doe No. 2 (collectively, with Partyka and Walsh, the "Officer Defendants"). The Officer Defendants needlessly beat Moore at a traffic stop—breaking his nose among other injuries—then fabricated and/or misrepresented evidence to falsely obtain a search warrant for his house as retribution when Moore attempted to lodge misconduct complaints against them.

The Officer Defendants' shocking conduct was caused and facilitated by Defendant City of Minneapolis and the Minneapolis Police Department ("MPD," and together with

1

the Officer Defendants, "Defendants"). The state of Minnesota's Department of Human Rights has found that MPD "teaches a paramilitary culture" to its officers that "emphasizes aggression" and "creates circumstances that lead to race-based policing" and further causes "MPD officers to unnecessarily use higher levels of force and unnecessarily escalate incidents."

Worse, MPD's leaders knowingly tolerate this misconduct, which is pervasive throughout the department, and have adopted a de facto policy of shielding officers accused of excessive force and other serious misconduct from actual discipline and covering up the problem by failing to properly investigate complaints and failing to appropriately discipline and retrain problem officers in blatant disregard of MPD's own written policies. MPD's deficient training and custom of tolerating excessive force were a direct cause of the Officer Defendants' conduct and Andre Moore's injuries.

The Officer Defendants violated Moore's civil rights—for the first time—by unnecessarily and recklessly using excessive force to pull Moore from his vehicle, throw him to the ground, deliver multiple knee and elbow strikes to his face and body, and then pull him by his hair along the ground although Moore had followed Defendants' instructions and had not made any sudden or threatening movements of any kind. This egregious conduct occurred pursuant to a so-called "traffic stop" that in fact took place in front of Moore's friend's home when Moore had parked there after having driven just blocks from his home. As a result of Defendants' unlawful and excessive force, Moore suffered a broken nose and multiple cuts, bruises, and abrasions to his face and body, among other injuries.

2

Moore was likely lucky to have survived his encounter with Walsh, the officer whose needless use of excessive force was the most flagrant among all of the Officer Defendants. In November 2018, Walsh responded to a "non-emergency" welfare check on Travis Jordan, whose friend had reported to police that he was emotionally disturbed and suicidal. At the scene, Jordan appeared on the front porch of the property holding a knife and walked toward Walsh. According to a civil lawsuit filed by Jordan's mother, Walsh shot Jordan three times as he "slowly walked toward Walsh with his arms at his side." After Jordan fell to the ground and dropped the knife, Walsh then "lowered his weapon and fired *four more shots* at Jordan, who was lying in the snow unarmed." Walsh had seven complaints filed against him in three years as an MPD officer, including the killing of Travis Jordan, but has never been disciplined by MPD.

Officer Partyka violated Moore's civil rights again three months later as retribution for Moore's complaints to the Minneapolis police department about Defendants' appalling conduct. In a premediated act of revenge, Partyka fabricated and/or misrepresented evidence to a Hennepin County judge in order to falsely obtain a search warrant for Moore's residence. Partyka, a beat cop who had absolutely no prior experience doing investigations of any kind, obtained the warrant by falsely telling the judge that he had found baggies containing drugs in a trash bin outside Moore's residence and that a so-called confidential and reliable source had observed Moore selling drugs at the property. The warrant was later thrown out when it turned out that the baggies were in fact completely empty and had no trace of drugs and Partyka had no explanation for why his application for search warrant stated that the baggies contained a powdery substance.

Unfortunately for Moore, the warrant was only quashed after he had unjustly been forced to spend over seven months in jail when he was arrested after the illegal search of his residence. Partyka had eleven complaints filed against him from 2018 through 2021, but has never been disciplined by MPD.

This action is for money damages brought pursuant to 42 U.S.C. § 1983 to redress the deprivation of Moore's civil rights by Defendants, while they were acting under the color of state law. Defendants shocking and egregious conduct violated Moore's rights under the Fourth Amendment of the United States Constitution to be free from unreasonable searches and unnecessary and senseless violence at the hands of peace officers.

### JURISDICTION AND VENUE

1.      This Court has jurisdiction over federal questions pursuant to 28 U.S.C. § 1331, and specifically has jurisdiction over civil actions to redress the deprivation of any right secured by the United States Constitution or Act of Congress guaranteeing equal rights including claims under 42 U.S.C §§ 1983 and 1988. See 28 U.S.C. § 1343.

2.      The action arises under the United States Constitution as applied to state and local authorities through 42 U.S.C. § 1983.

3.      This Court is a proper venue pursuant to 28 U.S.C. §1391(b) because all of the events giving rise to the action occurred within the District of Minnesota and all of the parties reside in the District of Minnesota.

## THE PARTIES

4.      Andre Moore is, and has been at all time relevant hereto, a citizen of the United States and the State of Minnesota, residing in Minneapolis within Hennepin County. He was 48 and 49 years old respectively at the time of the incidents described in this Complaint.

5.      Upon information and belief, Tony Partyka is, and was at all times material relevant to the case, a citizen of the United States and the State of Minnesota.

6.      Upon information and belief, Partyka is, and was at all relevant times, employed by the Minneapolis Police Department ("MPD") as a duly appointed and sworn police officer.

7.      Upon information and belief, Neal Walsh is, and was at all times material relevant to the case, a citizen of the United States and the State of Minnesota.

8.      Upon information and belief, Walsh is, and was at all relevant times, employed by the MPD as a duly appointed and sworn police officer.

9.      Upon information and belief, John Doe No. 1 is and was at all times relevant, a citizen of the United States and the State of Minnesota.

10.      Upon information and belief, John Doe No. 1 is, and was at all relevant times, employed by the MPD as a duly appointed and sworn police officer.

11.      Upon information and belief, John Doe No. 2 is and was at all times relevant, a citizen of the United States and the State of Minnesota.

12.      Upon information and belief, John Doe No. 2 is, and was at all relevant times, employed by the MPD as a duly appointed and sworn police officer.

5

13.     Minneapolis is and was at all times material hereto a political subdivision of the State of Minnesota, organized and existing under and by virtue of the laws of Minnesota.

14.     MPD is and was at all times material hereto a Minneapolis agency, providing the vehicle through which the City fulfills its policing functions.

## FACTUAL ALLEGATIONS

*MPD's Paramilitary Culture and Race-Based Policing*

**A.     MPD's "warrior training" "emphasizes aggression," "creates circumstances that lead to race-based policing" and causes "MPD officers to unnecessarily use higher levels of force and unnecessarily escalate incidents."**

15.     The Minneapolis Police Department has a well-documented pattern and practice of failing to appropriately train its officers on the use of force and failing to discipline officers accused of or found to have committed excessive force violations in accordance with its own written policies.

