**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Andre Moore,

Plaintiff,

v.

Officer Tony Partyka, in his individual capacity, Officer Neal Walsh, in his individual capacity, Officer John Doe No. 1, in his individual capacity, and Officer John Doe No. 2, in his individual capacity, and the City of Minneapolis,

Defendants.

Civil File No. 22-cv-1477-PAM/TNL

**REDACTED**

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO COMPEL AGAINST THE CITY OF MINNEAPOLIS AND TONY PARTYKA**

# TABLE OF CONTENTS


INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 3

A. The "Informant" and Partyka's "Diminished Credibility" ........ 3

1. Misrepresentations and Other Indicia of Partyka's Coverup of his Dubious "Investigation" into Moore Discovered by Judge Scoggin ........ 4

2. Misrepresentations and Other Indicia of Partyka's Coverup of his Dubious "Investigation" into Moore Unknown to Judge Scoggin ........ 8

3. Partyka's Misrepresentations About the Traffic Stop Incident ........ 18

B. MDHR's Investigation of MPD and its Highly Relevant Factual Findings ........ 25

C. Moore's Requests for Documents Related to Derek Chauvin's Training and Allegations of Excessive Force ........ 27

D. MPD's Revisions to its Use of Force Policies and Training ........ 27

E. The City's Refusal to Respond to Interrogatory No. 8 ........ 28

PROCEDURAL HISTORY ........ 29

A. The Protective Order expressly contemplates production of "information that could reveal the identity of confidential informants" and "nonpublic data under the Minnesota Data Practices Act." ........ 29

B. Defendants' Refusal to Produce any Requested Information ........ 30

ARGUMENT ........ 30

I. The Court should order Defendants to disclose the alleged Informant's identity and respond to all related discovery in full. ........ 30

A. Moore has a "clear need" for discovery into the alleged Informant because Partyka's misrepresentations are "specific information" indicative of "the possibility of judicial deception" in connection with the illegal search upon which his 4th Amendment claim is premised. ........ 31

B. Partyka's failure to disclose even obviously non-identifying information in his interrogatory answers further corroborates the possibility of judicial deception. ........ 36

1. Interrogatory No. 5 ........ 36

2. Interrogatory No. 6 ........ 37

3. Interrogatory No. 7 ........ 38

C. The Court should compel a deposition of the alleged Informant. ........ 40

II. The Court should Order the City to produce the materials it provided to MDHR that support MDHR's highly relevant findings. .... 40

A. The documents provided to MDHR are highly relevant because Moore's Monell allegations are expressly based upon them. .... 42

B. The burden of producing the MDHR materials is de minimus and the requests are therefore proportional to Moore's significant and important civil rights claim. .... 45

C. The Minnesota Data Practices Act does not shield the City from discovery in litigation. .... 48

III. The Chauvin-related materials should be produced because they are highly relevant and the burden of producing them is de minimus. .... 49

IV. Documents and ESI related to MPD's revisions to use of force policies and training should be produced because the materials are relevant and the burden proportionate to Moore's substantial and important civil rights claim. .... 49

V. The Court should order the City to immediately answer Interrogatory No. 8. .... 50

CONCLUSION .... 51

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Black Love Resists in the Rust by and through Soto v. City of Buffalo*, 334 F.R.D. 23 (W.D.N.Y. 2019) .......... 48

*Blight v. City of Manteca*, 266 F. Supp. 3d 1234 (E.D. Cal. 2017) .......... 33, 34, 35, 41

*Bordanaro v. McLeod*, 871 F.2d 1151 (1st Cir. 1989) .......... 51

*Costantino v. City of Atl. City*, 152 F. Supp. 3d 311 (D.N.J. 2015) .......... 42, 47

*Dorsett v. County of Nassau*, 762 F. Supp. 2d 500 (E.D.N.Y. 2011) .......... 49

*Elnashar v. Speedway SuperAmerica, LLC*, 484 F.3D 1046 (8TH CIR. 2007) .......... 36, 38

*Fields v. Wright Med. Tech., Inc.*, 2017 WL 3048867 (N.D. Ind. July 19. 2017) .......... 49

*In re Hardieplank Fiber Cement Siding Litig.*, No. 12-MD-2359, 2014 WL 5654318 (D. Minn. Jan. 28, 2014) .......... 48

*In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 320 (N.D. Ill. 2005) .......... 52

*Roviaro v. United States*, 353 U.S. 53 (1957) .......... 33, 38, 41

*Samaha v. City of Minneapolis*, 525 F. Supp. 3d 933 (D. Minn. 2021) .......... 42

*Tequila Centinela, S.A. de C.V. v. Bacardi & Co.*, 242 F.R.D. 1 (D.D.C. 2007) .......... 46

*United States ex rel. Luke v. Healthsouth Corporation*, No. 2:13-cv-01319, 2018 WL 3186941 (D. Nev. June 28, 2018) .......... 45

## STATE STATUTES

Minnesota Government Data Practices Act .......... 30, 31, 49

Rule 9 of the Minnesota Rules of Criminal Procedure .......... 18

Federal Rule of Civil Procedure 33(d) .......... 51

## INTRODUCTION

Plaintiff Andre Moore alleges that Defendant Minneapolis Officer Tony Partyka pulled him over because he was driving while Black after midnight, and that at the traffic stop he was beaten by Partyka and other officers because the prevailing custom within the Minneapolis Police Department ("MPD") is that officers can beat Black men first and nobody will ask questions later. When Moore attempted, twice, to file formal complaints, Partyka, a patrol officer who had zero training or experience investigating anything during his entire career, intentionally fabricated and misrepresented evidence, including but not limited to an alleged "informant" to obtain a search warrant of Moore's home in a premeditated act of retribution for Moore's attempt to vindicate his civil rights.

An enormous amount of evidence has already been uncovered corroborating Moore's claims against both Partyka and the City. For a start, Hennepin County Judge Paul Scoggin, threw out the warrant in the criminal case against Moore upon expressly finding that Partyka had "diminished credibility" as he had made at least four separate misrepresentations in connection with the warrant application. As explained further below, the misrepresentations uncovered by Judge Scoggin merely scratch the surface of the sordid mess that constitutes Partyka's so-called "investigation" into Moore.

The evidence adduced thus far indicates that that the alleged "informant" either doesn't exist at all, or he never told Partyka any of what Partyka swore to be true in the warrant application. Disclosure of the informant's identity and discovery into exactly what—if anything—the informant told Partyka is obviously essential to Moore's claim against Partyka.

Moore's claims against the City are buttressed by the detailed factual findings released by Minnesota Department of Human Rights ("MDHR") in an April 2022 report that support MDHR's conclusion that "MPD engages in a pattern or practice of discriminatory, race-based policing as evidenced by racial disparities in how MPD officers use force, stop, search, arrest, and cite people of color, particularly Black individuals, compared to white individuals in similar circumstances." These are exactly the allegations upon which Moore's complaint against the City is premised.

Understanding the legal peril that they face, Partyka and the City have both decided to stonewall all discovery into the informant, and the City further refuses to produce any of the documents and information that it provided to MDHR or MPD's failure to discipline Derek Chauvin despite the extensive track record of credible excessive force against him. The City also refuses to produce any documents related to MPD's revisions of its policies and training related to the use of force. Defendants' objections that the requested materials and information are irrelevant are frivolous on their face. Further, since all of requested materials related to the informant, the MDHR investigation, and Chauvin presently reside in a known location in an immediately producible format, the burden associated with complying with Moore's requests is *de minimus*.

The Court should not countenance Defendants' blatant attempt to win this case in discovery, reject their meritless objections, and order that they immediately produce the requested materials and answer Moore's interrogatories. Moore also requests an award of the attorney's fees in connection with bringing this motion, as Defendants' objections are

meritless and neither defendant made any meaningful effort to engage with Moore's counsel and resolve the issues without the Court's involvement.

