# EXHIBIT A
## to
## Declaration of Alicia Granse

April 11, 2023

Filed in District Court
State of Minnesota
6/23/2020 1:33 PM

STATE OF MINNESOTA DISTRICT COURT

COUNTY OF HENNEPIN FOURTH JUDICIAL DISTRICT

State of Minnesota,

Plaintiff,

vs.

**ANDRE LAMAR MOORE,**

Defendant.

**NOTICE OF MOTION AND MOTION TO SUPPRESS EVIDENCE OR TO ORDER AN EVIDENTIARY HEARING**

MNCIS File No. 27-CR-20-4146

* * *

TO: THE HONORABLE PAUL SCOGGIN, JUDGE OF DISTRICT COURT; AND ALLISON REYERSON, ASSISTANT HENNEPIN COUNTY ATTORNEY.

## NOTICE OF MOTION

**PLEASE TAKE NOTICE**, that on the 23rd day of June, 2020, at 5:00 p.m., or as soon thereafter as counsel may be heard, Defendant, Andre Lamar Moore, by and through Counsel will move this Court as follows:

## MOTION

Mr. Moore hereby moves this Court for an order to:

1. Suppress the search warrant and the results of the search of the home because the warrant was not supported by probable cause, and /or the warrant was issued as a no knock warrant without justification as required by case law and the United States and Minnesota Constitutions.

2. Alternatively, find under *Franks/Doyle* that the defense has met the threshold required to be granted a Franks/Doyle hearing.

Respectfully Submitted,

OFFICE OF THE HENNEPIN COUNTY PUBLIC DEFENDER
MARY MORIARTY - CHIEF PUBLIC DEFENDER

Respectfully submitted,

Filed in District Court
State of Minnesota
6/23/2020 1:33 PM

By: /s/
Tanya Bishop, #0398982
Assistant Public Defender
701 Fourth Avenue South, Suite 1400
Minneapolis, MN 55415
Telephone: 612-348-8229
Tanya.bishop@hennepin.us

/s/
Alicia L. Granse, #0400771
Assistant Public Defender
701 Fourth Avenue South,
Suite 1400
Minneapolis, MN 55415
Telephone: 612-596-1981
Alicia.granse@hennepin.us

Dated: This 23rd day of June, 2020.

Cc: Allison Reyerson
Office of the Hennepin County Attorney

Filed in District Court
State of Minnesota
6/23/2020 1:33 PM

STATE OF MINNESOTA DISTRICT COURT

COUNTY OF HENNEPIN FOURTH JUDICIAL DISTRICT

State of Minnesota,

Plaintiff,

vs.

**ANDRE LAMAR MOORE,**

Defendant.

**MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE OR TO ORDER AN EVIDENTIARY HEARING**

MNCIS File No. 27-CR-20-4146

* * *

## INTRODUCTION

On May 13, 2020, Defense filed two motions to the Court: One notifying the Court of Defense's intent to suppress any and all evidence obtained as a result of the search of 2821 Colfax Avenue North based on multiple deficiencies within the search warrant affidavit; the other compelling the disclosure of the identity of the confidential reliable informant (CRI).

On May 18, 2020, Defense filed a Memorandum of Law in Support of the May 13, 2020 Motion to Compel. On May 21, 2020, the State filed a Memorandum in Opposition to Defendant's Motion to Compel Evidence. On May 25, 2020, Defense filed a Reply. On June 5, 2020, the Court ruled that the motion was denied in part to wit "the Court finds Defendant has not met his initial burden of showing the CRI is a material witness in the charged crime or is necessary to present a defense." However, the Court further ruled that an in camera review was granted, specifically stating that, "Defendant meets the minimal threshold for an *in camera* review of the CRI's identity and the standard associated with reviewing the CRI's case file concerning the CRI's track record and any benefit offered to the CRI.

.

Filed in District Court
State of Minnesota
6/23/2020 1:33 PM

On June 11, 2020 at 11 a.m., the Court conducted an "in camera" review to inform its ruling on Defense's Motion to Compel. On June 12, 2020, the Court emailed a proposed Order denying Mr. Moore's Motion to Compel, but reserved filing and requested further oral argument on June 15, 2020.

On June 15, 2020, the court substantiated the proposed Order denying the defense to compel the informant's identity and other non-identifying information but advised counsel that a *Franks* motion needed to be addressed first, if counsel intended to file one.

This Motion and its supporting Memorandum, filed on June 23rd, combine the previously filed motion that challenged the sufficiency of the warrant, and a new challenge to the officer's credibility through a *Franks/Doyle* hearing. Mr. Moore requests that a ruling be made on the sufficiency of the warrant on its face. If the warrant is found sufficient, Mr. Moore then asks that the Court grant a *Franks*/*Doyle* hearing.

All evidence obtained as a result of the warrant must be suppressed. In the alternative, Mr. Moore has made a showing that sufficient for a *Frank's/Doyle* hearing on the Officer's credibility in this case.

## FACTS

Officer Partyka has arrested Andre Lamar Moore at least twice. Officer Partyka stopped Mr. Moore's car on December 7, 2019 and charged him with Obstructing Legal Process after smashing Mr. Moore's face into the ground and calling more than 20 officers to the scene of a traffic stop. This resulted in case number 27-CR-19-30140 being filed in the District Court. Two months later, Officer Partyka swore out a search warrant for the upper unit of 2821 Colfax Avenue North, Minneapolis and Mr. Moore was arrested and charge with First Degree Sale and Prohibited Person in Possession in case number 27-CR-20-4146. A summary of each arrest follows.

On December 07, 2019, Officer Partyka and his partner Officer Brandon Knuth were on routine patrol when they decided to pull over a vehicle, which came to a stop just outside 2821 Colfax Ave North. (*See* Pg. 10 of Police Report Attached as Exhibit 1) The car was driving slowly because of the weather conditions. *Id.* Officers "drove past the vehicle at a slow speed and I observed the driver to be Andre Lamar Moore." *Id.* Squad video of the initial stop does not verify that the officers pull up next to Mr. Moore, but only shows them pulling up behind the car as it was parking in a space outside of Mr. Moore's home (the same location Officer Partyka gets a search warrant for in the present case). *See* Minutes 20:15 through 24:31 of Squad Video attached as Exhibit 2).[1]

Officer Knuth activated the squad car lights, the vehicle stopped, and Officer Partyka approached the passenger-side door of the car. Once there, he spoke no words to the passenger, a white woman later identified as Kristine Barfknecht. (*See* Minute 00:55 to 01:30 of Officer Partyka's Body Cam attached as Exhibit 3) Just after Officer Knuth told Mr. Moore that he was going to have to get out of the car, Officer Partyka told Officer Knuth that Mr. Moore was reaching for something near his right waistband. *Id.* at Minute 1:31. Officer Partyka immediately rushed over to the other side of the car with his taser out. *Id.* Officer Partyka repeatedly threatened to tase Mr. Moore until he finally pulled him out of the car and smashed his face into the asphalt. *Id.* Minutes 2:10 through 4:00. Officer Partyka sat on top of Mr. Moore and handcuffed him. Id. (*See also* Minutes 22:00 through 24:31 of Exhibit 2) The official police report states that Mr. Moore was "resisting." (*See* Page 11 of Exhibit 1) Officers Partyka and Knuth searched Mr. Moore's car and found no weapons. (*See* entirety of Exhibit 2) They searched the vehicle for roughly 20

[1] It does not appear that standard time stamps apply to squad video in the available player. Throughout the duration of this argument any reference made to "Minutes" of the squad video, reference the "Current Time" displayed to the left of the media bar used to play, pause, and stop the video.

minutes. *Id*. This included driving the vehicle to another, better-lit location, to search it. They still did not find any weapons. *Id.* They could be heard multiple times stating they were so sure that he was reaching for something, and that Mr. Moore was a "DOC (Department of Corrections) guy that's been caught with guns and fuckin' dope all the time." (See Minute 6:22 to 6:26 of Officer Partyk's Body Cam attached as Exhibit 3)

Officer Partyka may have fractured several bones in Mr. Moore's face. But this did not prevent Officer Partyka from asking Mr. Moore to do a PBT, which came back as .00. (*See* Page 9 of Exhibit 1) Officers did not do FSTs because Mr. Moore's injuries prevented it. *Id.* Officers Partyka and Knuth then brought Mr. Moore to the chem test substation, where Sgt. Schmidt administered the DataMaster breath test. (*See* Chem Test Footage from 1:36:35 a.m. to 1:37:35 a.m. attached as Exhibit 4)[2] All breath samples came back as .00. (*See* Page 9 of Exhibit 1) Officer Partyka told Schmidt he suspected Mr. Moore was under the influence of a controlled substance. Schmidt, however, wrote:

> Concern then came up that Moore was possibly impaired by drugs, however, because of the limited observations by arresting officers and that Moore's injuries were preventing the ability to conduct an SFST, I deemed there was not sufficient cause to write an affidavit for a blood draw. Moore was then released to officer Partyka and I deactivated my BWC. *Id.*

Officer Partyka called Sergeant Nicholas Englund and left the room. (*See* 1:43:50 a.m. to 1:44:30 a.m. of Exhibit 4) When Officer Partyka came back, he asked Schmidt to speak with Sergeant Englund. *Id*. Even after speaking to Englund, Schmidt once again said there was not enough for probable cause for a warrant. *Id*. from 1:47:42 a.m. to 1:48:00 a.m. Undeterred, Officers Partyka and Knuth took Mr. Moore to the Public Safety Facility where he was refused for his injuries. *Id*. from 1:58:50 a.m. to 1:59;45 a.m..