16.     On April 27, 2022, the Minnesota Department of Human Rights released a report of its findings pursuant to its investigation of MPD following the murder of George

Floyd by MPD officer Derek Chauvin in May 2020 (the "Human Rights Report" or the "Report" attached hereto as **Exhibit 1**).

17.     The Human Rights Department found that in 56.8% of use of force cases, MPD officers fail to de-escalate when it would otherwise by appropriate to do so, and MPD officers in fact improperly escalate situations in 32.7% of cases. (Ex. 1 at 45.)

18.     The upshot, according to the Report, is that MPD officers "used unnecessary and inappropriate levels of force in 28.6% of incidents in which they recorded using force." (*Id.* at 46.)

**1.     MPD continued to implement "warrior-style training" after it was ostensibly banned in 2019.**

19.     The Human Rights Department found that "MPD does not provide its officers with appropriate, timely, or adequate in-service training on important policies and policing practices, including use of force policies." (*Id.* at 41.) For example, the MPD "provided no substantive training to officers about the new policy, which prohibited neck restrains and chokeholds," even though the policy had been in effect for over a year. (*Id.*)

20.     MPD's training on the use of force is not merely deficient because it is "insufficient and sometimes non-existent." Worse, "MPD's trainings establish a warrior mindset with officers from their very first day as new MPD officer hires." (*Id.* at 40.)

21.     While the city purportedly "banned official warrior style training in 2019," "much of MPD's current trainings continue to embed this warrior mindset." (*Id.*) "By teaching an approach to policing that emphasizes aggression, MPD creates a culture that results in unnecessary escalation and/or excessive force during encounters." (*Id.* at 44.)

2.     **MPD fails to train its supervisors and knowingly uses field trainers with a history of using excessive force—including Derek Chauvin.**

22.     MPD's failure to train its officers is systemic and extends to on-the-job field training of recruits and junior officers, inadequate and/or nonexistent training of supervisors, and senior leadership's deliberate failure to take any action rectify these known and serious problems.

23.     The Human Rights Department found that "the training MPD offers supervisors lacks substantive instruction on key skills such as mentoring, coaching, and assessing officers' performance. One lieutenant explained that they believe most of the problems at MPD stem from poor and inconsistent training for supervisors." (*Id.* at 42.)

24.     Rookie officers who just graduated from MPD's Academy are paired with veteran field training officers for on-the-ground training. The Human Rights Report states that "MPD field trainers have a lasting impact on rookie officers. Their role in setting the overall tone for MPD culture and accepted policing practices in Minneapolis cannot be overstated." (*Id.* at 43.) "If a field training officer uses unauthorized force or otherwise exhibits police misconduct while they are training a rookie officer, then they are training that rookie officer that using unauthorized force is, in fact, acceptable and even expected." (*Id.*)

25.     Yet, "MPD does not routinely offer any ongoing or continuing training for officers who serve as field trainers. In fact, according to its training records, MPD last offered the field training officer refresher class in 2015."  (*Id.* at 44.)

26.     Worse, MPD continues to use officers as field trainers even after the Police Chief has sustained findings of excessive force against them. (*Id.*) Local news outlet Kare 11 has reported that "of the more than 400 Minneapolis cops who have served as FTOs since 2016, nearly a third of them have been disciplined or named in lawsuits that have cost taxpayers more than $34 million."[1]

27.     The most famous and tragic example is MPD's failure to adequately discipline, or terminate, field trainer Derek Chauvin despite his having 22 complaints lodged against him—including at least eight for alleged excessive force—before Chauvin murdered George Floyd in May 2020 by kneeling on his neck for eight minutes while ignoring Floyd's repeated pleas that he could not breathe.

28.     All but one of the 22 complaints against Chauvin were "Closed with No Discipline" according to his MPD Internal Affairs Public Summary.[2] Among the the complaints was an incident in September 2017 when Chauvin allegedly used excessive force to detain and arrest a 14 year old boy. Chauvin admitted in a written report "delivering strikes" to the boy before "applying a neck restraint."[3] According to a filing by the state in

---

[1]     *Kare11 Investigates: Nearly 150 MPD cops with misconduct history served as trainers*, KARE11 (February 24, 2020) https://www.kare11.com/article/news/investigations/kare-11-investigates-nearly-150-mpd-cops-with-misconduct-history-served-as-trainers/89-29969f7%E2%80%A6

[2]     MPD Internal Affairs Public Summary for Derek Chauvin (attached hereto as **Exhibit 2**).

[3]     State's Supplemental Memorandum of Law in Support of Other Evidence (attached hereto as **Exhibit 3**) at 2.

Chauvin's criminal trial, body camera footage of the incident reveals "a far more violent and forceful treatment of the child than Chauvin described in his report." (Ex. 3 at 3.)

29.     Specifically, Chauvin grabbed the boy, pushed him up against a wall, and hit him with his flashlight eight seconds later when he didn't immediately comply with an order to get on his stomach. (*Id.*) Two seconds after that, Chauvin grabbed the boy's throat and hit him again with his flashlight, this time in the head. (*Id.*) The boy then told Chauvin he was being hurt called out "mom." (*Id.* at 3-4.) Chauvin ordered his partner to tase the boy, and then "applied a neck restraint, causing the child to lose consciousness and go to the ground." (*Id.* at 4.) Chauvin then handcuffed the boy and kneeled on his back for over 17 minutes while the boy alternately cried and complained that he his neck hurt and he couldn't breathe. (*Id.* at 4–5.)

30.     Notwithstanding that Chauvin used apparently egregiously excessive force on a 14 year-old boy and that his written description of the incident was apparently obviously false in light of the body camera footage, Chauvin not only remained on the force but he continued to be a field trainer. Indeed, Chauvin was acting in that capacity as he knelt on Floyd's neck and directed two trainees, Thomas Lane and Alexander Keung, to also kneel on Floyd's back and legs while he suffocated to death.

31.     Chauvin himself was trained in warrior-style "policing" by his own supervisors in the field. An article in the Minnesota Reformer reports that according to MPD records, in 2002, while Chauvin was still a recruit, he helped arrest three Black men suspected of burglary. One of the men started swearing at Chauvin, so the senior officer, Bill Palmer, hit the brakes, causing one suspect to slam his head into the back of the

partition. The man was treated at the hospital and then released after they learned he wasn't

involved in the burglary.[4]

### 3. MPD's field training program furthers a pattern of race-based policing and causes "MPD officers to use higher rates of more severe force against Black individuals compared to white individuals in similar circumstances."