## FACTUAL BACKGROUND

### A. The "Informant" and Partyka's "Diminished Credibility"

The below table[1] summarizes Moore's requests about the Informant and Defendants' objections:

| Defendant | Req. No. | Request | Objections |
|---|---|---|---|
| City | RFP No. 1 | All Documents related to the informant | Irrelevant<br>Not material |
| Partyka | Interrog. No. 5 | Identify the Informant and describe the circumstances of introduction to the Informant | Irrelevant<br>Not material |
| Partyka | Interrog. No. 6 | Describe efforts to investigate the reliability of information provided | Irrelevant<br>Not material |
| Partyka | Interrog. No. 7 | Identify all communications with informant | Irrelevant<br>Not material |

The City refused to produce the informant file or any other documents about the informant that exist. Partyka initially refused to answer the interrogatories at all except to state that all of Partyka's "meetings [with the informant] were in person and the items discussed included those items found in the search warrant."[2] Partyka subsequently amended his answers under the guise of supplementing them to include non-identifying information. But the amended answers still fail to disclose important non-identifying

[1] A similarly formatted chart that contains the complete text of all of the requests and responses at issue on this motion is attached as Exhibit 1 the First Declaration of Matthew Veenstra ("Veenstra Declaration") submitted in support of this motion. Complete copies of the relevant responses that Defendants served on Moore are attached as Exhibits 2, 3, 4, and 5 to the Veenstra Declaration. Hereinafter, citations to "Ex. 1, 2, 3" etc. refer to exhibits to the Veenstra Declaration.

[2] Ex. 2 (Partyka's Response to Plaintiff's Second Set of Interrogatories) at 5–6.

information. The only reason Partyka bothered with the amended answers was to make material changes to his original story regarding his contact with the Informant.[3]

Partyka claims to have launched an "investigation" into Moore within a few weeks of the December 7, 2019 traffic stop and Moore's attempts to file excessive force against him and Walsh. Partyka alleges that he learned from an Informant that Moore was selling drugs from his home and corroborated the tip with evidence obtained from two "garbage pulls" at Moore's home. As the foregoing constitutes the entire "investigation" Partyka conducted, any material misrepresentation about the Informant is highly relevant to Moore's claim that the search of his home was illegally premised on falsified evidence.

### 1. Misrepresentations and Other Indicia of Partyka's Coverup of his Dubious "Investigation" into Moore Discovered by Judge Scoggin

*<u>Partyka's Alleged Improper Informant Handling</u>*

REDACTED [redacted] Yet, Partyka—a beat cop on the force just two years who had no training, experience, resources, or even time to handle informants or conduct investigations

---

[3] *See infra* at 16–17.

[4] Ex. 6 (Deposition transcript of Michael Osbeck) at 31:10–11.

[5] *Id.* at 31:20–32:3 ("Q: If I [fill out the cover sheet] and I don't sign any kind of contract, am I signed up or am I not signed up as you use that phrase? A: No, you're not signed up if you just hand information or say, hey this and that.")

[6] Ex. 7 (Deposition transcript of Neal Walsh) at 94:13-14 ("In order to use them, they need to fill out both sheets [the sign-up sheet and cooperating agreement].").

of any kind whatsoever—claims that he worked with the unsanctioned informant in violation of MPD policy since "the spring of 2019,"—several months before the traffic stop on December 7, 2019.[7]

Judge Scoggin was openly skeptical of Partyka's claim that his "investigation" was permissible under MPD policy.[8] Before applying for the warrant to search Moore's home, Partyka had applied for just two warrants his entire career, both blood draws in DWI cases.[9]

*<u>The Incomplete Informant File</u>*

Judge Scoggin ordered Partyka to produce the "informant file" that must be kept on all signed-up informants per MPD policy.[10] But all that was in the file was "a cover sheet . . . and then a series of blurbs in which the allegation was [that the Informant] gave information about these kind of cases, not at all detailed."[11] REDACTED [redacted] But even if Partyka's explanation were true, it only begs the question why the "file" exists at all. As Judge Scoggin pointed

---

7 Ex. 3 (Partyka's Amended Response to Plaintiff's First and Second Sets of Interrogatories) Rog. 5 at 4.

8 *See* Ex. 8 (Transcript of July 21st, 2020 Hearing *State v. Moore* No. 27-CR-20-4146) at 114:19–115:19.

9 *Id.* at 25:12–16

10 Ex. 9 (Transcript of June 16, 2020 *State v. Moore* No. 27-CR-20-4146) at 6:21-23 ("I've told you that I asked [Partyka] provide the entirety of the file.")

11 *Id.* at 20:14-20

12 Ex. 10 (OPCR interview) at 5:21-22.

out, "everything on the cover sheet is identifying REDACTED [redacted] The simplest explanation is that neither the cover sheet nor the "blurbs" existed until Judge Scoggin ordered Partyka to bring them to his chambers, and Partyka hastily created them after the fact.

Judge Scoggin found, based on his review of the file and questioning of Partyka that "the informant is not a Confidential Reliable Informant" contrary to Partyka's misleading description and that there was "no showing that the informant has a history of providing accurate information."[15]

*<u>Partyka's Misrepresentations About Evidence From the Second Garbage Pull (1)</u>*

The most blatant misrepresentations in the search warrant relates to the evidence that was supposedly recovered from Moore's garbage. REDACTED[16] However, when the bag was inspected by Judge Scoggin, "th[e] bag did not contain any white powdery substance."[17] REDACTED[18]:

---

[13] Ex. 9 at 20:17.

[14] Ex. 11 (MPD Managing Confidential Informants Manual) at MPLS0000720.

[15] Ex. 12 (Order *State v. Moore* No. 27-CR-20-4146) at 2, ¶ 4.

[16] Ex. 13 (Application for second search warrant) at MPLS0000917.

[17] Ex. 12 at 8.

[18] Ex. 14 (photograph of the empty bag).



"Partyka offered no alternative explanation for why the warrant application alleges the existence of the powdery substance when it was non-existent upon review of the bag."[19] Judge Scoggin held that Partyka's description in the warrant application "was made in reckless disregard for the truth."[20]

*Partyka's Misrepresentations to Judge Scoggin About the Traffic Stop*

Judge Scoggin also found that Partyka gave a "misleading" description of his involvement in the December 7, 2019 traffic stop when he told the judge that "he dealt primarily with the passenger," not with Moore.[21] At the *Franks* hearing, Partyka was forced to admit that while he "never spoke a word to the passenger,"[22] REDACTED [redacted][23] and spent over two hours "very aggressively pursuing drug testing against

---

19 Ex. 12 at 8.

20 Ex. 12 at 8.

21 Ex. 12 at ¶ 15.

22 Ex. 8 at 44:18-19.

23 Ex. 24 at MPLS_Moore001278.

[Moore].”[24] Judge Scoggin concluded that “Partyka significantly understated the nature and duration of his prior interaction with” Moore.[25]

Judge Scoggin also noted other claims Partyka made that were “odd and a bit fantastic” including “claims to a photographic memory and being responsible for 40% of all firearms seized by the Minneapolis Police Department.[26]

### 2. Misrepresentations and Other Indicia of Partyka’s Coverup of his Dubious “Investigation” into Moore Unknown to Judge Scoggin

On the basis of the foregoing misrepresentations and his finding of Partyka’s diminished credibility,[27] Judge Scoggin threw out the search warrant and the criminal charges were dismissed. Discovery has since revealed that the rot at the heart of this case runs much deeper than Judge Scoggin realized.

*Partyka’s Misrepresentations About Evidence From the Second Garbage Pull (2)*

REDACTED [redacted]

---

[24] Ex. 12 ¶ 15.

[25] *Id.*

[26] *Id.* ¶ 16.

[27] *Id.* at 9.

[28] Ex. 13 at MPLS0000917.

[29] Ex. 6 at 130:19; *accord* Ex. 7 at 81:21-24 (“[I]magine putting a teaspoon of salt in a plastic bag and ripping the corner off and tying it, I would say that’s the average size.”).

[30] Ex. 15 (Inventory of four articles of evidence allegedly recovered).

REDACTED [redacted][31]




REDACTED [redacted]

---

[31] Ex. 16 (Photograph of article inventoried).

[32] Ex. 6 at 144:23-146:4.