[2] This video displays the time of day the footage is taken.

The official police report states that Officers Partyka and Knuth then took Mr. Moore to HCMC to see about the injuries. (*See* Page 11 of Exhibit 1) However, Mr. Moore was not examined by medical professionals. (*See* entirety of Sgt. Englund's Body Cam attached as Exhibit 5) Instead, at 3:58 a.m., Nurse Brager drew a blood sample to be tested for controlled substances based on a warrant applied for by Sergeant Englund. (*See* Page 19 of Exhibit 1) Sergeant Englund's report included the following explanation for why he swore out a warrant despite Schmidt's objections:

> OFC SCHMIDT, who had assisted in the breath test portion of the DWI processing, had not been on scene and did not have the opportunity to make some of the same observations I did of MOORE. As such, I drafted a search warrant for MOORE's blood in furtherance of the DWI investigation. The warrant was electronically signed by the Honorable Judge Bev Benson. *Id*.

Sergeant Englund cited Mr. Moore's disorientation and slurred speech to support the warrant used to obtain the blood draw but did not mention the fact that they had slammed his face on the ground while multiple officers forcefully restrained and cuffed him. (*See* Affidavit for Blood Draw attached as Exhibit 6).

In summary, Officer Partyka spent at least four hours with Mr. Moore for case number 27-CR-19-30140. He spent at most 20 seconds observing the passenger of the vehicle, whom Officers Chaput and Payne detained and questioned. (*See* Pages 7 and 8 of Exhibit 1).

After the blood sample was drawn, Officers Partyka and Knuth brought Mr. Moore back to the PSF where he was booked for Obstructing Legal Process. *Id*. at Page 11. Mr. Moore had to go to North Memorial the next day on his own in order to get treatment. Defense is waiting on medical records anticipated to show that there were multiple fractures in his face.

Just two months later, Officer Partyka swore out a search warrant for 2821 Colfax Avenue North that was based on information from a purported "CRI" and two trash pulls.[3] (*See* Pg. 2 of

[3] The application for the search warrant was submitted at 7:39 am and was signed by Judge Lamas at 7:45 am.

Search Warrant Affidavit attached as Exhibit 7) The CI had "provided information in the past to be found accurate, truthful, and timely" and said that "a male known to them as "Andre Moore" has been dealing narcotics, specifically Heroin and Methamphetamines in and out of 2821 Colfax Avenue North, Minneapolis, Minnesota." *Id.* The CI described "Andre Moore" as "an African American male that is approximately six feet tall and around *two hundred and twenty pounds* with short black dread locks." *Id.* This is the *exact* same weight listed on Mr. Moore's drivers license. (*See* Mr. Moore's DVS Report attached as Exhibit 8) The same license that Officer Partyka used to "positively identify Mr. Moore", instead of asking the alleged CI to make an identification. (*See* Pg. 2 of Exhibit 7)

The first trash pull allegedly resulted in "two clear plastic baggies containing a powdery substance." *Id.* The "collected garbage was taken to the Minnesota National Guard Counter Drug Task Force to be analyzed for traces of illegal narcotics. Both of the baggies tested positive for methamphetamines." *Id.*

The second trash pull allegedly resulted in "Hennepin County Sheriff's charging paperwork with the name Andre Lamar Moore and the address of 2821 Colfax Avenue North attached to it. *Id*. at Page 3. Along with the paperwork, officers located a one pound, sealed, plastic baggie with a white powdery substance inside of it and numerous plastic baggie tear offs." *Id.*

The affidavit did not include specific days or times for the trash pulls. No photographs of the baggies or paperwork have been turned over in discovery, nor were these items available for viewing when Brad Michaels, investigator with the Hennepin County Public Defender's Office, went to photograph evidence held by the County Attorney's Office. (*See* Affidavit of Brad Michaels attached as Exhibit 9). Investigator Lorena Ketchmark did take photographs of the trash cans located out back of 2821 Colfax Avenue North. Two garbage cans, one recycling bin, and

one organics recycling bin belong to the property. They are not labeled by upper or lower unit. (*See* Affidavit and photos attached as Exhibit 10)

In the search warrant affidavit, Officer Partyka wrote that "You [sic] affiant has had prior police contact with Moore, where Moore was charged with Obstruct the legal process (27-CR-19-30140)." (*See* Pg. 3 of Exhibit 7). The affidavit also included that Moore has been convicted of Fifth Degree Drugs twice in the year 2017 (27-CR-17-1942, 27-CR-17-29810).[4] *Id.* at Pg 2. The only relevant inquiry for the sake of this motion will address 27-CR-19-30140. Case number 27-CR-19-30140 started as a traffic stop of Mr. Moore by Officers Partyka and Knuth to which more than 25 officers responded. The charge was ultimately dismissed by the Minneapolis City Attorney's Officer. (*See* Register of Actions attached as Exhibit 11).

In an *in camera* review of the records of the purported CRI, Officer Partyka swore, under oath to this Court, that he was "involved in a traffic stop of Moore and others; Officer Partyka primarily dealt with another passenger; and, Officer Partyka was unaware of the outcome of the case arising out of that stop." (*See* Court Order attached as Exhibit 12)

## <u>ARGUMENT</u>

### ALL EVIDENCE AGAINST MR. MOORE MUST BE SUPPRESSED BECAUSE IT WAS OBTAINED ILLEGALLY BY A POLICE OFFICER THAT HAS CONSISTENTLY DEMONSTRATED HE BELIEVES HIMSELF ABOVE THE LAW

The Exclusionary Rule was developed because police officers would otherwise have no incentive to follow "'constitutional provisions for the security of person and property, [which] should be liberally construed.'" *Mapp v. Ohio*, 367 U.S. 643, 647 (1961) (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886); *see also Terry v. Ohio*, 392 U.S. 1, 21 (1968); *Weeks v. United States*, 232 U.S. 383, 392, 34 (1914). This important remedy protects citizens from abuses by

[4] Counsel for Mr. Moore Alicia L. Granse represented him in this matter.

Filed in District Court
State of Minnesota
6/23/2020 1:33 PM

officers that do not respect the rule of law, and "it is the duty of courts to be watchful for the constitutional rights of the citizen, and against *any* stealthy encroachments thereon." *Boyd*, at 635 (emphasis added). "It is tempting in a case like this, where illegal conduct by an officer uncovers illegal conduct by a civilian, to forgive the officer. After all, his instincts, although unconstitutional, were correct. But a basic principle lies at the heart of the Fourth Amendment: Two wrongs don't make a right." *Utah v. Strieff*, 136 S. Ct. 2056, 2065 (2016) (Sotomayor, J. dissenting). Officer Partyka has consistently demonstrated a flagrant disregard for Mr. Moore's constitutional rights, for the truth, and for the dignity of this very Court. He, and other officers that engage in "testilying"[5] must not be allowed to go unchecked. The search warrant affidavit Officer Partyka submitted to the District Court was defective both on its face and because he intentionally omitted material facts. All evidence obtained as a result of that search warrant must be suppressed.

## I. THE SEARCH WARRANT FOR MR. MOORE'S HOME WAS NOT SUPPORTED BY PROBABLE CAUSE THAT EVIDENCE OF A CRIME WOULD BE FOUND THERE

Mr. Moore and all citizens have the right to be free from unreasonable search and seizure. U.S. Const. amends. IV, XIV; Minn. Const. art. I, § 10. Warrants may only be issued "upon probable cause, supported by [o]ath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." U.S. Const. amends. IV, XIV; Minn. Const. art. I, § 10. Probable cause determinations are to be made based on the totality of the circumstances. *State v. Wiley*, 366 N.W.2d 265, 268 (Minn. 1985); *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The Court should consider information linking the crime to the place to be searched, the freshness of information, and the reliability of the source of the information. *State v. Souto*, 578 N.W.2d 744, 747 (Minn. 1998). When examining the basis for probable cause in the initial issuing of the

[5] Joseph Goldstein, *"Testilying" by Police: A Stubborn Problem*, N.Y. Times (Mar. 18, 2018) https://nyti.ms/2GE3piY. Attached as Exhibit 13.

warrant, the court looks to the information presented in the affidavit. *Id.* On the other hand, if there are questions regarding the validity of statements within the warrant, the court will look beyond the warrant application to determine whether probable cause existed. *State v. McGrath*, 706 N.W.2d 532, 540 (Minn. App. 2005).