32.     The Human Rights Department found that "MPD's insufficient and

sometimes non-existent policy guidance and  trainings create circumstances that lead to

race-based policing." (Ex. 1 at 46.)

33.     The Report cites the following example:

[I]n one case in 2020, a field training officer allowed the trainee to complete a search of an intoxicated Black woman, who did not have any weapons in her possession. In contrast, two hours later, the same filed training officer and trainee interacted with an intoxicated white man who disclosed having a knife in his bag. The trainer instructed the trainee to forego a search, saying 'I just didn't want you to waste your time.'

(*Id*. at 43.)

34.     The Human Rights Department found that "MPD officers use higher rates of

more severe force against Black individuals than white individuals in similar

circumstances." (*Id*. at 12.) Among the specific findings in the Report are that:

- MPD's data shows that between January 1, 2010 to December 31, 2020, 63% of all use of force incidents that MPD recorded were against Black individuals, although Black individuals comprise only 19% of the Minneapolis population (*Id*. at 11);

- Review of MPD officers' body worn camera footage confirms many instances where MPD officers used neck restraints against Black individuals, including

---

[4]     MINNESOTA REFORMER (Dec. 15, 2020) https://minnesotareformer.com/2020/12/15/the-bad-cops-how-minneapolis-protects-its-worst-police-officers-until-its-too-late/

Black youth under 18 years old, when it was objectively unnecessary to use such force (*Id*. at 13);

- When neck restraints were permitted under MPD policy, MPD officers were almost twice as likely to use neck restraints against Black individuals than white individuals whom MPD officers recorded as behaving in the same way when interacting with police (*Id*. at 12);

- MPD officers are more likely to use soft tactics on white individuals than Black individuals in similar circumstances (*Id*. at 18);

- MPD maintains a culture where MPD officers consistently use racist, misogynistic, and disrespectful language and are rarely held accountable (*Id*. at 38);

- During Academy training, some trainers rely on racist tropes to impersonate Black community members as part of scenario-based training and other trainers used racist or sexist tropes. (*Id*. at 41.)

35.    Having conducted analysis and review of use of force files and body worn camera footage the Report's stark conclusion is: "*race is the likely reason that MPD officers use higher rates of more severe force against Black individuals compared to white individuals in similar circumstances*. (*Id*. at 12.)

**B.    MPD's leadership knowingly tolerates the pervasive use of excessive force.**

36.    MPD leadership reinforces the overly aggressive warrior/paramilitary culture among its officers by failing to investigate complaints of officer misconduct and disregarding to its own written disciplinary policies to shield problem officers from consequences for serious misconduct, including the pervasive use of excessive force—the brunt of which is inflicted on members of the Minneapolis Black community.

1.    "**MPD does not appropriately and consistently hold officers accountable for police misconduct.**"

37.    Complaints against officers are supposed to be investigated either by MPD's Internal Affairs Department or by the Office of Police Conduct Review. Neither entity is remotely effective, as the Human Rights Department concluded:

> Police misconduct complaints that originate in either Internal Affairs or OPCR are inadequately investigated. As a result, officers who have engaged in misconduct are often not appropriately disciplined.

(*Id.* at 53.)

38.    According to the Report, OPCR improperly investigates approximately 50% of police misconduct complaints, and Internal Affairs improperly investigates approximately 25% of police misconduct complaints. (*Id.* at 54.)

39.    These figures certainly underestimate the extent of MPD's failure to investigate complaints, because they do not account for cases where members of the public attempt lodge formal complaints directly with MPD who are stonewalled and whose complaint forms are simply thrown into the garbage by precinct desk officers, something that, as described further below, happened to Andre Moore.

40.    Moreover, officers who witness misconduct by other officers "hesitate to, and often simply do not report problematic officers because they do not believe in the efficacy of the City's and MPD's accountability systems and fear retaliation if they report" the officer. (*Id.* at 42.)

41.    Further, unauthorized use of force misconduct is routinely not referred for investigation to Internal Affairs even when observed by supervising officers. The Human

Rights Department found that "based on a review of a statistically representative sample of 300 MPD use of force files from January 1, 210 to December 31, 2020, supervisors failed to complete a thorough and sufficient review of an officer's use of force in 48.2% of cases, notwithstanding that in 23.9% of the files there was "evidence in the file that contradicts or disputes the information that an officer recorded in their use of force report." (*Id*.)

42.     The Human Rights Department's bleak conclusions are that "[n]o meaningful independent review process exists for assessing MPD officer's conduct" and that "MPD does not appropriately and consistently hold officers accountable for police misconduct." (*Id*. at 50 & 56.)

43.     On information and belief, the failure to investigate complaints and appropriately discipline officers is the result of MPD leadership's tacit acceptance and/or willful blindness to the pervasive use of excessive force by MPD officers.

**2.      MPD deliberately disregards its own disciplinary policies and uses allegedly non-disciplinary "coaching" to shield problem officers.**

44.     Rule 11 of the Minneapolis Civil Service Commission Rules govern MPD's disciplinary policies. CSC Rules § 11.01. The rule establishes five levels of discipline: warning, written reprimand, suspension, demotion, and discharge. *Id*. The levels of discipline are to be "normally administered progressively in the [above] order." *Id*.

45.     Until December 31, 2020, Section 5-101.02 of MPD's Policy Manual stated that "[a]ny member of the Department who violates the code of conduct is subject to

discipline."[5] Until the same time, the Policy Manual also included Section 5-102.01, which delineated disciplinary categories ranging in severity from "A," the least serious, to "D," the most severe. (Ex. 4 § 5-102.01.) The discipline matrix in MPD's current Policy Manual (attached hereto as **Exhibit 5)** prescribes various forms discipline as the baseline consequence for all violations at the B level and above.

46.     On those occasions where complaints of misconduct are sustained after investigation, MPD regularly fails to discipline officers in accordance with the Policy Manual and CSC Rule 11. Instead, MPD instituted a policy of liberally using informal "coaching" of officers to shield them from formal disciplinary measures that have a meaningful impact on the officer's career.

47.     While MPD has always treated coaching as "a nondisciplinary corrective action" that is allegedly only used in cases of A-level misconduct,[6] in fact the coaching process is identical to a "warning" under by Civil Service Commission Rule 11 and is therefore a disciplinary action by definition.