[33] *Id.* at 145:16 & 146:3-4. REDACTED [redacted] *Id.* at 139:4-12 & 143:24-146:32.

REDACTED [redacted]

REDACTED [redacted]

[34] *Id.* at 149:1-6.

[35] *Id.* at 123:9-20.

*Partyka's Misrepresentations About Evidence From the Second Garbage Pull (3)*

After Judge Scoggin threw out the warrant and the charges against Moore were dropped, the Minneapolis Office of Police Conduct Review investigated. REDACTED [redacted][36]

REDACTED [redacted][39]

---

[36] Ex. 10 at 11:17-21.

[37] *See supra* at 7 n.18. That photograph was taken by the OPCR investigator. *See* Ex. 17 (OPCR Investigative Report 21-04831) at MPLS0000459.

[38] *Id.* at 470.

[39] *Id.* The fact that Partyka was cleared by OPCR after this obviously shoddy investigation tells you all that you need to know about the effectiveness of that body, which has recently been disbanded by the City.

*<u>The Inexplicable Discrepancies in the Concealed Original Warrant Application</u>*

REDACTED [redacted][40]

REDACTED [redacted]

---

[40] Ex. 18 (Application for first search warrant) at MPLS0002456-MPLS0002461.

[41] Ex. 13 (text missing from the original warrant application highlighted in yellow).

[42] Ex. 18 at MPLS0002457.

[43] *Id.* at MPLS0002456-MPLS0002459.

REDACTED [redacted]

This story falls to pieces upon even a cursory examination.

REDACTED [redacted]

[44] Ex. 6 at 85:23-25; 92:9-11.

REDACTED [redacted]

[redacted]

---

45 *Id.* at 89:16-90:6.

46 *Id.* at 90:3-90:6; 92:12-23

47 *Id.* at 92:24-93:4.

48 *Id.* at 57:17-24.

REDACTED

REDACTED

[redacted] To salvage the situation, Partyka obviously decided to put the information that he needed in the mouth of his alleged Informant. This is the only explanation that makes even a lick of sense. As explained further below, Partyka recently changed his story yet again, apparently to cover up the contradictions in his story on this point

*Partyka's Changed Answer to Interrogatory No. 7 Upon the Revelation of the Existence of the Original Warrant Application*

On March 9, Partyka served an answer to Interrogatory No. 7, which sought identification of all of his communications with the Informant, including the date, method of communication, and the topics discussed. Partyka vaguely answered only that "***the meetings were in person*** and that items discussed included those items found in the search warrant."[51] On March 28, five days after Osbeck spilled the beans about the concealed first

---

49 Partyka admits that the printout "is not an official document that Mr. Moore would have received from Hennepin County Sheriff's Office." Ex. 8 at 81:4-6. Moore expects to discover that Partyka printed the document himself the morning of the raid and passed it off as being found in the garbage.

50 Ex. 19 (Photograph of jail roster inventoried at garbage pull).

51 Ex. 2 at 5–6. (emphasis added). Partyka verified that this answer was true and correct. Ex. 20 (Partyka signed verification). Partyka objected (improperly) that further disclosure would identify the informant. Ex. 2 at 6.

warrant, Partyka reversed himself and amended his answer to now state that the "meetings were in person ***and over the phone***."[52]

REDACTED [redacted]

But Partyka's verified March 9 interrogatory answer (stating that all of his meetings with the Informant were "in person") makes it impossible for him to credibly claim that he spoke to the Informant that morning. By changing his answer to now claim that the "meetings" with the Informant were *both* "in person *and over the phone*" Partyka is

---

52 Ex. 3 at 4. (emphasis added).

53 Ex. 13 at MPLS0000916.

54 Ex. 6 at 91:25-93:4.

attempting to give himself wiggle room to claim that he got the new information in time to revise the warrant and keep the raid on schedule the morning of February 13, 2020.

The lack of detail in Partyka's interrogatory answers is telling. His objection that disclosing the dates that he met with the Informant and the information he learned at each meeting would reveal the Informant's identity is totally bogus.[55] None of that information has any relationship to the Informant's identity. In reality, Partyka is aware of his myriad flagrant contradictions and is obviously attempting to say as little as possible to preserve room to maneuver at his deposition.

REDACTED [redacted]

[redacted]

---

[55] Ex. 3 at 4.

[56] *See* Ex. 21 (Partyka Initial Disclosures); Ex. 22 (City Initial Disclosures); Veenstra Decl. ¶ 2.

[57] Declaration of Alicia Granse in Support of Motion to Compel ¶ 10.

In the first motion, Moore alleged that "the reliability of the information in [Partyka's] affidavit was suspect,"[58] there were "good reasons to doubt the credibility of Officer Partyka,"[59] and that "identity, veracity, consistency, and accuracy of the Informant"[60] were in doubt. The *Franks* motion was premised on the allegation that "Officer Partyka made statements that were demonstrably false in the search warrant affidavit."[61] Partyka was questioned under oath in open Court regarding the accuracy of his assertions in the warrant about the Informant and the garbage pulls.[62] REDACTED [redacted]

REDACTED [redacted]

**[redacted] [redacted] the Traffic Stop Incident**

As mentioned above, Judge Scoggin expressly found that "Partyka significantly understated the nature and duration of his prior interaction with" Moore during questioning

---

58 *Id.* at 7.

59 *Id.*, Ex. A at 6.

60 *Id.*, Ex. A at 9.

61 *Id.* ¶ 8 (Exhibit B at 1).

62 Ex. 8 at 62:24–67:18; 72:16-20; 76:13-16; 89:12-90:21 (questioning about informant); 72:21–73:10; 79:4–85:20 (questioning about garbage pull).

63 *See* Ex. 23 (Table of Contents of OPCR Matter #21-04831); Ex. 17 (Investigative Report for Matter #21-04831).

64 Ex. 10 at 2:11-13.

*in camera* and that Partyka's statements were "misleading."[65] Presumably because he had already found that Partyka was not credible for other reasons, Judge Scoggin did not make findings about Partyka's misrepresentations regarding the reason for the "traffic stop" of Moore. These misrepresentations are highly relevant for two reasons: (1) each misrepresentation further diminishes what's left of his credibility; and (2) they are evidence of Partyka's attempts to cover up the real reason for the stop, which is simply that Partyka thought Moore was suspicious as he was a Black man driving in North Minneapolis after midnight.

The fact that Partyka pulled Moore over without justification likely began to concern Partyka when Moore attempted twice to file formal complaints against Partyka and the other officers in the days and weeks following the December 7, 2019 traffic stop. It would be incredibly naïve to believe it is mere coincidence that Partyka began his "investigation" into Moore the following January.[66]

*Partyka's Misrepresentations About Recognizing Moore*

Partyka's story as it relates to why the stop was conducted has changed multiple times in contradictory ways in his reports and various sworn statements. His story further cannot be reconciled with the written report REDACTED of his partner (Brandon Knuth) REDACTED

65 Ex. 12 at 5, ¶ 15.

66 Ex. 3 Rog. 8 at 5.



41441550.2

REDACTED [redacted]

REDACTED [redacted]

> [redacted]

Knuth confirmed this unequivocally when he was under oath at the Franks hearing:

> A: I remember *Partyka recognizing the vehicle* as well . . . I remember having that quick conversation with Officer Partyka that it was a car that we knew to be associated with [Moore].
>
> Q: And you report that . . . [you] did not ID him before you pulled him over?
>
> A: No. Because *we didn't know who the driver was for certain before we stopped him.*[71]

---

[67] Ex. 24 (MPD Incident Report 12/7/2019) at MPLS_Moore001277.

[68] *Id.*

[69] *Id.*

[70] *Id.* at MPLS_Moore001280.

[71] Ex. 8 at 130:3-14; *accord id.* at 129:19-21 ("I remember Partyka and I recognizing the vehicle as being a vehicle associated with Andre Moore.").