If probable cause does not support the warrant, the ensuing search is unlawful and any evidence seized as a result of the search must be suppressed. *State v. Lozar*, 458 N.W.2d 434, 438 (Minn. App. 1990). The affidavit submitted in support of the search warrant for 2821 Colfax Avenue North (upper level) was deficient on its face and because the veracity of the affiant, Officer Partyka is suspect.

**A. The Information Supplied by the Purported CRI Was Unreliable and Insufficient to Establish Probable Cause that Mr. Moore Was Involved in Criminal Activity**

A magistrate issuing a warrant must determine "whether, given all the circumstances set forth in the affidavit, including the 'veracity' and 'basis of knowledge' of the persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Wiley*, 366 N.W.2d at 268. An affidavit that contains only vague and uncertain information cannot support the issuance of a search warrant. *State v. Bynum*, 579 N.W.2d 485, 486 (Minn. Ct. App. 1998).

A "first-time citizen informant is presumably reliable." *State v. Ross*, 676 N.W.2d 301, 304 (Minn. App. 2004). So is "an informant who has given reliable information in the past is likely also currently reliable" *Id.* The reliability of an informant can also be established "if the police can corroborate the information." *Id.* A mere recitation by an officer that an informant is reliable is not sufficient to establish reliability. *State v. Saver*, 295 Minn. 581, 205 N.W.2d 508 (1973) ("track record" recitals should be more specific than that informant has been "used successfully"); *State v. Wiley*, 366 N.W.2d 265 (Minn. 1985); *State v. Cavegn*, 356 N.W.2d 671 (Minn. 1984).

The basis of knowledge "may be supplied directly, by first-hand information, such as when an informant states that he purchased drugs from a suspect or saw a suspect selling drugs to another." *State v. Cook*, 610 N.W.2d 664, 668 (Minn. App. 2000). It may also come "indirectly through self-verifying details that allow an inference that the information was gained in a reliable way and is not merely based on a suspect's general reputation or on a casual rumor circulating in the criminal underworld." *Id.* "Assessment of the CRI's basis of knowledge involves consideration of the quantity and quality of detail in the CRI's report and whether police independently verified important details of the informant's report." *Id.* Corroboration of this detailed information from the informant which is substantiated by sources other than the informant prior to an arrest or search may establish the reliability of the tip itself. *State v. Holiday*, 749 N.W.2d 833 (Minn. Ct. App. 2008); *State v. McCloskey*, 453 N.W.2d 700 (Minn. 1990); *State v. Souto*, 578 N.W.2d 744 (Minn. 1998). Corroboration of "easily obtained" facts such as a suspect's physical appearance, clothing, vehicle ownership, address and present location is insufficient to establish the reliability of a tip. *State v. Cook*, 610 N.W.2d 664, 668 (Minn. Ct. App. 2000); *Albrecht*, 465 N.W.2d at 109. Recent personal observation of incriminating conduct is generally the preferred basis for an informant's knowledge. *State v. Wiley*, 366 N.W.2d 265 (Minn. 1985). The search warrant affidavit here contained vague information by an unreliable informant that was *not* effectively corroborated by police.

The warrant does not include enough information to establish the reliability of the CI. First, Officer Partyka did not make a showing that the informant merited the title[6] "Confidential Reliable Informant" through past reliability. The affidavit contains only boilerplate language stating the CI

[6] There are no averments that the CI was a first-time citizen informant, that s/he came forward voluntarily or made statements against her/his interest. *See Ross*, 676 N.W.2d at 668 The relevant factors are the prior reliability of the CI and police corroboration of the CI's tip.

had "provided information in the past to be found accurate, truthful, and timely." Under *Saver*, *Wiley*, and *Cavegn*, this is insufficient to give the CI a presumption of reliability. The affidavit did not contain information about how many cases the CI had worked, whether previous tips had led to any arrests, charges, or convictions, how many times Officer Partyka has worked with the CI, how often CI has provided reliable information versus inaccurate information, or whether the CI had any previous convictions for charges that might indicate dishonesty. In not providing such detail, Officer Partyka took the decision as to the informant's reliability out of the hands of the magistrate. This significantly hampered the ability of the court to independently evaluate a totality of the circumstances. The bald assertions of the prior reliability of the CI should thus be given little weight, especially given Officer Partyka's reckless disregard for the truth.

Second, the CI only provided easily-obtained facts and vague information that Officer Partyka did not corroborate prior to the search. Courts have required multiple means of corroboration even in cases in which a citizen informant's information was part of the basis for the warrant. The affidavit did not contain specifics of when or how long Mr. Moore was alleged to have been dealing drugs. The affidavit did not say how the CI knew Mr. Moore had been dealing drugs. The affidavit did not say that the CI specifically saw Mr. Moore dealing drugs, only that he "is known" to do so. Further, Officer Partyka did not corroborate anything beyond what he already knew—that Mr. Andre Moore lived at 2821 Colfax Avenue North. Officer Partyka did not ask the CI to do a line up to identify Mr. Moore. Officer Partyka did not conduct any controlled buys. *See Ross*, 676 N.W.2d 301, 304 ("[I]n narcotics cases, "controlled purchase" is a term of art that indicates reliability"). Officer Partyka did not conduct any surveillance to watch for the alleged instances of Mr. Moore "walk[ing] up to a waiting vehicle parked in front of the house and exchang[ing] narcotics for money." He merely did two trash pulls, the first allegedly resulted in a

baggie that tested positive for methamphetamine and the second in a baggie that was never tested and mail to Mr. Moore. These trash pulls came from a common trash can in a public alleyway shared by the upstairs and downstairs level and are insufficient to serve as corroboration of the CI's tip. Especially given Officer Partyka's known penchant for bending the truth while under oath, the CI's vague information and the lack of actual effective corroboration through a documented controlled buy are simply not enough for probable cause.

**B. Information Contained In The Search Warrant Is Stale And Should Be Disregarded**.

An element bearing on probable cause is the freshness, or lack of staleness, of the information supporting the search warrant. *See State v. Souto*, 578 N.W.2d 744 (Minn. 1998). A search warrant application will not be stale when its facts are so closely related to the time of the search warrant issuance that "justify a finding of probable cause at that time." *Id*. at 750 (citing *Sgro v. United States*, 287 U.S. 206, 210 (1932)). "There is no rule that information becomes stale after a set number of hours or days." *State v. Sherwood*, 352 N.W.2d 831, 833 (Minn. Ct. App. 1984) (citing *State v. McLance*, 346 N.W.2d 688, 690 (Minn. Ct. App. 1984)). "Instead, the question must be determined by the circumstances of each case." *State v. Jannetta*, 355 N.W.2d 189, 193 (Minn. App. 1984). Factors in the staleness analysis are the age of the person supplying the information, whether there is any indication of ongoing criminal activity, whether the items sought are innocuous or incriminating, and whether the property sought is easily disposable or transferable. *State v. DeWald*, 463 N.W.2d 741, 746 (Minn. 1990). Here, the information was stale under a totality of circumstances because there is no evidence of ongoing criminal activity and the items sought are incriminating and easily disposable.

When an activity is of an ongoing, protracted nature, the passage of time is less significant. *Souto*, 578 N.W.2d at 750 (citing 2 LaFave, Search and Seizure, § 3.7(a) at 344–46); *see also State v. King*, 690 N.W.2d 397, 401 (Minn. Ct. App. 2005) (finding warrant was not stale in part because defendant was in the ongoing business of selling drugs from his apartment). The CI's allegations that Mr. Moore was selling drugs includes no timeframe whatsoever. No reference was made to how long or how often Mr. Moore had allegedly been selling drugs or how long ago the CI found out about it. Nor did the warrant application even indicate when Officer Partyka received this information. Cases that have determined there was evidence of ongoing criminal activity, like *Cavegn* and *Yaritz*, involved affidavits that relied on informants who had recently purchased drugs from the defendants through one or more controlled buys. *Cavegn*, 356 N.W.2d at 672-73; *Yaritz*, 287 N.W.2d at 14 n. 1. Unlike in those cases, the affidavit here contained no dates and times, no controlled buys, and only conclusory statements that could have come from general reputation. This factor weighs heavily on the side of staleness.