48.     On information and belief, MPD has intentionally wrongly treated coaching as "nondisciplinary" because records of the discipline do not become public records under

---

[5]     Prior MPD Policy Manual (relevant excerpts attached hereto as **Exhibit 4**) at § 5-101.02.
[6]     At a meeting of the Police Conduct Oversight Commission on May 11, 2021, MPD Deputy Chief Amelia Huffman and Assistant City Attorney Trina Chernos both claimed that only A-level violations are eligible for coaching. City of Minneapolis, May 11, 2021 Police Conduct Oversight Commission, YOUTUBE (May 14, 2021), https://www.youtube.com/watch?v=OxvCq_aGles.

the Minnesota Government Data Practices Act, pursuant to which "the final disposition of any disciplinary action" is public government data. Minn. Stat. § 13.43, subd. 2(a)(5).

49.     Indeed this allegation was been publicly leveled by whistleblower and former MPD lieutenant Rich Jackson in an interview on PBS Frontline in June 2022. Jackson stated that "coaching can be used to shield a 'problem' officer that has a proven record of policy violations."[7] Jackson also stated that he was retaliated against and ostracized by other officers when he reported to Internal Affairs the serious misconduct of an officer that had been covered up by MPD via use of coaching. *Id*.

50.     Jordan Sparks, a member of the City's Police Conduct Oversight Commission, echoed those concerns to the to the Star Tribune, stating that he "worries that police are abusing the practice of coaching to keep some cases away from the public."[8]

51.     Sparks' concerns are based on having personally "seen multiple complaints where . . . policy violations are upheld after an investigation, but police appear to ignore the appropriate procedure and send the case to coaching in lieu of formal discipline." (*Id.*)

52.     Available Police Conduct Oversight Commission records substantiate Jackson and Sparks' statements and show that, contrary to its written own disciplinary

---

[7]     FRONTLINE PBS (June 2, 2022) https://www.youtube.com/watch?v=b0Nlzsthp3g "Former MPD Lieutenant Reported Another Cop. He Says He Paid a Price."

[8]     Andy Mannix, STAR TRIBUNE (January 18, 2021) https://www.startribune.com/police-watchdog-group-says-minneapolis-uses-legal-loophole-to-keep-police-misconduct-from-the-public/600012076/?refresh=true

matrix, MPD liberally uses coaching instead of formal discipline even after finding serious violations of MPD policy that are classified as B-, C-, and D-level violations.[9]

53.     Further, former MPD Chief Medaria Arradondo—who was Chief at all times relevant to this lawsuit—routinely downgraded sustained policy violations of B-level and above to the A-level in order to impose coaching, or simply disregarded MPD policy and approved coaching for such violations. (*See* Ex. 6 at rows 10 & 14.) Out of 136 cases where a recommendation was made to the Chief of Police that formal discipline be imposed from the beginning of 2013 through the end of the first quarter of 2021, the Chief overruled the recommendation and sent 48 of the cases to coaching.[10]

54.     The result of MPD's failures to investigate and appropriately discipline officers in response to complaints is that only 1.5% of the 2,013 complaints against MPD officers resulted in suspensions, terminations, or demotions between 2013 and 2019, according to a June 2020 analysis of OPCR data by CNN.[11]

**3.     MPD attempted to cover up its improper coaching practices by rewriting the Policy Manual.**

55.     MPD's use of coaching began to be publicly scrutinized in the wake of George Floyd's murder. Instead of complying with its Policy Manual, acknowledging the

---

[9]     PCOC incident data spreadsheet (attached hereto as **Exhibit 6**) at rows 2, 6 & 15 (detailing B- and C-level violations where coaching was the only corrective action taken.

[10]    OPCR Portal, "Coaching," https://tableau.minneapolismn.gov/views/OPCR RevisedD

[11]    CNN *Minneapolis police are rarely disciplined for complaints, records show* (June 12, 2020) https://www.cnn.com/2020/06/11/us/minneapolis-police-discipline-invs/index.html.

that coaching is in fact a warning that constitutes "discipline" pursuant to Civil Service Commission Rule 11 and making coaching records public as required under Minnesota Government Data Practices Act, MPD chose to rewrite the Policy Manual in a blatant attempt to retroactively align its written policies with its improper concealment of the records.

56.     On December 31, 2020, MPD removed Section 5-101.02 of MPD's Policy Manual, which had provided that "[a]ny member of the Department who violates the code of conduct is subject to discipline."[12] MPD also removed Section 1-102.01, which section delineated code violations from A- to D-level. (*Id.*)

57.     MPD replaced Sections 5-101.02 and 1-102.01 with a new Section 2-112. (*Compare* Ex. 4 *with* Ex. 5.) Under this new section, the Chief of Police is no longer required to discipline officers who violate the code of conduct. (*Id.* § 2-112.)  The section also contains a new provision that expressly defines coaching as "non-disciplinary." (*Id.*)

---

[12]     Current MPD Policy Manual (attached hereto as **Exhibit 7**).

18

*Andre Moore's Victimization at the Hands of the Officer Defendants*

**C.      The Officer Defendants use excessive force to illegally and unnecessarily restrain Moore pursuant to a routine traffic stop.**

58.      On December 7, 2019 at approximately 12:20 a.m., the Officers Partyka and Brandon Knuth were on patrol near Lowry Avenue North and Colfax Avenue North in Minneapolis.

59.      Moore was driving with one passenger between his home located at 2821 Colfax Ave. N. Minneapolis, Minnesota 55411 to his passenger's home located at 3306 Bryant Ave. N. Minneapolis, Minnesota, 55412. The distance between the homes is one half mile.

60.      In police report detailing the incident, Partyka and his partner Knuth claim to have observed Moore's vehicle stop at a stop sign and then belatedly signal a left turn. The officers then observed Moore park the vehicle. Partyka claims to have recognized Moore as a someone for whom there was an outstanding arrest warrant, when in fact no such warrant existed at the time.

61.      Knuth and Partyka nonetheless choose to conduct a suspicious vehicle stop. When the officers approached, Moore rolled down the window and had his hands on the wheel, demonstrating to the officers that nothing was in his hands.

62.      Knuth claimed to smell alcohol emanating from the vehicle and observe an open container he suspected to be alcohol, and he ordered Moore out of the vehicle.

63.     Moore then attempted to unfasten his seatbelt to get out of the car. As he did so, Knuth and Partyka accused Moore of reaching down towards the waistband area of his pants. Knuth ordered Moore to put his hands up, and Moore immediately complied.