At the *Franks* hearing, Partyka changed his story and testified that he didn't know Moore's revoked status until "after [he] ran his name through the NCIC database."[72] Presumably it dawned on Partyka how implausible it is that he not only recognized Moore's face and remembered his name from a single bulletin he had seen once between six and eleven months before, but also remembered that Moore had a revoked drivers' license. Or, perhaps he realized that he could not justify a traffic stop on an memory that was several months old.

REDACTED [redacted]

Notwithstanding Knuth's testimony and report, Partyka is steadfast that he did recognize Moore from a bulletin that he saw "somewhere between January and June

---

72 *Id.* at 40:3-5; *accord id.* at 94:20-24 ("Q: Why was it that you pulled the defendant over? A: I ran his name and found that he was driving after revocation, and then he failed to signal a turn sufficiently before a stop sign.").

73 *Compare* Ex. 25 (MPD incident detail report) at MPLS_Moore001315 (00:29:31) *with* Ex. 26 (Screenshot of squad video (00:23:20)).

74 Ex. 27 (NCIC report) at 3.

75 *Compare id.* at 3 (00:20:49 (query)) *with id.* (00:20:48 (arrived)).

2019,"[76] that all the information that he had about Moore came from that bulletin,[77] and that he "did not act on a tip at the time of the traffic stop."[78]

REDACTED [redacted][2]

While Partyka's and Knuth's stories are equally implausible, that is the only thing that they have in common. Both accounts are so fantastic they are simply unbelievable.

*<u>Partyka's Misrepresentations About Moore's Alleged Failure to Signal</u>*

REDACTED [redacted]

---

76 Ex. 8 at 107:12; *accord id.* at 107:17-20 ("Q: you recognized Andre Moore from that bulletin . . . before you and Officer Knuth pulled him over? A: Yes, ma'am.").

77 *Id.* at 28:5-9.

78 *Id.* at 72:4-5.

79 Ex. 29 (Deposition Transcript of Brandon Knuth).

80 Knuth cannot remember who. *Id.*

81 *Id.*

82 *Id.*

REDACTED [redacted]

Knuth's testimony is even more damning. Probably because he anticipated that the squad camera footage would show that Moore obeyed every traffic law, Knuth testified at both the *Franks* hearing that the allegedly illegal turn occurred *before* the two vehicles crossed paths, not after the officers began tailing Moore:

> At one point [Moore] was travelling west and he was coming up to a stop sign, and we noticed that they didn't signal a hundred feet before the turn, so they made that turn, we continued and crossed paths momentarily, *and then we turned around on him*.[85]

REDACTED [redacted]

---

83 Ex. 24 at MPLS_Moore001277.

84 *See* Ex. 30 (Squad video screenshot at 00:20:23 showing squad turning west onto 33rd) *and* Ex. 31 (Squad video screenshot at 00:20:25 showing squad headed west on 33rd and Moore's vehicle turning north onto 33rd circled in red).

85 Ex. 8 at 131:10-13; *accord id.* at 129:17-21 ("I remember seeing a car fail to signal a hundred feet before their turn, and that caught our attention to the vehicle. And then I remember the vehicle passed us[.]").

86 Ex. 29.

87 Ex. 27.

REDACTED

[redacted][88]:




[redacted] As with their "recognition" of Moore (or was it his vehicle?) Partyka and Knuth apparently decided to make up a story to conceal the truth, but they were comically inept at coordinating the details.

---

[88] Ex. 32 (Route created on Google Maps derived from coordinates from Ex. 27). Knuth confirmed the route taken by the squad car after reviewing the geolocation records in squad's NCIC record. Ex. 29.

[89] Ex. 29.

### B. MDHR's Investigation of MPD and its Highly Relevant Factual Findings

The MDHR Report found, among many other findings highly relevant to Moore's *Monell* claim against the City, that:

- "MPD officers use higher rates of more severe force against Black individuals compared to white individuals in similar circumstances"[90];
- "race is the likely reason that MPD officers" do so[91];
- "By teaching an approach to policing that emphasizes aggression, MPD creates a culture that results in unnecessary escalation and/or excessive force during encounters with community members of all racial backgrounds"[92]; and
- "No meaningful independent review process exists for assessing MPD officer's conduct" and therefore "MPD does not appropriately and consistently hold officers accountable for police misconduct."[93]

Several of MDHR's most specific findings were based on its analysis of four categories of documents and data that MPD supplied to MDHR and which the City therefore concedes can be easily re-produced in this lawsuit at the touch of a button.[94] Yet,

---

90 Ex. 33 at 12; cited in Am. Compl. (Doc. 25) at ¶ 34.

91 *Id.*; cited in Am. Compl. at ¶ 35.

92 *Id.* at 44; cited in Am. Compl. at ¶ 21.

93 *Id.* at 50 & 56; cited in Am. Compl. at ¶ 42.

94 *See* Ex. 34 (Email from Kitze Collins February 28, 2023) at 2.

the City refuses categorically to produce any of the materials. Moore's requests and the City's objections are summarized in this table:

| RFP. No. | Request | Objections |
| --- | --- | --- |
| RFP No. 7 | 300 MPD use of force files comprising representative sample provided to MDHR | Overbroad<br>Irrelevant<br>Burdensome to redact PII |
| RFP No. 8 | Compilation of MPD use of force incident data provided to MDHR | Overbroad<br>Irrelevant |
| RFP No. 9 | Compilation of MPD traffic stop data provided to MDHR | Overbroad<br>Irrelevant |
| RFP No. 10 | 125 Internal Affairs and 164 OPCR files provided to MDHR | Overbroad<br>Irrelevant<br>Burdensome to redact PII |

The City's position is that "MDHR's investigation . . . is focused on an entirely different issue than [Moore's] case—the disparities in the use of force between certain populations; not whether one particular use of force was unconstitutional."[95] The City's counsel is apparently unfamiliar with the basic elements of a *Monell* claim, which requires a plaintiff to prove a pattern of similar misconduct. Here, Moore's claim is not merely premised on allegations of the exact same conduct that MDHR found to constitute "a pattern or practice of discrimination" of a "repeated, routine, or of a generalized nature."[96] Rather, the lion's share of his allegations against the City in the amended complaint are expressly based on the MDHR findings themselves.[97]

---

95 Ex. 35 (City letter dated February 27, 2023) at 2.

96 Ex. 33 at 5.

97 The allegations underlying Moore's *Monell* claim are found on pages 6 through 18 of the amended complaint. The MDHR Report is cited at least 26 times. (*See* Am. Compl. at 6–18.)

### C. Moore's Requests for Documents Related to Derek Chauvin's Training and Allegations of Excessive Force

Moore's claim against the City is also expressly based on the City's apparent condoning of Derek Chauvin's habitual use of excessive force, most commonly against Black citizens.[98] Chauvin is the poster child for MPD's culture of excessive force and race-based policing. Moore's requests regarding Chauvin and the City's objections are summarized in the below table. The City refuses to produce any of the requested materials.

| No. | Request | Objections |
|---|---|---|
| RFP No. 11 | Documents sufficient to show training received by Derek Chauvin | Irrelevant<br>Overbroad |
| RFP No. 13 | All Documents related to Chauvin's alleged use of excessive force. | Irrelevant<br>Overbroad |

### D. MPD's Revisions to its Use of Force Policies and Training

MHDR concluded that "City and MPD leaders have been aware of the long-standing, disproportionate impact of race-based policing on people of color . . . especially Black individuals" and that "City and MPD leaders . . . allowed organizational culture to fester within MPD."[99] The City's awareness of the problem is reflected in its recent changes to its use of force policies and training, including its ostensible but unenforced ban on "warrior-style training" in 2019[100] and its extensive revisions to its policies in 2020. Among other new provisions added to the revised policies are requirements that officers

98 Am. Compl. (Doc. 25) at 8–11, ¶¶ 22–31.

99 Ex. 33 at 9.

100 *Id.* at 40 ("[M]uch of MPD's current trainings continue to embed this warrior mindset . . . [as] MPD currently uses a 'paramilitary' approach to train its officers.").