The search warrant for 2821 Colfax Avenue North sought evidence of drugs, drug activity and/or firearms, both unlawful to possess and clearly incriminating. *See Contra State v. DeWald*, 463 N.W.2d 741, 747 (Minn. 1990) (finding warrant supported by probable cause when sought-after items, including clothing and a hatchet, were lawful to possess and innocuous in nature). Therefore, the second factor of whether the items in the warrant were innocuous or incriminating weighs in favor of staleness.

Finally, the evidence sought in this case is easily disposable or transferable, supporting staleness. Drugs/firearms may be disposed of or transferred with ease. *Contra Gerdes v. State*, 319 N.W.2d 710, 713 (Minn. 1982) (finding that the warrant was not stale when the contraband—traffic control signs—were observed thirty days before the search warrant execution because they

are difficult to transfer on the market and their disposal would have been conspicuous). Evidence of narcotics were allegedly found up to one week before the search warrant was executed, more than enough time for it to be moved or transferred. And somehow, the evidence of the trash pulls described in the search warrant affidavit itself seems to have been disposed of.

Thus, because the sought-after items were easily disposable or transferable, they are incriminating in nature, and the allegations of ongoing criminal activity have no basis in time, the information supporting the search warrant was stale.

**C. There Was No Nexus Between Any Alleged Criminal Activity And The Upper Dwelling Of 2821 Colfax Avenue North**

The affidavit accompanying the warrant must demonstrate a "direct connection between the alleged criminal activity and the site to be searched."). *State v. Souto*, 578 N.W.2d 744, 749 (Minn. 1998). In order to permit a search of a residence the Minnesota Supreme Court "has historically required a direct connection, or nexus, between the alleged crime and the particular place to be searched...." *Souto*, 578 N.W.2d at 744. The affidavit stated that Mr. Moore had "been observed selling narcotics in the common living area of the upstairs" but the CI believed that residence to be a single-family home. It is, in fact, a duplex, which Officer Partyka knew through surveillance. Rather than conducting a controlled buy to verify the CI's tip and make sure he had a link to the unit upstairs, Officer Partyka did brief surveillance of a trash can anyone can access.

The facts here are easily distinguishable from those in *State v. McGrath*, 706 N.W.2d 532, 543 (Minn. Ct. App. 2005), where the warrant was upheld based on trash pulls. There, the address was a single-family residence. *Id.* Here, Mr. Moore lives in a duplex and the trash cans at the residence are not labeled by unit, nor is there proof that Officer Partyka even pulled the evidence from the same trash can. Additionally, in *McGrath* there were multiple trash pulls with materials that tested positive for contraband. However, here the only positive test was from the first trash pull where there were no other

items recovered that would identify this trash as Mr. Moore's. The second trash pull allegedly resulted in mail addressed to Mr. Moore, but no items from that pull tested positive for narcotics. There was no actual connection between Mr. Moore's upper level residence and the evidence of narcotics allegedly obtained by Officer Partyka.

Under a totality of the circumstances, the search warrant affidavit was defective due to the lack of reliability of the CI and the vague language used to describe the alleged criminal activity by Mr. Moore, the staleness of the information presented in the affidavit, and the lack of nexus between the upper unit of 2821 Colfax Avenue North and any criminal activity. There were not enough facts to establish probable cause and all evidence seized as a result of this unlawful search must be suppressed as fruit of the poisonous tree.

## II. A HEARING IS NECESSARY TO DETERMINE THE VALIDITY OF THE SEARCH WARRANT BECAUSE OFFICER PARTYKA ACTED IN RECKLESS DISREGARD FOR THE TRUTH.

When questions are raised regarding the validity of statements in a search warrant application or affidavit, Minnesota courts must look beyond the four corners of the warrant to determine whether there was probable cause. *McGrath*, 706 N.W.2d at 540. A defendant may attack a facially sufficient warrant application, challenging the truth of factual allegations. *Franks v. Delaware*, 438 U.S. 154, 171-72 (1978); *State v. Causey*, 257 N.W.2d 288, 292-93 (Minn. 1977). In order to do so, a defendant must allege "deliberate falsehood or…reckless disregard for the truth," by the affiant officer; and "those allegations must be accompanied by an offer of proof."

When a defendant establishes by a preponderance of the evidence that a warrant application contains false information, the warrant must be invalidated and the fruits of the search excluded if: (1) the misstatement of fact is material to the determination of probable cause and (2) the government agent deliberately or recklessly misrepresented or omitted a material fact. *See State v.*

*Doyle*, 336 N.W.2d 247 (Minn. 1983). This remedy "underlies the rule that the affiant must provide the magistrate with sufficient *factual* information regarding the circumstances which the affiant believes establish probable cause. *Id*. at 249. If, the Doyle Court stated, "a defendant was totally barred from attacking the accuracy of an officer's affidavit, police would be able to intentionally misrepresent the facts in order to obtain a search warrant." *Id.* at 249–50.

"Although a presumption of validity attaches to a search-warrant affidavit, this presumption is overcome when the affidavit is shown to be the product of deliberate falsehood or reckless disregard for the truth." *McGrath*, 706 N.W.2d at 540. A warrant is deemed void and the fruits of the search must be suppressed if the affidavit contains intentional or reckless misrepresentations of fact material to a finding of probable cause. *Id*. A misrepresentation is material if absent the misrepresentation, probable cause no longer exists. *State v. Smith*, 448 N.W.2d 550, 555 (Minn. Ct. App. 1989). The reviewing court, in determining whether probable cause exists, must evaluate the warrant application with false material absent and with omitted material supplemented and decide whether the application still establishes probable cause. *U.S. v. Clapp*, 46 F.3d 795, 799 (8th Cir. 1995) (citing *Franks*, 438 U.S. at 156 and *U.S. v. Falls*, 34 F.3d 674, 681 (8th Cir. 1994)).

There are serious doubts about the credibility of anything included in the search warrant application in the instant case. First, Officer Partyka intentionally and/or recklessly omitted material information regarding his prior involvement with the subject of the search warrant affidavit. This information is clearly something a signing judge would have wished to know, and was reckless to omit, at best. *See United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993) (where a canine sniff's failure to alert was considered such that "any reasonable person would have known that this was the kind of thing the judge would wish to know"). Second, the affiant

displayed reckless disregard for the truth under oath in front of this Court regarding that interaction. Third, the absence of any proof that the trash pulls actually occurred as Officer Partyka said they did, coupled with his troublesome credibility, make very real the possibility that he invented them out of whole cloth.

There are inconsistencies and half-truths littering the documentation for case numbers 27CR1930140 and 27CR204146. Body-worn camera, squad video, and police reports demonstrate a shocking case of officers either trying to ameliorate a charge of excessive force by manufacturing probable cause for a warrant in December 2019 or of officers so determined to "get" Mr. Moore that they would manufacture probable cause for a warrant in February 2020.

First, Officer Partyka has consistently misrepresented his role in the incident resulting in case number 27CR1930140. In the search warrant affidavit dated February 13, Officer Partyka simply stated that "You affiant has had prior police contact with Moore, where Moore was charged with Obstruct the legal process (27-CR-19-30140)." (*See* Page 2 of Exhibit 6) Officer Partyka failed to include what actually happened that evening, which would have affected any magistrate's decision on whether there was probable cause in this case. Namely, Officer Partyka suspected Mr. Moore of carrying weapons and drugs in his car and those suspicions were proved faulty. Mr. Moore was neither reaching for a weapon when Officer Partyka thought he was nor was he carrying narcotics or drinking while he drove. Officer Partyka jumped to conclusions and severely injured Mr. Moore.[7] The knowledge that Officer Partyka had once previously erroneously suspected Mr. Moore of committing a crime and being dangerous could lead a judge to rightly conclude Officer

[7] Officer Yanez jumped to similar conclusions about Philando Castile in 2016 when he shot him seven times for reaching for his wallet. The readiness of officers to believe that Black men are always armed and dangerous and ready to shoot police is a product of their militarized training and a society that depicts Black men as dangerous thugs. *See* Alicia L. Granse, *Gun Control and the Color of the Law*, 37 Law & Ineq. 387 (2019). Attached as Exhibit 14.

Partyka has a bias against Mr. Moore and that he is an unreliable narrator when it comes to Mr. Moore.

Officer Partyka made the same false characterization of his interaction with Mr. Moore in December to this very Court. Officer Partyka told this Court that he had primarily dealt with the passenger. Officer Partyka spoke NOT ONE WORD to Ms. Barfknecht. Not one word. He did spend more than four hours with Mr. Moore, smashing his face into the pavement, sitting on him, handcuffing him, forcing him to take several breath tests, bringing him to the PSF, HCMC where he forced him to undergo a blood draw based on a trumped-up warrant and didn't allow him to get medical treatment.