64.     Although Moore promptly complied with their orders, the officers disregarded his compliance and rapidly screamed commands at Moore, including not to reach or they would tase him.

65.     At this point Partyka, and pulled out his taser, placed it against Moore's chest and told him that he would tase Moore if he did not put his hands up. Moore attempted to comply with the officer's commands and put his hands up multiple times.

66.     While this occurred, two more officers, Dirk Spee and Neal Walsh, had arrived on the scene. Spee, like Partyka, disregarded Moore's compliance and pulled his gun and pressed it against the back of Moore's head, although Partyka still had his taser pressed to Moore's chest. Spee also applied various pressure point maneuvers and pulled on Moore's hair contorting Moore's neck.

67.     Moore was unable to move with the officers thus restraining him, and he froze. Partyka, Spee, and two other officers nonetheless chose to open the driver's side door and forcibly remove Moore from the vehicle. The officers pulled Moore from the vehicle and threw him to the ground.

68.     Immediately after Moore was thrown to the ground, Partyka delivered three or four elbow strikes to Moore's left shoulder area and then kneeled on Moore's torso. Spee then kneeled on Moore's legs. With Moore sprawled on the ground and the full weight of both Partyka and Spee on his back and legs, he was fully restrained and rendered almost

completely unable to move any part of his body. A third officer, possibly Knuth, then also began kneeling on Moore's torso with Partyka.

69.     As a result of the haphazard and completely unnecessary and aggressive manner that the officers had thrown Moore to the ground, his right arm had become pinned underneath his body.

70.     The officers ordered Moore to remove his right hand from underneath his body. Moore attempted to comply with the officers' commands, but as was completely obvious to anyone and everyone at the time, he physically could not do so because the three officers on top of him.

71.     Purportedly in response to Moore's alleged "failure" to comply with the officers' impossible orders to remove his hand from underneath the weight of his own body plus three other grown men, Walsh held down Moore's head against the pavement and subsequently delivered three powerful knee strikes to Moore's face.

72.     Walsh's knee strikes to Moore's head rendered Moore temporarily unconscious. While Moore was unconscious and thus completely immobilized, John Doe No. 1 pulled Moore *by the hair* and dragged him along the ground. The below photograph taken by the police at the scene demonstrates the severity of Moore's facial injuries:



73.     The officers then handcuffed Moore, placed him under arrest, and conducted a search incident to arrest.

74.     At this point Partyka entered Moore's vehicle and drove it several blocks away. The other officers followed with Moore detained in the back of one of the police vehicles. The officers then searched the interior of Moore's vehicle and conducted a body search of Moore.

75.     No alcoholic beverage was found on Moore or in his vehicle.

76.     No weapon was found on Moore or in his vehicle.

77.     Officers not only searched the interior of Moore's vehicle but also opened several compartments including two areas that could only be accessed when the doors were open and the glove compartment as well as the trunk of Moore's vehicle.

78.     The officers had no search warrant and therefore their only legal authority to search was to search incident to arrest.

79.     The police eventually impounded Moore's vehicle and he had to pay several hundred dollars to get it back.

80.     Moore was brought to a police chemical testing facility where Officer Justin Schmidt observed that Moore had several obvious injuries and both of Moore's eyes were nearly sworn shut to the point where Schmidt could not see Moore's pupils.

81.     Moore tested as having a .00 blood alcohol content in the breathalyzer administered at the precinct. Schmidt did not find probable cause to conduct a blood draw for alcohol content despite Partyka's insistence.

82.     Partyka then took Moore to the Hennepin County Jail but was denied admission because of his injuries.

83.     Moore was then taken to Hennepin County Medical Center for evaluation and treatment of his facial injuries. After receiving first aid and treatment Moore was cleared from Hennepin County Medical center and booked in Hennepin County Jail for "Obstruction of the Legal Process," a misdemeanor offense that was later dismissed.[13]

---

[13]     The Human Rights Report states that a "high-level MPD leader explained that officers often arrest and cite individuals with obstruction or disorderly conduct 'for things that could fall under the category, arguably, of pissing off the police.'" (Ex. 1 at 15.)

84.     Immediately upon leaving jail the next morning, Moore received treatment at North Memorial Health for his injuries, which consisted of a left eye nearly swollen shut, blurred vision in the swollen eye, nasal bone fractures, numerous painful abrasions on his face, left knee pain, back pain, and neck pain.

**D.     Moore's excessive force complaints are ignored by MPD.**

85.     On or about two days later, Moore went to the Fourth police precinct to file an excessive force complaint for the events of December 7, 2019.

86.     When he asked the officer attending the desk about how to submit an excessive force complaint, the officer handed Moore a blank sheet of printer paper and told to fill out his complaint.

87.     Moore wrote down his complaint which included specific complaints against Partyka and handed it back to the officer at the desk. He included his name, phone number, and address so that he could be contacted for further details corroborating the incident.

88.     No one from the police department ever contacted Moore in connection with his complaint.

89.     On or about a week after submitting the complaint, Moore called the precinct for an update. On or about one week after the phone call, Moore went back to the precinct to file another complaint.

90.     This time, Moore was handed a document that appeared to him to be an official complaint form. Moore filled out the document, including his name, phone number, address, and description of the incident and handed it back to the police.

91.     Once again, nobody from the department contacted him to investigate his complaint.

92.     On information and belief, both complaint forms were either intentionally destroyed by the police before they were submitted for investigation or were inadequately investigated.

**E.     Partyka illegally obtains a search warrant for Moore's residence.**

93.     At all times relevant to this complaint, Partyka was and had been a patrol officer. He was not and never had been an investigator or detective, and he was not assigned to any unit specifically tasked with investigating drug crimes.

94.     During Partyka's entire career prior to February 7, 2020, he had applied for just two search warrants, both of which were routine requests for blood draws pursuant to arrests for suspected DWI offenses.

95.     Yet, within weeks of Moore's two attempts to submit complaints in connection with the appalling use of excessive force by Defendants, including himself, Partyka began an "investigation" of Moore on February 7, 2020. In an apparent reflection of the level of professionalism with which Partyka approached the investigation, and perhaps his job as a police officer, he titled the investigation file that he opened "Moore Money Moore Problems."

96.     On February 13, 2020, Partyka submitted an application for a search warrant.

97.     In the application, Partyka claimed to have received information from a "confidential reliable informant" that Moore had been dealing heroin and methamphetamines out of his home at 2821 Colfax, although the "information" did not

25

include any dates, times, or description whatsoever of when the alleged drug sales had occurred.