"use the lowest level of force needed to safely control a subject" and "not purposefully use words or actions . . . intended to incite or escalate reactive behavior."[101]

Moore's requests regarding these issues and the City's objections are summarized in this table:

| RFP. No. | Request | Objections |
| --- | --- | --- |
| RFP No. 15 | All Documents related to revisions, or potential revisions, to use of force policies from 2018 to the present | Irrelevant<br>Overbroad<br>Vague |
| RFP No. 16 | All Documents related to revisions, or potential revisions, to use of force training from 2018 to the present | Irrelevant<br>Overbroad<br>Vague |

The City has produced MPD's revised use of force policies, but it refuses to produce the revised training materials and refuses to search for a produce any documents related to the City and MPD leaders' consideration of need for the changes or and the specific proposals that were adopted and/or rejected. The City specifically refuses to do any searching of ESI of the City involved leaders, contending that ESI searches are overbroad and disproportionate to the needs of the case.[102]

**E. The City's Refusal to Respond to Interrogatory No. 8**

Interrogatory No. 8 requests identification of any database search regarding Moore or his vehicle the night of the traffic stop that is not reflected on the records that the City has produced. This issue is relevant because Partyka's alleges that he recognized Moore, ran his name and discovered that Moore had a revoked license, and that is why Partyka conducted the traffic stop. [redacted]

101 Ex. 36 (MPD use of force revisions effective September 8, 2020) at 6, 8.

102 *See* Ex. 42 (Email from Kitze Collins 3/17/2023) at 2.

[redacted][103]

The City's completely nonresponsive "answer" attempts to avoid admitting that the City has no knowledge of any other database query of Moore by stating merely that "the City will search for and produce any relevant, nonprivileged documents."[104]

## PROCEDURAL HISTORY

### A. The Protective Order expressly contemplates production of "information that could reveal the identity of confidential informants" and "nonpublic data under the Minnesota Data Practices Act."

Counsel for Moore and Assistant City Attorneys Mark Enslin and Rebekah Murphy agreed to a stipulated Protective Order that was approved and issued by the Court on October 13, 2022.[105] The Protective Order expressly contemplates that "information concerning confidential informants, including information that could reveal the identity of such informants" will be produced.[106] It was for that specific reason that the parties agreed to permit an "attorney's eyes only" category of confidentiality.[107]

The Protective Order also expressly contemplates production of "nonpublic data under the Minnesota Government Data Practices Act."[108]

103 *See supra* at 22.

104 Ex. 37 (City's response to fourth set of interrogatories) at 4.

105 Doc. 19

106 *Id.* ¶ 11.a.

107 *Id.* ¶ 11.

108 *Id.* ¶ 2.

### B. Defendants' Refusal to Produce any Requested Information

As set forth in detail in the meet and confer statement filed herewith, counsel for Moore went to great lengths to attempt to engage Defendants' counsel in substantive discussions regarding resolving the parties' discovery disputes, but neither defendants' counsel meaningfully engaged with the issues. Illustrative of the City's approach is its decision to assert that the MDHR materials were irrelevant and unduly burdensome to produce before undertaking any effort whatsoever to investigate the factual basis for those objections, and then refusing to provide any information to substantiate the objections. Partyka's continued improper withholding of important non-identifying information related to the Informant is similarly unreasonable. Moore therefore requests an award of attorney's fees incurred in connection with this motion.

## ARGUMENT

### I. The Court should order Defendants to disclose the alleged Informant's identity and respond to all related discovery in full.

Moore's claim against Partyka is that "in a premeditated act of revenge, Partyka fabricated and/or misrepresented evidence to a Hennepin County judge in order to falsely obtain a search warrant for Moore's residence."[109] As set forth at length above, Judge Scoggin has already found, based on only a fraction of the relevant evidence, that Partyka had exhibited a "reckless disregard for the truth" in making multiple misrepresentations in the warrant application—including a misleading description of the alleged Informant. Since that time, it has come to light that Partyka made numerous other highly relevant and

---

[109] Am. Compl. (Doc. 25) at 3.

material misrepresentations about the Informant, the garbage pulls that supposedly corroborated the Informant's "information," and the obvious lack of any justification for the December 7, 2019 traffic stop of Moore.

Partyka and the City's litigation strategy is to deny Moore any further discovery into Partyka's misrepresentations about the Informant. If the Court allows them to do this, it would effectively sanction Partyka's past deception and permit him to spend the next several months coming up with whatever story he thinks the jury might believe to explain away all of contradictions in the evidence about how he came to be introduced to the Informant and what the Informant told him and Moore will thus have been denied the opportunity to find out how much of Partyka's story is true or false on what is arguably the most important factual issue in the case. Given the high likelihood that Partyka intentionally fabricated material evidence in the criminal case against Moore, it would be a travesty of justice if the Court turned a blind eye and thereby allow Moore to be disabled from discovering the full extent of Partyka's conduct so that he can present his case to the jury.

### A. Moore has a "clear need" for discovery into the alleged Informant because Partyka's misrepresentations are "specific information" indicative of "the possibility of judicial deception" in connection with the illegal search upon which his 4th Amendment claim is premised.

Defendants are correct that under *Rovario v. United States*, disclosure of the identity of an alleged confidential informant requires a showing of a clear need for the identity. 353 U.S. 53, 60–61, 77 S. Ct. 623, 628 (1957). But they ignore that "[w]here the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to

the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Id*. at 60–61, 77 S. Ct. at 628. Indeed, this case presents the exact type of factual scenario where the Supreme Court contemplated the informant's privilege would give way: "where the legality of a search . . . is in issue and the communications of an informer are claimed to establish probable cause." *Id*. at 61. 77 S. Ct. at 628.

To prevail on this motion, Moore only need establish specific facts that "could lead a reasonable person to conclude that further inquiry into the possibility of judicial deception" by Partyka in connection with his affidavits is warranted. *Blight v. City of Manteca*, 266 F. Supp. 3d 1234, 1236 (E.D. Cal. 2017). Judge Scoggin has already found not only that Partyka *may have* misrepresented evidence in the warrant application—including misrepresenting the Informant as a CRI—he found that Partyka *actually did* misrepresent material evidence. Judge Scoggin's careful factual findings of Partyka's "reckless disregard for the truth" and "diminished credibility" alone compel a ruling in Moore's favor.

In *Blight*, a federal court ordered a deposition of a confidential informant where the plaintiff alleged, exactly as Moore does, that police violated the Fourth Amendment by "misrepresent[ing] or omitt[ing] material aspects of what the CI told them" in an affidavit supporting an application for a search warrant for the plaintiff's home. *Id*. at 1235. "Defendants' affidavit stated that a certain drug dealer lived in plaintiff's home[, but] when defendants searched [the] home, that person was not found there." *Id*. at 1236 n.2. The defendant municipality and officers opposed the motion to compel the deposition on the ground that the plaintiff's allegations were mere speculation unsupported by specific facts.

*Id*. at 1236. The magistrate judge disagreed, finding that mere the fact that the alleged drug dealer was not found during the search "along with the fact that [the affidavit alleged] the CI 'was familiar with' plaintiff's home . . . indicat[ed] that plaintiff's judicial deception claim [wa]s not mere speculation." *Id.* at 1236 n.2. The district court denied defendant's motion for reconsideration of the magistrate judge's order compelling the deposition of the informant. *Id.* at 1236.

The only difference between *Blight* and this case is that Moore's showing of the possibility that Partyka blatantly and intentionally deceived the state court judge who signed off the warrant is exponentially stronger than in *Blight*. Unlike here, in that case there was no allegation that the specific averments in the defendants' affidavit were false or contradicted by subsequent testimony, and there was no judicial finding that the officers made any misrepresentations whatsoever. In contrast, here Judge Scoggin has already found that Partyka: (1) misrepresented the Informant as a CRI when he was not; (2) misrepresented an empty bag as containing non-existent white powder "in reckless disregard for the truth"; (3) misled the court regarding his role in the excessive force at the traffic stop; and (4) made "fantastic" claims of having "a photographic memory and being responsible for 40% of all firearms seized by the Minneapolis Police Department."[110] Judge Scoggin's findings alone establish a likelihood of judicial deception far higher than was the case in *Blight*.