Officer Partyka's willingness to distort the facts leads one to wonder what else he would lie about. There is no record of the evidence supposedly obtained during the trash pulls. Not evidence of baggies, not photos of the charging documents, and no test results or other record from the National Guard Task Force.

It has been suggested that body-worn camera would deter untruths and unconstitutional behavior by the police. "For the moment, however, video seems more capable of exposing lies than vanquishing them."[8] The defense has pointed to specific issues in the warrant and provided offers of proof and therefore the Court must grant the defense's request for a *Franks/Doyle* hearing.

## III. THE WARRANT APPLICATION LACKED A REASONABLE PARTICULARIZED SUSPICION OF DANGER, FUTILITY, OR POSSIBILE INHIBITION OF THE INVESTIGATION TO JUSTIFY A NO-KOCK WARRANT.

Police officers are required to knock and announce their presence before executing a search warrant to protect against unreasonable searches and seizures. U.S. Const. Am. IV; Minn. Const.

[8] Goldstein, *supra* note 5.

Art. I, § 10; *Wilson v. Arkansas*, 514 U.S. 927, 930-34 (1995); *State v. Wasson*, 615 N.W.2d 316, 320 (Minn. 2000). The courts have long acknowledged that "[i]mportant purposes are served by the knock and announce requirement, including preventing the unnecessary destruction of property and mistaken entry into the wrong premises, protecting against unnecessary shock and embarrassment, and decreasing the potential for a violent response." *State v. Wasson*, 615 N.W.2d 316, 319-20 (Minn. 2000). "[T]hese values are protected by including in the reasonableness inquiry under the Fourth Amendment an inquiry into the necessity of an unannounced entry." *Id.* In light of recent studies about the detrimental effects of no-knock warrants, their disparate impacts on minorities, and their ineffectiveness, this inquiry is especially important in ensuring the fairness of the judicial system. *See The War Comes Home: The Excessive Militarization of American Policing* (ACLU, New York, N.Y.), June 2014, at 20 (Attached as Exhibit 15). Based on this important constitutional dimension to the method of entry into a residence, "evidence should be suppressed when the circumstances do not warrant an unannounced entry." *Wasson*, 615 N.W.2d at 320. Suppression is designed to "compel respect for the constitutional guaranty in the only effectively available way--by removing the incentive to disregard it." *Elkins v. United States*, 364 U.S. 206, 217 (1960); *In re Welfare of E.D.J.*, 502 N.W.2d 779, 783 (Minn. 1993).

In order to obtain a no-knock warrant, there must be "reasonable suspicion" that demonstrates that knocking and announcing would either: (1) be dangerous, (2) be futile, (3) or "inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Id.* at 320. The Minnesota Court of Appeals has stated that, "[t]here must be a strong showing that an unannounced entry is a necessity." *State v. Martinez*, 579 N.W.2d 144 (Minn. Ct. App. 1998) (quoting *State v. Lien*, 265 N.W.2d 833 (Minn. 1978)). In *Botelho*, the Court stated, "[t]he application for a no-knock warrant must contain a 'particularized' showing of

dangerousness, not one that is merely possible or speculative." 638 N.W.2d at 778 (Minn. Ct. App. 2002). Factors that justify an unannounced entry include: 1) the degree of specificity in the facts alleged; 2) the showing of reliability as to the source of these allegations; 3) recentness of the facts suggesting dangerousness; and 4) any other factors that tend to show specifically that weapons are likely to be present at the premises to be searched, and likely to be used in the case of an announcement. *Id*.

"To substantiate the need for a no-knock warrant an officer must establish more than that drugs are involved." *Wasson*, 615 N.W. 2d at 320. The United States Supreme Court has also held that a blanket exception for the announce requirement in all felony drug cases violates the Fourth Amendment. *See Richards v. Wisconsin*, 520 U.S. 385, 396 (1997). In *Richards*, the Court required more particularized findings [of dangerousness] to justify an unannounced search warrant than the danger typically associated with felony drug cases. *See Botelho*, 638 N.W.2d at 778. In *Botelho*, the Court of Appeals rejected the justification for a no-knock warrant on the basis that "unidentified periodic visitors with equally unidentified drug, dangerous weapon, and obstructing legal process histories" lacked the requisite particularized dangerousness. In *Wasson*, on the other hand, ammunition and weapons found as a part of that search warrant established a present sense of dangerousness that would elevate an officer's suspicion above that of a typical felony drug investigation. *Wasson*, 615 N.W. 2d at 320-21.

Courts have tended to give great deference to police in these matters. Unfortunately, data suggests that these aggressive entries are neither safer for everyone involved nor more effective than standard warrants. *See* attached Exhibit A *The War Comes Home: The Excessive Militarization of American Policing* (ACLU, New York, N.Y.), June 2014, at 4. Recent studies suggest that there are several troubling aspects to unannounced entry warrants. First among them

that they are typically executed by heavily armed SWAT teams that use military-style tactics and flashbang grenades. *Id.* at 2. A New York Times investigation revealed that at least 81 civilians and 13 law enforcement officers died in such raids from 2010 through 2016, and "[s]cores of others were maimed or wounded." Kevin Sack, *Door-Busting Drug Raids Leave a Trail of Blood*, N.Y. Times, Mar. 18, 2017, https://www.nytimes.com/interactive/2017/03/18/us/forced-entry-warrant-drug-raid.html. (Attached as Exhibit 16) In May 2014, for example, a SWAT team threw a flash grenade into a home where it landed in a playpen and permanently scarred a young child. *Id.* They were there after a controlled buy of $50 worth of methamphetamine. *Id.* Further, these warrants are more often than not ineffective at finding and confiscating contraband. ACLU at 37. The overwhelming majority of these unannounced searches are in pursuit of drugs. *Id.* at 20. ("Drugs or other contraband were either found or probably found in only a quarter of the deployments in which the SWAT team forced entry. In fifty-four percent of deployments in which the SWAT team forced entry into a person's home using a battering ram or other breaching device, the SWAT team either did not or probably did not find any weapons."). On balance, it is hardly reasonable to potentially make drug and firearm possession capital offenses, especially with such a poor track record in actually finding contraband or weapons.

Such a dramatic search is unreasonable in the present case. The affidavit in this case is akin to *Botehlo* and has the same fatal deficiency—in fact it contains less than the warrant struck down in that case. Even in *Botehlo*, the section of the search warrant affidavit requesting unannounced entry included that persons with dangerous weapon criminal histories as well as histories reflective of obstructing legal process were frequenting the residence to be searched. The search warrant was for drugs expected to be in the home. 638 N.W.2d at 774. The Appellate Court noted that "even if we assume appellant engaged in drug trafficking, *this fact alone, without a particularized showing*

*of dangerousness, futility, or the likelihood of destruction of evidence, cannot support an unannounced entry*." *Id*. at 780 (emphasis added). The only showing (if such a showing was in fact made) was that Mr. Moore was involved in drug sales. There was no particularized showing of anything beyond a "typical" case of that nature.

And unlike in *Wasson*, there was no prior search warrant executed at the residence that indicated a presence of drugs and/or weapons. The affidavit lists no history of violence or criminal convictions for gun offenses. The only mention of anything even remotely related to dangerousness was the CI's assertion that they have "seen him in possession of a handgun in the past." When? Where? In 2821 Colfax Avenue or at a shooting range? Mere possession of a handgun by a Black man at an unspecified location at an unspecified time does not mean officers are at risk knocking on 2821 Colfax Avenue North on February 13, 2020.[9] Moreover, the CI's reliability, as discussed above, is suspect in the extreme. This type of stale, vague, non-specific information does not amount to a "particularized suspicion of dangerousness."