98.     According to Partyka, the informant gave a vague description of Moore's body type and race, but he never positively identified a photograph of Moore.

99.     Probably not coincidentally, the height and weight description allegedly provided by the "informant" exactly matched the information on Moore's drivers' license, which Partyka had access to as a result of his arrest of Moore three months before.

100.    Partyka did not take any action to verify any of the information that he had allegedly received from the alleged informant, such as conducting surveillance of Moore's residence.

101.    Partyka then claims to have conducted a trash pull from a garbage can at Moore's duplex at 2821 Colfax.

102.    Partyka knew the address to be a duplex observed at the time of the trash pull that the house had two separate gas meters. As such, there were two garbage bins and one recycling bin located at the address. None of the bins were marked to indicate which unit the trash came from.

103.    In the search warrant application, Partyka claimed to have found two clear plastic baggies with white substance in one of the unmarked bins.

104.    Partyka later submitted baggies that he claimed were those that he found in one of the unmarked bins at Moore's residence for testing and the submitted baggies tested positive for methamphetamines. Partyka did not have the baggies tested for fingerprints or DNA.

105.    Partyka claims to have later conducted a second trash pull from a garbage can at 2821 Colfax.

106.    Partyka claimed in the warrant application that the second pull included a piece of paper that purportedly came from the sheriff's office with Moore's name on it as well as a one-gallon resealable baggie that allegedly contained white powder and other plastic tear-off baggies.

107.    The document listing Moore's name was not an official county document but instead a printed copy from the jail roster which is publicly available information through a simple internet search.

108.    In his search warrant application Partyka described the document as paperwork from the sheriff's office addressed to Moore.

109.    In addition to the document and baggies, the evidence bag from the second trash pull also contained a letter addressed to "Jennifer Johnson" at the same 2821 Colfax Avenue North address. Partyka omitted from the search warrant application the fact that the trash bin that he claims to have searched contained mail addressed to another person at Moore's address.

110.    Partyka did not submit any of the baggies from the second alleged trash pull for testing of any kind.

111.    A Hennepin County judge issued a search warrant of 2821 Colfax Ave. N. based on Partyka's representations described above.

112.    Police conducted a search pursuant to the warrant on February 13, 2020.

113.    In connection with the search, Moore was arrested and subsequently charged with violating Minnesota Statute Sections 152.021.2b(1) and 624.713.1(2). Moore did not have the means to obtain a bond to post bail, and he was therefore incarcerated at the Hennepin County Jail for the next seven months while he attempted to challenge validity of the search and defend himself from the charges.

**F.    Charges Dismissed Because of Illegal Search and Seizure**

114.    After Moore had been incarcerated for several months, his public defender succeeded in bringing a motion to challenge the validity of the search warrant based on the fact that several important pieces of information were omitted or misrepresented by Partyka from the application for search warrant, including his failure to take steps to determine which trash bin belonged to the duplex unit occupied by Moore, his inaccurate description of the allegedly official sheriff's office document, and his failure to disclose that mail addressed to another person was allegedly found in the second trash pull.

115.    Judge Paul Scoggin presided over the suppression hearing, where Partyka was questioned about the evidence that supported the warrant and its provenance.

116.    Partyka admitted under oath that the baggies that he had allegedly found at the second trash pull had nothing in them at all, though the application for the warrant states that they contained "white powder." Partyka had no explanation for the apparent misrepresentation in response to Judge Scoggin's questions about the discrepancy.

117.    Judge Scoggin also ordered Partyka to submit the confidential file on Partyka's alleged informant that Partyka was required to maintain according to the department's standard procedures to his office for in camera review and verification of the

Partyka's claim that the informant was a confidential reliable source of actionable information.

118.    Partyka did not deliver the requested file to Judge Scoggin.

119.    On information and belief, Partyka could not deliver the file because no such informant exists.

120.    Based on Partyka's multiple material misrepresentations and omissions in the warrant application, Judge Scoggin held that no probable cause existed for the warrant and that the search was conducted in in violation of Moore's Fourth Amendment rights.

121.    In so holding, the Court wrote that Partyka's description of white powder in the baggies of the second trash pull was "made in reckless disregard for the truth" and that Partyka had no explanation for why his warrant application alleged that the bags contained powder when they in fact did not.

122.    The Court further stated that Partyka's decision to include these false facts in his warrant application was "a material misrepresentation and, at a minimum, a reckless disregard for truth."

123.    The Court also made specific comment on Partyka's diminished credibility after the suppression hearing. In addition to the misrepresentation about the nonexistent white powder, the judge also noted that Partyka made other incredible statements at the hearing, including Partyka's estimate that he was personally responsible for the seizure of fifty illegal firearms in Minneapolis in 2020, which number represented approximately 40% of the firearms seized in the fourth precinct that year.

124.    The Court determined that if the information about the white powder from the second trash pull had not been included in the warrant application, the application would have lacked probable cause to support a warrant.

125.    Because there was no probable cause for the warrant the Court ordered that the evidence that was allegedly obtained pursuant to the search of Moore's residence be thrown out.

126.    The charges against Moore were subsequently dismissed because there was no evidence to support them, and Moore was released from jail after having over seven months in jail.

**COUNT I**
**43 U.S.C. § 1983**
**Excessive Force**
**Against Walsh**

127.    Moore incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

128.    Moore's civil rights were violated when Walsh used excessive force after Moore was already immobilized. 42 U.S.C. § 1983.

129.    "By the plain terms of § 1983, two – and only two – allegations are required in order to state a cause of action under that statute. First, the plaintiff must allege that some person has deprived him of a federal right. Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law." *Gomez v. Toledo*, 446 U.S. 635, 640 (1980).

130. Walsh acted under the color of law, in uniform under the authority of the City of Minneapolis, when he delivered multiple knee strikes to Moore's face and head.

131. Walsh arrived at the scene after Partyka and Knuth commenced an altercation with Moore, who was complying with the officers' commands.

132. At the time that Walsh was involved in restraining Moore, three officers were kneeling on top of Moore with their full body weight.

133. Nonetheless, Walsh delivered multiple knee strikes to Moore's head while he was lying on the ground immobilized.

134. Walsh's actions were unnecessarily excessive and brutal for the situation at hand.

135. Under the circumstances, a reasonable officer would not have delivered head strikes to an immobilized person.

136. The conduct by officer Walsh constituted excessive force in violation of the Fourth Amendment of the United States Constitution.