---

110 Ex. 12 at 4–6 ¶¶ 13–16, 8.

But there's more—much more. [redacted]

Defendants principally rely on *Elnashar v. Speedway SuperAmerica, LLC*, to support their objections. 484 F.3d 1046, 1052–53 (8th Cir. 2007).[111] But, unlike Moore, Elnashar was not suing police officers for fabricating evidence. Rather, he was suing his former employer for discrimination, contending that that he had been fired because a coworker told the FBI that he was a bomb-making terrorist. *Id.* at 1050–51. Elnashar's motion to compel the identity of the informant was premised on a hair-brained theory that the existence of one bigoted coworker could be bootstrapped into a showing that the entire organization harbored anti-Arab animus. *Id.* This Court denied the motion because *in camera* review of the tip "revealed that the informant did not accuse Elnashar of making bombs or other terroristic activities," and the Eight Circuit affirmed. *Id.* at 1053. *Elnashar* is nothing at all like this case and Defendants' reliance thereon is misplaced.

Defendants also rely on *Carpenter v. Lock* for the proposition that the identity of a "tipster" is never discoverable. 257 F.3d 775 (8th Cir. 2001). Defendants are wrong. The *Carpenter* decision is a denial of a habeas corpus motion in a criminal case, where the defendant had sold drugs to an undercover officer and the informant "did not participate in or witness the actual transaction" and so was not a material witness. *Id.* at 779. Defendants are conflating Moore's criminal case with this civil rights lawsuit. While a tipster may not be a material witness in a drug trafficking trial, he certainly would be in a subsequent lawsuit against the police for framing the defendant by lying about what the tipster told them.

---

111 Ex. 3 at 3; Ex. 4 at 4.

### B. Partyka's failure to disclose even obviously non-identifying information in his interrogatory answers further corroborates the likelihood of judicial deception.

Partyka amended his answers to Interrogatory Nos. 5, 6, and 7, purportedly to add all of the requested information that could be disclosed without identifying the Informant. In fact, Partyka continues to withhold information that could not possibly be used to identify the Informant, but which certainly could be used to expose presently unknown details regarding possible misrepresentations by Partyka. Partyka's studiously vague answers, which improperly withhold discoverable, non-identifying information, constitute yet more indicia of a coverup.

#### 1. Interrogatory No. 5

Interrogatory No. 5 requests a description of how it came about that Partyka—a beat cop on the force just two years who had no training, experience, resources, or even time to handling informant or conduct investigations of any kind whatsoever—began to "handle" an informant at all, reliable or otherwise. Partyka refuses to identify the alleged "other law enforcement agency" that introduced him to the Informant. His contention that this information would disclose the Informant's identity is nonsense. The Court should order a complete response that includes full disclosure of all involved parties, the dates of the relevant communications, and details of the information that was exchanged.

| Interrogatory No. 5 | Complete Amended Answer |
|---|---|
| Identify the Informant and describe in detail the circumstances surrounding your introduction to the Informant. | Partyka objects to this interrogatory as it seeks privileged information. A confidential informant's identify is privileged. *Elnashar v. Speedway SuperAmerica, LLC*, 484 F.3d 1046 (8th Cir. 2007); *see also Roviaro v. United States*, 353 U.S. 53 (1957). The Informant's identity is not essential to the fair determination of Plaintiff's action. Additionally, Partyka objects as the Informant's identity is not relevant to the underlying lawsuit and is not likely to lead to admissible evidence. The Informant's identity and the circumstances surrounding Partyka's introduction to the Informant will not result in the discovery of admissible evidence.<br><br>Without waiving the above objections, in the spring of 2019, Partyka was introduced to the Informant by another law enforcement agency. The Informant contacted the other law enforcement agency to provide information about multiple individuals engaged in criminal activity. The other law enforcement agency contacted Partyka and provided contact information for the Informant. Additional information will result in the identification of the Informant. |

### 2. Interrogatory No. 6

Interrogatory No. 6 requests a description of Partyka's efforts to investigate the reliability of the information that the Informant allegedly provided. Partyka's answer is completely nonresponsive; it literally says *nothing at all* about *anything* that Partyka did. Partyka's use of the passive voice with respect to his various claims about the information proving to be reliable is highly unlikely to be merely poor draftsmanship. Upon further discovery, Moore expects to find out that Partyka did absolutely nothing at all to verify the Informant's reliability.

| Interrogatory No. 6 | Complete Amended Answer |
|---|---|
| Describe in detail all of Your efforts to investigate the reliability of information provided by the Informant, the Informant's relationship with Moore, and the Informant's alleged knowledge of any of Moore's alleged criminal activities. | Partyka objects to this interrogatory and incorporates the objections listed in Partyka's response to Interrogatory No. 5. The information sought would result in the identification of the Informant. Without providing information that would identify the informant, the items discussed included those items found in the search warrant previously provided to Plaintiff by Defendant City of Minneapolis.<br><br>The Informant provided names and locations of individuals who had active warrants for their arrests. The information resulted in multiple arrests as the individuals' names and locations were accurate. Those individuals were also occasionally found to be in possession of controlled substances. The Informant also provided detailed information of people associated with Moore and his drug trafficking, including names, addresses, and vehicle descriptions that were found to be accurate. |

A complete answer to this interrogatory will state: (1) all of the information that the Informant allegedly provided; (2) who the information was provided to; (2) all of the actions taken by Partyka to verify the accuracy of the information; (3) which officers acted on the information if not Partyka; and (4) the result of those actions (e.g., arrests, etc.).

**3. Interrogatory No. 7**

Interrogatory No. 7 requests that Partyka identify the date, method of communication, and details of his alleged communications with the Informant. Partyka's response is another intentional non-answer that says almost nothing. The contention that disclosing the date of Partyka's communications with the Informant would reveal the Informant's identity is utter nonsense. Partyka obviously wants to avoid admitting how many times he spoke with the Informant (smart money is on one—or zero) and that he has no recollection of any of the conversations (if any) that did not relate to Moore (if any).

| Interrogatory No. 7 | Complete Amended Answer |
|---|---|
| Identify all Communications with the Informant, including the date; the method of communication (in-person, telephone, etc.); and describe in detail everything that You discussed with the Informant during each Communication. | Partyka objects to this interrogatory and incorporates the objections listed in Partyka's response to Interrogatory No. 5. The information sought would result in the identification of the Informant. Partyka's response, without responding with identifying information states that the meetings were in person and over the phone. The items discussed included those items found in the search warrant previously provided to Plaintiff by Defendant City of Minneapolis and also found in these Amended Responses to Second Set of Interrogatories. Additional details would result in the disclosure of the identity of the Informant. |

As explained above, it is obvious that the only reason that Partyka bothered amending this answer at all is to change his original March 9 verified statement that all of his "meetings" with the Informant "were in person"[112] to now state that the "meetings" were "in person ***and over the phone***."[113] [redacted].[114]

A complete answer to this interrogatory will enumerate all of the communications that Partyka ever had with the Informant, including: (1) their exact or approximate dates and times; (2) the method of communication, including the location of any in-person meetings; (3) the details of everything that Partyka was told by the Informant at each meeting.

---

112 Ex. 2 at 5–6; Ex. 20.

113 Ex. 3 at 4 (emphasis added).

114 Ex. 13 at MPLS0000916.

### C. The Court should compel a deposition of the alleged Informant.

Disclosure of the Informant's identity and the incomplete, so-called informant file is insufficient for Moore to have a "fair determination" of his claim against Partyka because the only way to confirm or refute the veracity of Partyka's averments about the Informant is to depose the Informant. *Rovario,* 353 U.S. at 61, 77 S. Ct. at 628. The City has stated in writing that they will seek a protective order barring the deposition.[115] But without a deposition, Partyka could simply continue to insist that everything in his affidavits is true and Moore will not be able to gainsay him even if Partyka makes up the entire story. This is an absurd result that would defeat the entire purpose of the *Rovario* test. As Judge Scoggin has already ruled that Partyka engaged in judicial deception—not merely that there is a reasonable possibility that he did so—the Court should issue an order permitting the deposition and compelling the Informant to appear (if he or she exists). *See Blight*, 266 F. Supp. 3d at 1236.