The affidavit is remarkable not for what it contained but for what it lacked. The affidavit made no mention of gang affiliation. Neither did it state that the CI was afraid for their life at any time, or that Mr. Moore had made any statements threatening to officer safety. It did not specify whether Mr. Moore is known to carry firearms frequently, or if he had ever been convicted for illegal possession of a firearm or for acts of violence. There was no mention of a history of

[9] The Second Amendment of the Constitution has recently been held to protect the personal right to bear arms. *D.C. v. Heller*, 554 U.S. 570 (2008). If possession of a firearm is the only requirement for a no-knock warrant, SWAT teams would be justified in entering almost half of all American homes. Pew Research Center, *Key Takeaways on Americans' Views of Guns and Gun Ownership*, June 22, 2017, *available at* http://www.pewresearch.org/fact-tank/2017/06/22/key-takeaways-on-americans-views-of-guns-and-gun-ownership/ (last visited July 25, 2017) ("About four-in-ten Americans say they either own a gun themselves or live in a household with guns"). While Minnesota does allow some citizens to possess handguns with a permit, that right does not extend to the large set of the population that has been convicted of certain crimes. Minn. Stat. § 624.014. This has primarily affected Black Minnesotans, who are exponentially more likely to be investigated by the police, arrested, and convicted of all crimes than their White counterparts. For an in-depth discussion on the inequities of Minnesota's gun regulations and the stereotypes of the Black male as dangerous. *See* Exhibit 14.

destruction of evidence, let alone a "strong showing" that announcement before entry would lead to Mr. Moore attempting to do so. *State v. Lien*, 265 N.W.2d 833, 838 (Minn. 1978). Further, no surveillance was conducted during this time period to verify or corroborate even basic facts about what persons lived at or were staying at the residence. The affidavit here contained far less that that supporting the warrant held invalid in *Bothelo*. Nor did it contain the facts required to establish a particularized suspicion that announcing their presence would be dangerous, futile, or would hamper investigation not to the standards as established by *Richards* and subsequent Minnesota case law. It therefore does not conform to constitutional requirements, and all evidence discovered as a result of the unannounced entry execution of the search warrant must be suppressed.

## **CONCLUSION**

The Constitution is not just words on some very old paper—it lays out who we are and who we want to be as a nation. It gives us rights and responsibilities, freedoms and duties. It protects our persons, our property, and our effects from government intrusion and it preserves our right to challenge unjust laws and unequal systems. Nowhere should the constitution be more robust than when protecting citizens from an overbearing and unjust government in their own homes. Tyranny, those long-ago authors explained, had no place in a modern world and revolution was the only antidote to such a disease. Where police officers are allowed to lie with impunity to the courts, and citizens see that there is no remedy for such abuses, they lose faith that the Constitution really does grant everyone equal protection under the law. For the aforementioned reasons Mr. Moore respectfully requests this Court to suppress the warrant as it lacks probable cause on its face, or in the alternative, to grant a *Franks/Doyle* hearing due to the gross misrepresentation and omission of material facts integral in the assessment of the search warrant affidavit for probable cause.

Filed in District Court
State of Minnesota
6/23/2020 1:33 PM

Respectfully Submitted,

OFFICE OF THE HENNEPIN COUNTY PUBLIC DEFENDER
MARY MORIARTY - CHIEF PUBLIC DEFENDER

Respectfully submitted,

By: /s/
Tanya Bishop, #0398982
Assistant Public Defender
701 Fourth Avenue South, Suite 1400
Minneapolis, MN 55415
Telephone: 612-348-8229
Tanya.bishop@hennepin.us

/s/
Alicia L. Granse, #0400771
Assistant Public Defender
701 Fourth Avenue South,
Suite 1400
Minneapolis, MN 55415
Telephone: 612-596-1981
Alicia.granse@hennepin.us

Dated: This 23rd day of June, 2020.

Cc: Allison Reyerson
Office of the Hennepin County Attorney

# EXHIBIT B
## to
## Declaration of Alicia Granse

April 11, 2023

Filed in District Court
State of Minnesota
8/11/2020 3:03 PM

STATE OF MINNESOTA DISTRICT COURT

COUNTY OF HENNEPIN FOURTH JUDICIAL DISTRICT

| | |
|---|---|
| State of Minnesota,<br><br>Plaintiff,<br>vs.<br><br>**ANDRE LAMAR MOORE,**<br><br>Defendant. | **MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE AND DISMISS**<br><br>MNCIS File No. 27-CR-20-4146 |

* * *

## INTRODUCTION

On July 21st, 2020, a hearing was held regarding the credibility and veracity of information contained within the search warrant affidavit authored by Officer Partyka and information provided by Officer Partyka during sworn testimony to Judge Scoggin. The following memorandum incorporates all previous filings, the exhibits entered into evidence at that hearing, and all testimony taken.

## FACTS

Officer Partyka made statements that were demonstrably false in the search warrant affidavit, to this Court while under oath in chambers during an *in camera* review, and while under oath providing testimony at the *Franks/Doyle* hearing. The following is a list of the inconsistencies and false statements Officer Partyka has made since first encountering Mr. Moore on December 7, 2019.

1) During an *in camera* review, Officer Partyka said under oath that he primarily dealt with the passenger in a previous encounter with Mr. Moore on December 7, 2019. He

also failed to describe that interaction accurately in the search warrant affidavit. Officer Partyka spent more than four hours with Mr. Moore and acknowledged in sworn testimony that he had not even spoken with the passenger or mentioned her name in his report.

2) In the affidavit in support of the search warrant executed on February 13, 2020, Officer Partyka averred that officers had performed two trash pulls, the first one resulting in "two clear plastic baggies containing a powdery substance," the second resulting in "Hennepin County Sheriff's charging paperwork with the name Andre Lamar Moore and the address of 2821 Colfax Avenue North attached to it [and]… a one pound plastic sealed plastic baggie with white powder substance inside of it and numerous plastic baggie tear offs." None of the baggies contained any kind of powdery substance—as acknowledged by Officer Partyka—including the baggies from the second trash pull, which were in their original condition and had not been subjected to narcotics testing. When questioned by Judge Scoggin as to a possible explanation multiple times, Officer Partyka gave none.

3) The paperwork referred to as "Hennepin County Sheriff's charging paperwork with the name Andre Lamar Moore and the address of 2821 Colfax Avenue North attached to it" was in fact a printout from the Hennepin County Jail roster relating to the charges resulting from the traffic stop on December 7, 2019. The jail roster is a public database, and there is no way to determine from the paper when or who printed it. The evidence packets for the second pull did not list a badge number or a date. Officer Partyka failed to mention in the search warrant mailings to another person—Jennifer Johnson—at

2821 Colfax Ave N. When questioned about this other mailing, Officer Partyka said he did not know why he had not included it in the search warrant.

4) Officer Partyka testified at the hearing that both trash pulls were taken from the curb. The first trash pull occurred on Friday, February 7. *See* MPD Report Feb. 7. The second trash pull happened Thursday, February 13, 2020. *See* MPD Report Feb. 13. Trash retrieval day at that address is Thursday, according to the City of Minneapolis website, Find Your Garbage Day, attached.[1]

5) Officer Partyka testified at the hearing that he had identified Mr. Moore prior to pulling him over during the December 7, 2019 traffic stop. Officer Brandon Knuth, who had been his partner that night, testified to the contrary that he and Officer Partyka had recognized the vehicle as one associated with Mr. Moore, but that they had been unable to positively identify Mr. Moore before pulling him over.

6) Officer Partyka swore under oath that traffic patrol officers often write search warrants for narcotics investigations, though this was his first in three years of patrol as a sworn officer. This Court can attest that search warrants are generally not applied for by patrol officers.

7) Officer Partyka testified that it is common for cases to have nicknames. None of the other police reports related to either case includes reference to anything but a simple list of charges. Officer Partyka acknowledged that "Moore Money, Moore Problems" was the first thing that came to mind when deciding on a nickname for the case. He

[1] Available at:
http://apps.ci.minneapolis.mn.us/CalendarApp/EX_Monthly.aspx?linkname=2821+COLFAX+AVE+N&linkurl=http%3a%2f%2fapps.ci.minneapolis.mn.us%2fRecyclingFinderApp%2fRecyclingRpt.aspx%3fAPN%3d0902924440214&datebook=15&date=2%2f10%2f20&view=monthly.

also acknowledged that he is familiar with the song "Mo' Money, Mo' Problems," that it was a reference to that song, and that song was about drug dealing.

8) Officer Partyka specifically stated that he and his partner had collected 75 guns in the past year as a result of traffic stops. Lorena Ketchmark, investigator with the Hennepin County Public Defender's Officer, testified that according to the City of Minneapolis, all officers in the Fourth Precinct had collected approximately 125 firearms as a result of traffic stops in 2019, that Officer Partyka had been linked to 27 firearms discovered through traffic stops in 2019 and 7 in 2020, and that these numbers were likely high because officers often include ammunition when reporting firearms.

9) Officer Partyka proudly testified that he has a photographic memory. He testified that he remembered Mr. Moore's face from a bulletin listing him as an armed fugitive from justice he had seen perhaps one month prior to the December 7, 2019 stop and that he had never seen Mr. Moore before. Mr. Moore had not been in warrant status for six months prior to that stop, as testified to by Ms. Ketchmark. That bulletin was not turned over in evidence.

10) Officer Partyka also testified he could not remember several aspects of his interaction with Mr. Moore, including whether the second trash pull was on a trash collection day, whether Mr. Moore was wearing a seatbelt during the December 7, 2019 traffic stop, if he transported Mr. Moore to the chemtest and observed the test, if he transported Mr. Moore to the jail after the chemtest, if he called Sgt. England that day and asked him to speak with Officer Schmidt about doing a warrant for Mr. Moore's blood, whether Mr. Moore had been refused by the jail for his injuries, or whether he had driven Mr.