137. Walsh's conduct caused severe physical harm to Moore's head and face, including a broken nose and bruising that caused severe swelling.

138. Moore also suffered emotional harm as a result of Walsh's conduct.

139. Moore is entitled to compensatory damages for his injuries in an amount to be proven at trial in excess of $75,000.

140. Moore is entitled to punitive damages for Walsh's conduct as it was cone with willful malice or with reckless or careless indifference to Moore's constitutional rights. *See Smith v. Wade*, 461 U.S. 30, 56 (1983).

141.   Moore is entitled to reasonable attorney's fees for the vindication of his rights. 42 U.S.C. § 1988(b).

## COUNT II
## 43 U.S.C. § 1983
## Excessive Force
## Against John Doe No. 1

142.   Moore incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

143.   Moore's civil rights were violated when John Doe No. 1 used excessive force after Moore was already immobilized. 42 U.S.C. § 1983.

144.   Walsh and John Doe No. 1 acted under the color of law, in uniform under the authority of the City of Minneapolis, when he dragged Moore along the ground by his hair.

145.   John Doe No. 1 arrived at the scene after Partyka and Knuth commenced an altercation with Moore, who was complying with the officers' commands.

146.   By the time John Doe No. 1 was involved in restraining Moore, he had been effectively immobilized as a result of the force applied by other officers, including but not limited to the knee strikes to the face and head delivered by Walsh.

147.   Nonetheless, John Doe No. 1 grabbed Moore by the hair and dragged him along the ground.

148.   John Doe No. 1's conduct in dragging Moore by the hair served no legitimate law enforcement purpose whatsoever and were unnecessarily excessive and brutal for the situation at hand.

149. Under the circumstances, a reasonable officer would not have grabbed an immobilized person by the hair and dragged him along the ground.

150. The conduct by John Doe No. 1 constituted excessive force in violation of the Fourth Amendment of the United States Constitution.

151. John Doe No. 1's conduct caused severe physical harm to Moore's head and face, including a broken nose and bruising that caused severe swelling.

152. Moore also suffered emotional harm as a result of John Doe No. 1's conduct.

153. Moore is entitled to compensatory damages for his injuries in an amount to be proven at trial in excess of $75,000.

154. Moore is entitled to punitive damages for John Doe No. 1's conduct as it was done with willful malice or with reckless or careless indifference to Moore's constitutional rights. *See Smith*, 461 U.S. 30 at 56.

155. Moore is entitled to reasonable attorney's fees for the vindication of his rights. 42 U.S.C. § 1988(b).

## COUNT III
### 43 U.S.C. § 1983
### Illegal Search of the Trunk of Moore's Vehicle
### Against the Officer Defendants

156. Moore incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

157. After Moore was in the custody of the police, the officers drove Moore's vehicle to new location stating that the area of the arrest had become hostile because of local citizens coming out of their homes and voicing concern.

158.   Several officers, including Defendants continued a search incident to arrest of the interior of Moore's vehicle for alleged weapons or alcohol.

159.   No weapons or alcohol were found within the vehicle.

160.   Partyka and John Doe No. 2 continued to search within closed compartments of the vehicle including the glove compartment, heater ducts and door panels that could only be accessed when the passenger or driver doors were open, and the trunk.

161.   The searches of these closed areas extended beyond the legal search incident to arrest of the interior of Moore's vehicle.

162.   Moore had no ability to open closed compartments, particularly the trunk, in order to stash weapons or contraband.

163.   Moore was in custody at the time of the search and there can be no reasonable justification to say the officers were in danger if they did not immediately search the closed compartments without a warrant.

164.   The officers did not have probable cause to search closed areas for evidence of a crime.

165.   The search cannot reasonably be considered an inventory search nor fall under community caretaking which must be "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 252, 2528 (1973).

166.   The officers were in search of evidence to support their unfounded claims that Moore had a weapon rather than taking any administerial inventory of the vehicle's contents.

167. The vehicle was not impounded in any traditional sense for the police to conduct a standardized inventory procedure.

168. The fact that Partyka drove Moore's vehicle to a new location without checking the odometer or gas tank demonstrates that the officers had no concern for protecting Moore's property or protect themselves from disputes over lost or damaged further demonstrates that the search was not an inventory search.

169. At the new location one officer remarked that they needed to search Moore's person again to see if he had a weapon.

170. When officers act "in bad faith or for the sole purpose of investigation," an inventory search is invalid. *Colorado v. Bertine*, 479 U.S. 367, 373, 107 S. Ct. 738(1987)

171. Any purported inventory search was simply "a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4, 110 S. Ct. 1632 (1990).

172. The warrantless search, without any other justification, of the closed compartments of Moore's vehicle were in violation of the Fourth Amendment.

173. Even assuming the car was legitimately impounded for the purposes of an inventory search, the warrantless search of heater ducts and door panels was per se unreasonable and in violation of the Fourth Amendment.

174. Partyka and John Doe No. 2 conducted their illegal search under the color of state law while in uniform and on behalf of the Minneapolis Police Department.

175.   Moore is entitled to nominal damages for the violation of his Fourth Amendment rights by Partyka and John Doe No. 2. *Carey v. Piphus*, 435 U.S. 247, 266–67 (1978).

176.   Moore is entitled to punitive damages for the illegal search was conducted with willful malice or with reckless or careless indifference to Moore's constitutional rights. *See Smith*, 461 U.S. at 56.

177.   Moore is entitled reasonable attorney's fees for the vindication of his rights. 42 U.S.C. § 1988(b).

**COUNT IV**
**43 U.S.C. § 1983**
**Illegal Search of Moore's Home**
**Against Partyka**

178.   Moore incorporates and re-alleges all preceding paragraphs as though fully pleaded herein

179.   Partyka's investigation of Moore including his application for search warrant were conducted under the color of state law on behalf of the Minneapolis Police Department.

180.   Partyka's omissions and misrepresentation in his application for search warrant were made in reckless disregard for the truth.

181.   Partyka's reckless actions directly led to a judge granting a warrant that lacked probable cause in violation of Moore's Fourth Amendment rights. *Franks v. Delaware*, 438 U.S. 154, 172 (1978).

36

182.   As a result of the illegal search, Moore was arrested without grounds and incarcerated in the Hennepin County Jail for over seven months.

183.   Moore suffered emotional harm during his incarceration.

184.   Moore is entitled to compensatory damages for his injuries in an amount to be proven at trial in excess of $75,000.