## II. The Court should Order the City to produce the materials it provided to MDHR that support MDHR's highly relevant findings.

In order to prove his *Monell* claim against the City, Moore must show:

> 1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
>
> 2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

115 Ex. 38 (Letter from City's counsel dated April 4, 2023).

> 3) That plaintiff was injured by acts pursuant to the governmental entity's custom, *i.e.*, that the custom was a moving force behind the constitutional violation.

*Samaha v. City of Minneapolis*, 525 F. Supp. 3d 933, 941 (D. Minn. 2021). MDHR concluded after an exhaustive investigation that: MPD officers have a "pattern or practice"[116] of "using higher rates of more severe force against Black individuals"[117]; "race is the likely reason"[118] for this disparity; and the City condones the abusive practices by "teaching an approach to policing that emphasizes aggression"[119] and failing to hold "[o]fficers . . . accountable because of ineffective accountability and oversight systems."[120] "The pattern or practice of discriminatory, race-based policing is caused primarily by [MPD's] organizational culture."[121]

"Only by looking at the content of [internal affairs] files can [a] plaintiff learn whether [a police department's] investigations were real, meaningful, and objective." *Costantino v. City of Atl. City*, 152 F. Supp. 3d 311, 322 (D.N.J. 2015). *Monell* plaintiffs "must review [such] files to be able to compare the facts in this case to other cases." *Id.* Accordingly, Moore requested that the City produce the following documents and information that were provided to MDHR:

---

116 Ex. 33 at 5.

117 *Id.* at 12.

118 *Id.*

119 *Id.* at 44.

120 *Id.* at 48.

121 *Id.* at 8.

| RFP. No. | Request | Objections |
|---|---|---|
| No. 7 | 300 use of force files comprising a representative sample of MPD use of force files provided to MDHR | Overbroad<br>Irrelevant<br>Burdensome to redact PII |
| No. 8 | Compilation of MPD use of force incident data from January 1, 2010 to December 31, 2020 provided to MDHR | Overbroad<br>Irrelevant |
| No. 9 | Compilation of MPD traffic stop data January 1, 2017 to May 24, 2020 provided to MDHR | Overbroad<br>Irrelevant |
| No. 10 | 125 Internal Affairs and 164 OPCR files provided to MDHR | Overbroad<br>Irrelevant<br>Burdensome to redact PII |

The City categorically refuses to produce a single document. The City's original responses the requests are nearly verbatim copies of each other and the exact same objections are asserted in response to each request. Six days ago, after weeks of ignoring requests for the information, the City supplemented its responses to Request Nos. 7 and 10 to finally specify the quantity of responsive documents and data at issue on April 4, 2023.[122]

### A. The documents provided to MDHR are highly relevant because Moore's *Monell* allegations are expressly based upon them.

Moore's claim is not only premised on allegations of the same conduct that MDHR's investigation was focused on—his claim is literally based on the MDHR findings themselves.[123] Helpfully, MDHR's report states exactly which information supports each of the detailed factual findings upon which its damning overall conclusions are premised. Many of MDHR's most relevant findings are expressly based on its analysis of the specific

---

122 Ex. 4 at 8, 10–11.

123 The allegations underlying Moore's *Monell* claim are found on pages 6 through 18 of the amended complaint. The MDHR Report is cited at least 26 times. (*See* Am. Compl. (Doc. 25) at 6–18, ¶¶ 15–57.)

information that Moore has requested. Just a few examples of these findings are listed below:

*RFP No. 7: Representative Sample of 300 MPD Use of Force Files*

- "A review of a statistically representative sample of 300 of MPD's use of force files . . . demonstrates that MPD officers used unnecessary and inappropriate levels of force in 28.6% of incidents in which they recorded using force."[124]

- "Review of these files also demonstrated that in 76.5% of incidents in which MPD officers inappropriately used force, another officer should have, but failed, to intervene."[125]

*RFP No. 8: MPD Use of Force Data Compilation*

- "63% of all use of force incidents that MPD officers recorded were against Black individuals."[126]

- "MPD officers are more likely to use soft tactics on white individuals than Black individuals in similar circumstances."[127]

*RFP No. 9: MPD Traffic Stop Data Compilation*

- "Analysis of MPD's traffic stop data demonstrates that when MPD officers are more likely to see the race of a vehicle's occupants, officers are more likely to stop vehicles with people of color than vehicles with only white occupants. In other words, race is the likely reason for the racial disparity in MPD's traffic stop practices."[128]

- "Of the officer-initiated traffic stops in which MPD officers recorded using force, 80% of those stops involved Black individuals even though Black individuals only comprise approximately 19% of the Minneapolis population."[129]

---

124 Ex. 33 at 46.

125 *Id.*

126 *Id.* at 11.

127 *Id.* at 18.

128 *Id.* at 20.

129 *Id.* at 28.

*RFP No. 10: Sample of 164 OPCR and 125 Internal Affairs Files*

- "The review of these files demonstrates that: OPCR improperly investigates approximately 50% of police misconduct complaints . . . [and] Internal Affairs improperly investigates approximately 25% of police misconduct complaints."[130]

- "[R]eview of police misconduct files demonstrates that before the Police Chief issues a final decision, the problematic officers may even be assigned to a field training officer position or promoted to a supervisor position, where they have the potential to train other officers to use the same racially biased methods of policing."[131]

The City's objection that the materials are irrelevant because MDHR's investigation . . . [wa]s focused on an entirely different issue than [Moore's] case"[132] is nonsensical and frivolous on its face.

Moreover, documents and information produced to a government body that, like MDHR here, "was investigating the allegations [a plaintiff] makes in his complaint" are "plainly relevant." *United States ex rel. Luke v. Healthsouth Corporation*, No. 2:13-cv-01319, 2018 WL 3186941, at *9 (D. Nev. June 28, 2018) (upholding order to produce "all documents exchanged between the Government and the defendants" and rejecting argument that request was overbroad "because the Government's investigation expanded beyond [plaintiff's] allegations"); *accord In re Broiler chicken Antitrust Litig.*, 2017 WL 4417447, *6-7 (N.D. Ill. Sept. 28, 2017) (ordering production of documents "Defendants have produced to the Florida AG" because "the benefit of producing a specific set of

---

130 *Id.* at 53–54.

131 *Id.* at 55.

132 Ex. 35 at 2.

documents that appear to be relevant to Plaintiffs' claims outweighs the burden of doing so").

Finally, the Court should not countenance the City's attempt to stonewall discovery by claiming that "the files requested involve uses of force that are substantially dissimilar to the force used against" Moore[133] while refusing to provide any information to substantiate that assertion. District courts will "only entertain[] an unduly burdensome objection when the responding party demonstrates how the request is 'overly broad, burdensome, or oppressive,' by submitting affidavits or offering evidence which reveal[] the nature of the burden." *Tequila Centinela, S.A. de C.V. v. Bacardi & Co*., 242 F.R.D. 1, 10 (D.D.C. 2007). The City's counsel stated during meet and confer that the specific use of force and investigative files that were produced to MDHR were negotiated between the parties based on MPD's summary data.[134] The undersigned requested this information to evaluate the City's relevance objection, but the City simply ignored the request, and refused further discussions under the guise that it was "evident that [the parties] are at an impasse."[135]

### B. The burden of producing the MDHR materials is *de minimus* and the requests are therefore proportional to Moore's significant and important civil rights claim.

The City's fallback position is that "the majority of the MDHR documents are not relevant" and therefore "[a]ny time/cost associated with reviewing the documents is plainly

133 Ex. 4 at 7–11.

134 *See* Meet and Confer Statement of Matthew Veenstra at 4.

135 Ex. 34 at 1.

excessive in comparison to the needs of this case."[136] This argument rings completely hollow, given the City's refusal to provide any information to back it up. Moreover, the number of documents at issue is actually quite modest as the City finally acknowledged six days ago that there are just 9,355 documents responsive to Request Nos. 7 and 10,[137] which seek files pertaining to a "representative sample"[138] of 300 use of force incidents and investigations into associated excessive force complaints. Request Nos. 8 and 9 seek data that was presumably produced to MDHR on a single spreadsheet.