Moore to HCMC after that refusal. He either recalled these events after reviewing his police report or agreed if it was on video that they occurred.

11) In the search warrant affidavit, Officer Partyka relied on the tip of what he called a "CRI." After an in-camera review, Judge Scoggin stated on the record that the informant was to be considered at best a "tipster," rather than a CRI.

## ARGUMENT

### ALL EVIDENCE MUST BE SUPPRESSED AND THIS CASE DISMISSED BECAUSE OFFICER PARTYKA'S LACK OF CREDIBILITY UNDERMINES THE ENTIRETY OF THE SEARCH WARRANT APPLICATION AND A SANITIZED VERSION IS NOT SUPPORTED BY PROBABLE CAUSE

Both the United States and Minnesota Constitutions provide that "no [w]arrants shall issue, but upon probable cause, supported by [o]ath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV; Minn. Const. Art. I, § 10. "Although a presumption of validity attaches to a search-warrant affidavit, this presumption is overcome when the affidavit is shown to be the product of deliberate falsehood or reckless disregard for the truth." *State v. McGrath*, 706 N.W.2d 532 at 540 (Minn. Ct. App. 2005). When questions are raised regarding the validity of statements in a search warrant application or affidavit, Minnesota courts must look beyond the four corners of the warrant to determine whether there was probable cause. *McGrath*, 706 N.W.2d at 540. A defendant may attack a facially sufficient warrant application, challenging the truth of factual allegations. *Franks v. Delaware*, 438 U.S. 154, 171-72 (1978); *State v. Causey*, 257 N.W.2d 288, 292-93 (Minn. 1977).

When a defendant establishes by a preponderance of the evidence that a warrant application contains false information, the warrant must be invalidated and the fruits of the search excluded if: (1) the misstatement of fact is material to the determination of probable cause and (2) the

government agent deliberately or recklessly misrepresented or omitted a material fact.[2] *See State v. Doyle*, 336 N.W.2d 247 (Minn. 1983). A misrepresentation is material if, absent the misrepresentation, probable cause no longer exists. *State v. Smith*, 448 N.W.2d 550, 555 (Minn. Ct. App. 1989). This remedy "underlies the rule that the affiant must provide the magistrate with sufficient *factual* information regarding the circumstances which the affiant believes establish probable cause. *Doyle,* 336 N.W.2d at 249. If, the *Doyle* Court stated, "a defendant was totally barred from attacking the accuracy of an officer's affidavit, police would be able to intentionally misrepresent the facts in order to obtain a search warrant." *Id.* at 249–50.

## I. OFFICER PARTYKA INTENTIONALLY MADE FALSE STATEMENTS OR MATERIAL OMISSIONS IN THE SEARCH WARRANT APPLICATION.

To succeed in a *Franks/Doyle* challenge, a defendant must show that the officer acted intentionally or in reckless disregard for the truth in making misstatements or material omissions in the search warrant affidavit. *Doyle,* 336 N.W.2d 247. *McGrath*, 706 N.W.2d 532, is instructive as to what constitutes reckless disregard for the truth[3] by a police officer. There the court found

[2] This case demonstrates the need to change what is often a difficult standard for a defendant to overcome: in order to have a hearing on the validity of a search warrant affidavit, the defendant must essentially show the search warrant is invalid. Here, Mr. Moore may not have met the *Franks* standard for the hearing if he had not moved to compel the identity of the informant, which spurred the Judge to inquire about the previous case and in turn led to Officer Partyka's reckless mischaracterization of his history with Mr. Moore and the order to disclose evidence of the trash pulls.
Moreover, in the State's Response to Mr. Moore's Motion for an Evidentiary hearing, Ms. Reyerson stated that it is typical for the State not to disclose evidence of trash pulls to the defense. If this is typical, how many other cases are based upon falsified or distorted evidence? How many other officers feel no need to ensure that what they've stated in their search warrant affidavits is accurate because no one questions it? In theory, an officer could fabricate an entire warrant without anyone ever knowing. The Court spoke about this case as potentially a "*Florence* for warrants," and perhaps it is time to allow for more liberal challenges to search warrant affidavits that may be facially valid (though Mr. Moore continues to maintain this one is not). *Florence* specifically states that one of the primary purposes of a probable cause hearing is "to uncover at an early stage cases based on false assertions springing from misunderstanding, mistake, or malevolence." *State v. Florence*, 306 Minn. 442, 447, 239 N.W.2d 892, 896 (1976), *holding modified by State v. Rud*, 359 N.W.2d 573 (Minn. 1984). All defendants should have the opportunity to uncover whether a search warrant was based on misunderstanding, mistake, or malevolence.

[3] Minnesota law does not define reckless disregard for the truth in a criminal context. In tort law for defamation, however, "'reckless disregard' requires that a defendant make a statement while subjectively believing that the statement is probably false." *Chafoulias v. Peterson*, 668 N.W.2d 642, 655 (Minn. 2003).

that it was reckless for an officer to describe an informant as a concerned citizen in the search warrant affidavit when that citizen had an extensive "criminal history, use of aliases, and pending charges." The court held that an experienced officer "should have known the relevance of this information and presented it to the issuing judge." When asked why he had not included that information at the evidentiary hearing, the officer responded, "I don't know." *Id.* at 542. And in *Doyle*, 336 N.W.2d 247, a police officer deliberately falsified or recklessly disregarded the truth in the search warrant where they omitted information that they knew conflicted with that provided by an informant and stated they "had seen marijuana plants growing on 'the porch for Apartment 4'" but they had originally seen the plants in the window of apartment 3 and the next day saw them on the building's back porch. *Id.* at 250.

Here, Officer Partyka's inconsistencies and misstatements go beyond the standard in both *Doyle* and *McGrath*. Officer Partyka could not explain why the evidence described in the search warrant application does not match the evidence provided by the State in discovery—despite repeated opportunities to do so. Even the newest recruit would know a search warrant must be based on an accurate description of the evidence. Officer Partyka similarly mischaracterized the nature of the informant against Mr. Moore. This Court has stated that instead of a Confidential Reliable Informant that is presumed credible, the informant relied upon here is merely a tipster. Again, an officer swearing out a search warrant for a home should know the difference. All officers receive training on the use of informants and are responsible for knowing the policies and procedures as laid out in the manual. Officer Partyka's misstatements and omissions were thus made at minimum in reckless disregard for the truth.

The backdrop in this case, however, leads to the conclusion that Officer Partyka was intentional in his false statements and omissions. Officer Partyka's disregard for Mr. Moore is

clear—in his "nickname" for the case, a song title referencing drug dealing, and his decision to apply for a search warrant himself, rather than passing it off to a narcotics investigator. His insistence that he was able to identify Mr. Moore from a single fugitive bulletin from at least six months prior to a traffic stop on a dark winter night on a poorly lit street is not born out by his "photographic memory," but instead suggests he's had encounters with Mr. Moore before and has some bias against him. Indeed, Officer Knuth also testified to knowing the car was associated with Mr. Moore, so this was not simply a case of a random stop. It is equally clear that he understated his role in the December 7, 2019 traffic stop and brutal detention of Mr. Moore to the Judge deliberately in order to avoid the appearance of the very bias that was fueling his bid to search Mr. Moore's home. In that encounter, he and Sergeant Englund got a search warrant to draw Mr. Moore's blood in order to shield them from any complaints of excessive force. *See* Mark Joseph Stern, *The Police Lie. All the Time. Can Anything Stop Them?*, Slate (Aug. 4, 2020), https://slate.com/news-and-politics/2020/08/police-testilying.html. "(Officers have a litany of incentives to lie, but there are two especially powerful motivators. … In many notorious testilying cases, including Parham's, officers blame the victim for their own violent behavior in a bid to justify disproportionate use of force."). The sheer number of inconsistencies in Officer Partyka's search warrant affidavit, his testimony, and the physical evidence in this case also point to intentional falsification, rather than mere recklessness.

The credibility of an affiant is at the very heart of an inquiry into a challenge to a search warrant affidavit's validity. Officer Partyka is not credible. His penchant for lying and stretching the truth as demonstrated by his testimony and the numerous records in evidence infects his entire history with Mr. Moore and demonstrates that the misstatements and omissions in that affidavit were intentional or *at minimum* made in reckless disregard for the truth.