185.   Moore is entitled to punitive damages because Partyka's omissions and misrepresentations were conducted with willful malice or with reckless or careless indifference to Moore's constitutional rights. *See Smith*, 461 U.S. at 56

186.   Moore is entitled to reasonable attorney's fees for the vindication of his rights. 42 U.S.C. § 1988(b).

**Count V**
**43 U.S.C. § 1983**
***Monell* liability**
**Against the City of Minneapolis**

187.   Moore incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

188.   MPD's Policy Manual provides that the Mayor is "vested with all the powers of said city connected with and incident to the establishment, maintenance, appointment, removal, discipline, control, and supervision of its police force, subject to the limitations herein contained and the provisions of the Civil Service chapter of this Charter, and may make all needful rules and regulations for the efficiency and discipline, and promulgate and enforce general and special orders for the government of the same, and have the care

and custody of all public property connected with the Police Department of the city." (MPD Policy Manual Sec. 1-301 (citing City Charter reference-Chapter 6, Section 1)).

189.    The Mayor, the City Council, and the Police Chief had final policymaking authority with regard to establishing written policies and training programs governing the conduct of MPD officers performing policing functions on behalf of the City.

190.    The written policies, training, complaint investigation, and disciplinary policies established and/or approved by The Mayor, the City Council, and the Police Chief constitute the official policy of the City and were the moving force behind and caused the injuries suffered by Moore on December 7, 2019 at the hands of the Officer Defendants.

191.    The City, acting by and through its Mayor and/or other policymakers, had knowledge of MPD's unconstitutional patterns and practices and knowledge that the same gave rise to a risk of violations of citizens' federal rights.

192.    The City, acting by and through its Mayor and/or other policymakers, made a deliberate and/or conscious decision to disregard the known risk of harm that would result from MPD's unconstitutional patterns and practices and was deliberately indifferent to and/or tacitly authorized the same.

193.    On or prior to December 7, 2019, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that failed to provide for the safety of arrestees, detainees, and the like during arrest, including but not limited to the failure to adequately train MPD's officers on the appropriate use of force.

194.    On or prior to December 7, 2019, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that condoned and required officers to turn a blind eye to and not intervene with the use of excessive force by MPD officers.

195.    On or prior to December 7, 2019, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that condoned and required officers to treat the members of the Black Community of Minneapolis differently, including but not limited to using excessive force at a higher rate against Black men who did not pose a threat to officers.

196.    On or prior to December 7, 2019, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that shall be further identified in discovery.

197.    Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, continued to employ the Officer Defendants despite knowledge of their repeated unconstitutional, unlawful, or other improper conduct.

198.    Minneapolis had to the power to terminate or appropriately discipline the Officer Defendants for their misconduct prior to December 7, 2019, but failed to do so despite the City's knowledge of a pattern of complaints regarding excessive force.

199.     By failing to discipline the Officer Defendants, Minneapolis caused them to act with impunity and without fear of retribution.

200.     Minneapolis' failure to terminate or properly discipline the Officer Defendants is part of its larger custom, police, or practice of failing to supervise, terminate, or properly discipline its officers for unconstitutional, unlawful, or otherwise improper conduct, and thereby encouraged them to continue engaging in unlawful acts towards arrestees, including Moore.

201.     The unconstitutional policies, practices, and customs defined herein were the moving force behind Moore's injuries.

202.     As a direct and proximate result of the acts and omissions described herein, Moore suffered compensatory and special damages as defined under federal common law and in an amount to be determined by jury.

203.     Moore is entitled to recovery of costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988(b).

**Count VI**
**43 U.S.C. § 1983**
***Canton* liability**
**Against the City of Minneapolis**

204.     Plaintiff hereby incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

205.     Minneapolis failed to properly train or modify its training to the Officer Defendants and its other officers, including but not limited to, matters related to the

reasonable and appropriate use of force during such arrests, and intervention in the excessive use of force by fellow officers.

206.   Effectuating an arrest, using force to effectuate an arrest, and intervening in the use of force is a usual and recurring situation with which Minneapolis law enforcement officers and other agents encounter on a regular basis.

207.   As such, Minneapolis was aware of a need for more and different training. Minneapolis specifically knew that its officers needed training regarding race-based policing and proper and improper escalation of force.

208.   With deliberate indifference to the rights of citizens, Minneapolis failed to provide adequate training to its officers.

209.   Minneapolis was aware that deprivation of the constitutional rights of citizens was likely to result from its lack of training and the failure to modify its training.

210.   As such, Minneapolis was deliberately indifferent and exhibited reckless disregard with respect to the potential violation of constitutional rights.

211.   The failure to train and/or to appropriately modify training constituted official Minneapolis policies, practices, or customs.

212.   Minneapolis's failure to train and/or to modify training was behind the acts and omissions the Defendant Officers made toward Moore.

213.   As a direct and proximate result of Minneapolis's acts and omissions, Moore suffered injuries and experienced pain and suffering

214.   As a direct and proximate result of the acts and omissions described herein, Moore suffered compensatory and special damages as defined under federal common law and in an amount to be determined by jury.

215.   Moore is entitled to recovery of costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

**PLAINTIFF DEMANDS A JURY TRIAL FOR ALL ISSUES OF FACT HEREIN.**

PRAYER FOR RELIEF

WHEREFORE, Plaintiff Andre Moore prays for judgment against Defendants as follows:

1.   As to Count I, a money judgment against Defendant Neal Walsh for compensatory and punitive damages together with costs and disbursements, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest.

2.   As to Count II, a money judgment against Defendant John Doe No. 1 for compensatory and punitive damages together with costs and disbursements, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest.

3.   As to Count III, a money judgment against the Officer Defendants for nominal and punitive damages together with costs and disbursements, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest.

4.   As to Count IV, a money judgement against Defendant Tony Partyka for compensatory and punitive damages together with costs and disbursements, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest.

5.     As to Count V, a money judgment against the City of Minneapolis for compensatory and punitive damages together with costs and disbursements, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest.

6.     As to Count VI, a money judgment against the City of Minneapolis for compensatory and punitive damages together with costs and disbursements, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest.

Dated: November 22, 2022          **SAUL EWING LLP**

By:  _s/ Matthew Veenstra_
     Matthew Veenstra (MN #0392517)
     Courtland Merrill (MN #0311984)
     Douglas Anderson (MN #0402494)
     33 South Sixth Street, Suite 4750
     Minneapolis, MN 55402
     Telephone: (612) 225-2800
     matthew.veenstra@saul.com
     courtland.merrill@saul.com
     douglas.anderson@saul.com

*Attorneys for Plaintiff*