Moore's requests here are well targeted to the conduct alleged in his complaint and far narrower than the expansive discovery that has been allowed in similar *Monell* cases based on police misconduct. For example, in *Costantino*, the court ordered the city to produce *all* of its Internal Affairs files for an *eleven-year period* totaling "approximately 2,000 files" because they were "vital to plaintiff's *Monell* claim." 152 F. Supp. at 315 (noting "the unremarkable fact that production of [internal affairs] files is routinely ordered in § 1983 cases). Similarly, in *Perry v. City of Gary*, the district court ordered the production of all "information regarding complaints of excessive force" against "all" officers in the entire police department because they were "directly relevant to Plaintiff's § 1983 and *Monell* claims." 2009 WL 2253157, at *6 (N.D. Ind. July 27, 2009).

---

136 *Id.* at 2.

137 2,889 documents are responsive to No. 7, and 6,466 documents are responsive to No. 10. Ex. 4 at 8, 11. There is almost certainly a great deal of overlap in these figures, so the total number of unique documents is likely significantly lower than 9,355.

138 Ex. 33 at 11 n.16.

Federal district courts routinely require municipalities to produce a targeted sample of investigative files such as those Moore seeks. *E.g., Black Love Resists in the Rust by and through Soto v. City of Buffalo*, 334 F.R.D. 23, 35 (W.D.N.Y. 2019) (granting motion to compel production of 168 Internal affairs files). Moore's request is limited to a sample of use of force files that is "weighted to closely represent all of MPD's recorded use of force incidents from January 1, 2010 to December 31, 2020, in terms of the type of force used by an officer, the race of the individual against whom the officer used force, and whether the incident was coded as a crisis intervention incident involving an individual experiencing a mental or behavioral health crisis."[139] Given the precise and targeted nature of the request, the City's overbreadth objection has no merit.

Furthermore, the City's burden in responding is dramatically reduced because—as the City concedes—all of the materials are sitting in a readily producible format, and no additional effort is required to compile or process the files for production.[140] *See, e.g., In re Hardieplank Fiber Cement Siding Litig*., No. 12-MD-2359, 2014 WL 5654318, at *2 (D. Minn. Jan. 28, 2014) (affirming order compelling production of "all documents . . . produced in discovery" in similar lawsuits); *accord, e.g., Fields v. Wright Med. Tech., Inc.*, 2017 WL 3048867, at *3 (N.D. Ind. July 19. 2017) (stating that "the fact that Defendants need not engineer a search from scratch makes Plaintiff's request less burdensome").

139 *Id.*

140 Ex. 34 at 2.

### C. The Minnesota Data Practices Act does not shield the City from discovery in litigation.

The Court's Protective Order, which was negotiated between Moore's counsel and the City Attorney's office, expressly contemplates the production of "'not public data' under the Minnesota Government Data Practices Act."[141] The only information that the Order contemplates "will not be produced" is "private personnel data" such as "home addresses, home telephone numbers" etc., and only then when the information is not "relevant to the causes of action."[142] Since all of the requested information is relevant, it must be produced and the City may designate it confidential as appropriate.

Moreover, the Data Practices Act does not override this Court's substantial power to compel the production of information relevant to the action from the parties. To the contrary, "state law does not govern discoverability and confidentiality in federal civil rights actions." *Dorsett v. County of Nassau*, 762 F. Supp. 2d 500, (E.D.N.Y. 2011) (holding that internal affairs report was not protected by state privacy statute and stating that "federal law disfavors privileges barring disclosure of relevant evidence").

Finally, The Court should reject the City's make-work objection that they have to review every document to redact privately identifying information ("PII"). The Protective Order expressly contemplates the production of documents containing "sensitive personal information." Under Local Rule 7.1, PII need not be redacted unless the document is filed.

---

[141] Doc. 19 ¶ 2.

[142] Doc. 19 ¶ 6.

## III. The Chauvin-related materials should be produced because they are highly relevant and the burden of producing them is *de minimus*.

Moore's claim against the City is also expressly based on the City's apparent condoning of Derek Chauvin's habitual use of excessive force, most commonly against Black citizens.[143] Chauvin is the poster child for MPD's infamous paramilitary culture of excessive force and race-based policing. Moore requested (1) documents sufficient to show the training that Chauvin received from MPD[144] and (2) documents related to allegations of his use of excessive force, including eight incidents that prosecutors sought to enter into evidence against him at his murder trial.[145] Unbelievably, the City contends that the requested documents are "wholly irrelevant to the allegations in this case, because Derek Chauvin is not a defendant."[146] It refuses to produce any of the requested materials, although it knows exactly where they are located and could produce them tomorrow at the touch of a button.

The City's position is absurd, and the Court should reject it out of hand.

## IV. Documents and ESI related to MPD's revisions to use of force policies and training should be produced because the materials are relevant, and the burden proportionate to Moore's substantial and important civil rights claim.

The City's refusal to search for a produce documents reflecting the City's awareness of the need for changes to MPD's use of force policies and training and the specific proposals that MPD considered is improper. The City objects that any documents post-

---

143 Am. Compl. (Doc. 25) at 8–10.

144 Ex. 4 at 11 (Request No. 11).

145 *Id.* at 12 (Request No. 13); Ex. 43 (State's Supp. Mem. of Law).

146 Ex. 4 at 12 (Resp. No. 13); *accord Id.* at 11 (Resp. No. 11) (same).

dating the traffic stop are irrelevant. This objection has no merit. "Post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right." *Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989).

The Court should order the City to conduct a reasonable search for all documents responsive to Request Nos. 15 and 16, including in email and other ESI among the MPD and City leaders who were involved with considering and approving the changes.

## V. The Court should order the City to immediately answer Interrogatory No. 8.

The City's promise to "search for and produce" documents that contain information responsive to Interrogatory No. 8 (if it finds any) is an improper abuse of Rule 33(d) and a transparent attempt to avoid admitting that the City no knowledge of any other database query of Moore other than what is reflected in the known records.

Parties "may not simply refer generically to past or future production of documents. They must identify in their answers to the interrogatories specifically which documents contain the answer. Otherwise, they must completely answer the interrogatories without referring to the documents." *Sylva Corporation, Inc. v. Lewandowski*, WL 5087267, at *7 (D. Minn. May 14, 2021). It is "an abuse of" Rule 33(d) to point to a mass of produced documents rather than answering the interrogatory. *In re Sulfuric Acid Antitrust Litig*., 231 F.R.D. 320, 325-26 (N.D. Ill. 2005). "If [the City's] position is that there is no information in [its] possession regarding" the specified database queries regarding Moore "it must say so unambiguously in [its] answer." *Id.* at 327.

The Court should order the City to immediately answer the interrogatory based on the information that it presently has.

## CONCLUSION

None of Defendants' objections has any merit whatsoever. Nothing could conceivably be more relevant to a claim that a police officer lied about information from an informant than discovery into the identity of the informant and what information he gave to the police. Similarly, the City's contention that the MDHR and Chauvin materials are irrelevant notwithstanding that Moore's claim against the City is expressly premised on MDHR's analysis of the specific requested materials and Chauvin's despicable "non-disciplinary" record is disingenuous.

The Court should not countenance Defendants blatant stonewalling, and should order Defendants to promptly respond in full to Moore's to valid discovery, and award Moore the fees incurred in connection with the motion.

Dated: April 10, 2023

**SAUL EWING LLP**

By *Matthew Veenstra*

Matthew Veenstra (MN #392517)
Courtland Merrill (MN #311984)
Douglas Anderson (MN #0402494)
33 South Sixth Street, Suite 4750
Minneapolis, MN 55402
Telephone: (612) 225-2800
Email: courtland.merrill@saul.com
matthew.veenstra@saul.com
douglas.anderson@saul.com

*Attorneys for Plaintiff Andre Moore*