## II. AFTER SUPPLYING THE MATERIAL OMISSIONS AND REMOVING THE FALSE STATEMENTS BY OFFICER PARTYKA, THE SEARCH WARRANT IS DEFECTIVE BECAUSE IT IS NOT SUPPORTED BY PROBABLE CAUSE

When an officer has made misstatements or material omissions in a warrant application intentionally or in reckless disregard for the truth, the court must delete the false material and supply the omitted information and then decide whether the application still establishes probable cause. *Doyle*, 336 N.W.2d at 250. Here, in its July 14th Order granting a *Franks* Hearing, the Court found that "the information… was sufficiently reliable and was sufficiently corroborated so as to establish probable cause for the search warrant."[4] (p. 9) However, because Officer Partyka intentionally made false statements and material omissions in the search warrant affidavit, several alleged "facts" must be removed and omissions supplied. The remaining information is insufficient to establish probable cause for the issuance of a search warrant–demanding suppression of anything seized pursuant to its execution and ultimately dismissal.

The search warrant affidavit contained seven paragraphs of "facts" to establish grounds for issuance of a search warrant. Paragraph one (1) covers Officer Partyka's work history. Paragraphs two (2) and three (3) reference information purportedly provided by an informant regarding alleged sales of narcotics by Andre Moore. Paragraph four (4) states that Officer Partyka identified Mr. Moore by his driver's license but did not ask the informant for confirmation and lists Mr. Moore's criminal history. Paragraph five (5) and six (6) contain information regarding the results of two alleged trash pulls. Of these seven paragraphs, only one remains intact—The first, which details Officer Partyka's work history. Once the misstatements are deleted and the material omissions supplied, the search warrant is insufficient to establish probable cause.

---

[4] Defense maintains that the original search warrant application did not contain facts sufficient to establish probable cause.

**A. Paragraphs 2 and 3: The Informant**

The Court applied the *Ross* factors when evaluating whether the search warrant based on the alleged CRI[5] was supported by probable cause. It found that "*factors two and three are most relevant*."[6] (emphasis added) (Order, p. 9) *See also State v. Ross*, 676 N.W.2d 301, 303-304 (Minn. Ct. App. 2004). The Court found that while Officer Partyka's description of the informant's track record was "somewhat vague," it was sufficient under *Wiley* for this factor to weigh in favor of reliability—though the Court made no findings whether the informant was a CRI. *Id*. at Fn 3. In fact, the Court paused the *Franks/Doyle* hearing to inform all parties he is treating this "CI" as a "tipster" and not a vetted or verified confidential reliable informant. This, paired with the now established unreliability of Officer Partyka, requires a higher threshold showing than provided in the instant case, or as established in *Wiley*, 366, N.W. 2d 265. Officer Partyka's statement that the informant's past information was "accurate, truthful, and timely," must now be removed from the affidavit.

**B. Paragraphs 4, 5, and 6: Corroboration of the Tip**

The Court found that the information from the informant had been sufficiently corroborated by Officer Partyka. The Court cited three elements to find that Officer Partyka sufficiently corroborated the information: 1) that Andre Moore lived at 2821 Colfax Avenue North, 2) The trash pulls conducted by Officer Partyka at 2821 Colfax Avenue North resulted in evidence indicative of drug sales, and 3) Mr. Moore's previous convictions for Fifth Degree Drugs. *See* Court Order at 11.

[5] Defense maintains its Motion to Compel the Identity of the CRI filed on May 13th
[6] Absent disclosure of the identity of the CI in the instant case, *Ross* factors (1), (4), and (6) cannot be addressed.

*i. Andre Moore and 2821 Colfax Ave N.*

In the search warrant affidavit, Officer Partyka stated that he "positively identified" the male as Andre Lamar Moore and that he lived at 2821 Colfax Avenue North by referring to his driver's license. The tipster was not asked to identify Mr. Moore from a photo and made no positive identification of Mr. Moore. It is also unknown how recently the tipster provided Officer Partyka the physical description of Mr. Moore or told him that Mr. Moore was living at the address 2821 Colfax Ave N. Officer Partyka did not observe Mr. Moore at this residence during his surveillance. Officer Partyka failed to mention that his identification of Mr. Moore during their "prior contact" in December 2019 was similarly based on a tip—that time from the department of corrections in the form of a wanted fugitive bulletin he had seen no later than June 2019, six months earlier. Officer Partyka testified that he believed that Mr. Moore was armed and dangerous in December because of that bulletin and was incorrect. A neutral magistrate would have found this context helpful in evaluating probable cause.

Further, Officer Partyka acknowledged that the "Hennepin County Sheriff's charging paperwork… and the address of 2821 Colfax Avenue North attached to it" found in the second trash pull was, in fact, a printout of a jail roster search and could be accessed/printed by anybody in the public. It was *not*, as implied by the phrasing in the warrant application, a legal document Mr. Moore would have received personally. It did not link Mr. Moore to the address on February 13, 2020, but to the address on December 7, 2019. Officer Partyka failed to mention two pieces of mail in the search warrant affidavit that had been logged – a letter from Allstate addressed to Jennifer Johnson and a letter addressed to "Dre" from December. The other mailings are particularly relevant in a case with a duplex, and they cast serious doubt on the connection between Andre Moore and the upper unit of 2821 Colfax Ave N. in February of 2020.

*ii. The trash pulls and evidence of narcotics sales*

The July 21st testimony of Officer Partyka sheds new light upon the trash pulls that allegedly occurred, and what resulted from them. Officer Partyka acknowledged that the garbage cans were not marked for the "upper" and "lower" units of the duplex. He acknowledged that the baggie from the first trash pull on February 7 no longer contained any trace of a powdery substance, though one does contain some blackish substance.

Next, Officer Partyka acknowledged that the one-pound **sealed** plastic baggie from the second pull did not contain a white powdery substance upon review at the hearing. He indicated this was the sealed plastic baggie on the search warrant application and it appeared to be sealed in the evidence baggie that was presented at the hearing. Officer Partyka further stated that it was in the same condition as when the trash pull occurred, that no testing was done, and that he was unsure why no substance is now visible. Officer Partyka also acknowledged that there were not "numerous plastic baggie tear offs" as stated in the search warrant affidavit.

There were no dates or badge numbers attached to any of the evidence from the second trash pull—though the police report lists it happened the same day Officer Partyka signed the search warrant affidavit 7:39 am. Anyone could have put them in the trash and then taken them out again at any time. Because the first trash pull did not happen on a garbage pickup day, it is unclear whether the cans would have been accessible to police without trespassing on private property, and thus whether the tested baggies should even be admissible against Mr. Moore.

The trash pulls are insufficient to corroborate vague information from a "tipster" that someone saw Andre Moore sell drugs at some time. Officer Partyka may have tested something at the National Guard Drug Task Force on February 7, 2020, but it's unclear whether it was the

baggies found in evidence from the first trash pull. Nor was there a link between Mr. Moore and the tested baggies. The second trash pull is utterly unreliable. There was thus no connection between Mr. Moore, 2821 Colfax Ave N. and evidence of narcotics.

*iii. Prior Convictions*

Finally, the simple fact that Mr. Moore had prior fifth degree drug convictions cannot alone corroborate an information from a tipster to establish probable cause to sustain a search warrant. Stale low-level drug convictions from 2017 provide no substantive evidence that drug activity was current and ongoing in 2020. After supplying the material omissions and deleting the misstatements made by Officer Partyka in the search warrant, there was insufficient corroboration of the tip to establish probable cause.

## CONCLUSION

The extensive litigation of this issue has been burdensome. The Constitution, however, was written expressly to protect people from government abuses such as that which has occurred here. Officer Partyka acted in flagrant disregard for the truth and demonstrated an utter lack of respect for the criminal legal process and the Constitution. He intentionally and/or recklessly made misstatements and material omissions in the search warrant affidavit, and a sanitized version of that affidavit is not supported by probable cause. The search of 2821 Colfax Ave N on February 13, 2020 was thus unreasonable and its fruits must be suppressed. Additionally, Defense requests that following this finding, both Counts contained within the complaint be dismissed for lack of probable cause as well as any other relief the Court deems just and equitable.

Respectfully Submitted,

OFFICE OF THE HENNEPIN COUNTY PUBLIC DEFENDER
MARY MORIARTY - CHIEF PUBLIC DEFENDER

Respectfully submitted,

By: /s/

Tanya Bishop, #0398982
Assistant Public Defender
701 Fourth Avenue South, Suite 1400
Minneapolis, MN 55415
Telephone: 612-348-8229
Tanya.bishop@hennepin.us

Alicia L. Granse, #0400771
Assistant Public Defender
701 Fourth Avenue South,
Suite 1400
Minneapolis, MN 55415
Telephone: 612-596-1981
Alicia.granse@hennepin.us

Dated: This 11th day of August, 2020.

Cc: Allison Reyerson
Office of the Hennepin County Attorney