**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Andre Moore,

Plaintiff,

v.

Officer Tony Partyka, in his individual capacity, Officer Neal Walsh, in his individual capacity, Officer John Doe No. 1, in his individual capacity, Officer John Doe No. 2, in his individual capacity, and the City of Minneapolis,

Defendants.

Civil No. 0:22-cv-1477 PAM/TNL

---

**DEFENDANT CITY OF MINNEAPOLIS' RESPONSE TO**
**PLAINTIFF'S MOTION TO COMPEL AGAINST THE CITY AND PARTYKA**

**REDACTED**

# TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. STATUS OF DISCOVERY ........ 1

III. FACTUAL BACKGROUND ........ 2

A. The December Traffic Stop. ........ 3

B. The February Warrant and Search of Plaintiff's Home. ........ 5

C. The City's Investigation of the Incidents. ........ 5

D. The MDHR Investigation into Race Discrimination. ........ 6

IV. ARGUMENT ........ 7

A. Information Tending to Disclose the Identity of the Confidential Informant is Not Discoverable. ........ 8

B. The Documents Provided to MDHR Are Not Relevant and Their Production and Review is Unduly Burdensome. ........ 10

1. The MDHR Report and Its Findings Are Distinct from Plaintiff's *Monell* Claims. ........ 11

2. The Specific Documents Requested by Plaintiff Are Not Relevant. ........ 15

3. The Burden of Reviewing the Documents is Disproportionate to the Needs of the Case. ........ 19

C. Chauvin's Records are Not Relevant. ........ 22

D. Discovery of ESI Related to Policy Changes is Not Relevant and is Unduly Burdensome. ........ 24

E. Plaintiff's Motion to Compel a Different Response to Interrogatory 8 is Premature and Meaningless. ........ 28

V. CONCLUSION ........ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrews v. Fowler*,
98 F.3d 1069 (8th Cir. 1996) .......... 13

*Atkinson v. City of Mountain View*,
709 F.3d 1201 (8th Cir. 2013) .......... 28

*Black Love Resists in the Rust, by and through Soto v. City of Buffalo*,
334 F.R.D. 23 (W.D.N.Y. 2019) .......... 19

*Bordanaro v. McLeod*,
871 F.2d 1151 (1st Cir. 1989) .......... 25, 26

*In re Broiler Chicken Antitrust Litigation*,
No. 1:16-cv-08637, 2017 WL 4417447 (N.D. Ill. Sept. 28, 2017) .......... 15

*Chalmers v. Petty*,
136 F.R.D. 399 (M.D.N.C. 1991) .......... 26

*City of Canton v. Harris*,
489 U.S. 378 (1989) .......... 5, 23

*Clardy v. City of St. Paul*,
No. 01-cv-1275, 2003 WL 21805203 (D. Minn. Aug. 4, 2003) .......... 13

*Elnashar v. Speedway SuperAmerica, LLC*,
484 F.3d 1046 (8th Cir. 2007) .......... 8, 9

*In re: EpiPen Direct Purchaser Litig.*,
No. 20-CV-827, 2023 WL 2675134 (D. Minn. Mar. 29, 2023) .......... 7

*Evenstad v. Cnty. of Hennepin*,
No. 04-1124, 2006 WL 8445284 (D. Minn. May 22, 2006),
*report and recommendation adopted*, 2006 WL 8445281
(D. Minn. July 20, 2006) .......... 12, 18, 22

*Fancher v. Klann*,
No. 13-cv-435, 2014 WL 4294960 (D. Minn. Aug. 28, 2014) .......... 16, 18

*Grandstaff v. City of Borger*,
767 F.2d 161 (5th Cir. 1985) .......... 27

*Haggins v. City of St. Paul*,
No. 09-cv-537, 2010 WL 1380134 (D. Minn. Mar. 1, 2010),
*report and recommendation adopted as modified*, 2010 WL 1379913
(D. Minn. Mar. 31, 2010) ..................................................... 13

*Her v. Pacolt*,
No. 11-cv-808, 2013 WL 4053218 (D. Minn. Aug. 12, 2013) ..................... 19

*Hunziker as Tr. for ALH v. Doherty*,
No. 20-CV-2188, 2021 WL 3146529 (D. Minn. July 26, 2021) ..................... 25

*Kruse v. City of Elk River*,
No. CV 21-01262, 2022 WL 4387994 (D. Minn. Sept. 22, 2022) ..................... 13

*United States ex rel. Luke v. Healthsouth Corp.*,
No. 2:13-cv-01319, 2018 WL 3186941 (D. Nev. June 28, 2018) ..................... 14, 15

*McKinney v. United States*,
No. 17-cv-4156, 2020 WL 7334411 (D. Minn. Dec. 14, 2020) ..................... 9

*Mettler v. Whitledge*,
165 F.3d 1197 (8th Cir. 1999) ..................................................... 11

*Monell v. Dep't of Social Servs. of the City of N.Y.*,
436 U.S. 658 (1978) ..................................................... *passim*

*Patterson Dental Supply, Inc. v. Pace*,
No. 19-CV-1940, 2020 WL 10223625 (D. Minn. June 17, 2020) ..................... 7

*Perkins v. Hastings*,
915 F.3d 512 (8th Cir. 2019) ..................................................... 17

*Randle v. City of Minneapolis Police Dep't*,
No. 06-cv-859, 2007 WL 2580568 (D. Minn. Sept. 5, 2007) ..................... 25

*Roviaro v. United States*,
353 U.S. 53 (1957) ..................................................... 8

*Russell v. Hennepin Cnty.*,
420 F.3d 841 (8th Cir. 2005) ..................................................... 12

*Strauss v. City of Chicago*,
760 F.2d 765 (7th Cir. 1985) ..................................................... 17, 18

*Wright v. City of Chicago*,
No. 09-c-3489, 2010 WL 4875580 (N.D. Ill. Nov. 23, 2010) ..................... 18, 19

**Statutes**

Minn. Stat. § 363A.12 .................................................... 6, 14

Minn. Stat. § 626.8434 .................................................... 26

**Other Authorities**

Fed. R. Civ. P. 26.................................................... *passim*

Fed. R. Civ. P. 33.................................................... 29

Richard L. Marcus,
*Federal Practice and Procedure* § 2177 (3d ed. Apr. 2023 Update) .......................... 28

## I. INTRODUCTION

Plaintiff Andre Moore's ("Plaintiff") motion to compel seeks an extraordinary array of discovery—from disclosing the identity and compelling the deposition of a confidential informant to requiring the production of 700 hours of video and tens of thousands of pages of documents related to hundreds of records, complaints, and investigations spanning a ten-year period. But in more than 50 pages of briefing, Plaintiff offers no legitimate basis to conclude that this discovery is relevant to his claims, let alone a justification for the extraordinary burden associated with the review and production of these materials. The City of Minneapolis ("the City") respectfully requests Plaintiff's motion be denied in its entirety.

## II. STATUS OF DISCOVERY

Plaintiff filed a Complaint on June 1, 2022, alleging constitutional violations against Officer Tony Partyka, Officer Neal Walsh, and two John Does, arising from a traffic stop of Plaintiff on December 7, 2019, and a search of Plaintiff's home on February 13, 2020. Dkt. 1. On October 12, 2022, Plaintiff served a subpoena on the City requesting production of documents. City Ex. 1.[1] On November 22, 2022, Plaintiff filed an Amended Complaint, adding the City as a Defendant, and alleging that the City's policies, customs, and/or deficient training caused Plaintiff's injuries with respect to the December traffic stop. Dkt.

[1] Exhibits to the Declaration of Rachel Kitze Collins ("Kitze Collins Decl."), filed herewith, are labeled "City Ex.". Exhibits to the Declaration of Matthew Veenstra, Dkt. 51, are labeled "Pf. Ex.".

25. Plaintiff does not assert a claim against the City related to the February warrant search. *See id.* ¶¶ 187–215 (Counts V and VI).

Discovery is now well underway. Plaintiff has served the City with six separate sets of interrogatories, and three sets of requests for production of documents. Kitze Collins Decl. ¶ 3. The City has produced almost 3,000 pages of documents and dozens of hours of body camera video in response to these requests for production, including: (1) the entire file associated with the December traffic stop; (2) the entire file associated with the February warrant and search; (3) [redacted] (4) personnel records for the Officer Defendants; (5) the entire set of Minneapolis Police Department ("MPD") policies in place at the time of the incidents involving Plaintiff; (6) revised MPD policies through 2022; (7) documents related to academy and in-service training for police officers between 2016 and 2019; (8) annual reports from OPCR; and (9) other internal analysis regarding the City's police conduct complaint process. *Id.* ¶ 4. The City continues to search for documents responsive to Plaintiff's requests and will produce them on a rolling basis. In addition to document discovery, Plaintiff has already taken the depositions of five current and former MPD Officers, including Defendant Officer Walsh. *Id.* ¶ 5. The City has noticed the deposition of Plaintiff for May 10. *Id.* ¶ 6. Discovery is not scheduled to close in this case until October 2, 2023. Dkt. 39.

## III. FACTUAL BACKGROUND

Plaintiff's factual background contains select references to actual testimony and evidence in this case, combined with a significant amount of unfounded exposition and

extrapolation. In light of this, the City recounts the factual background of this case in somewhat more detail than is perhaps directly relevant to the motion to compel, but does so in the interest of correcting and clarifying the record.

### A. The December Traffic Stop.

On the evening of December 7, 2019, Officer Tony Partyka and Officer Brandon Knuth were on patrol in the area of Lowry Avenue and Colfax Avenue North in the Fourth Precinct in Minneapolis.[2] Pf. Ex. 24 at MPLS_MOORE001277. The Officers initiated a traffic stop after Plaintiff failed to signal a left turn at least 100 feet before the turn. *Id.; see also id.* at 1280. In addition, one or both Officers recognized Plaintiff and his vehicle, and Officer Partyka believed Plaintiff to have a revoked driver's license, a fact which was confirmed through dispatch. *Id.* at 1277, 1280. As the Officers exited their vehicle and approached Plaintiff's car, Plaintiff rolled down his window and handed Officer Knuth his license. *Id.* at 1280. When the window was rolled down, Officer Knuth smelled alcohol

[2] One factual issue the City is compelled to correct relates to the map on Page 24 of Plaintiff's brief. Plaintiff introduced this map during the deposition of Officer Knuth. *See* Pf. Ex. 29 at 30:19-31:23. The map purports to depict the route that Plaintiff allegedly drove the night of December 7, 2019. *See id.* at 38:4-18. However, Plaintiff's brief conspicuously fails to mention that this map was created by Plaintiff's counsel and the alleged route Plaintiff drove is not supported by any evidence—document, testimony, or even declaration—in this case. But even if the map is accurate as to the route Plaintiff drove, Plaintiff's own characterizations of the map in the brief are plainly wrong. Colfax Avenue does not run straight north. Rather, a driver traveling north on Colfax must turn left (*west*) onto Lowry, and then turn right again, to continue going north on Colfax. Officer Knuth also observed this fact during his deposition, and noted that he believed there was a stop sign at the intersection of Colfax and Lowry. *See id.* at 62:3-63:15. Accordingly, Plaintiff's assertion in his brief that he *never drove west* is belied by his own map. All of this to say, Plaintiff's characterizations (or mischaracterizations) of the facts, should not be taken at face value.

in the vehicle and saw a cup he believed to contain alcohol. *Id.* For these reasons, he asked Plaintiff to put his hands on the wheel in order to handcuff him and remove him from the vehicle. *Id.* Plaintiff initially complied with this request, but then immediately dropped his right hand down near his waist and the center console. *Id.* Officer Knuth testified that he "thought he was going for a weapon." City Ex. 2, Knuth Depo. at 79:1-24. The Officers repeatedly ordered Plaintiff to stop reaching and put his hands up. *See* Pf. Ex. 24 at 1277, 1280.

Officer Walsh and Officer Dirk Spee quickly arrived on the scene, and the four Officers managed to open the door and pull Plaintiff out of the vehicle and put him on the ground. *Id.* at 1277-78, 1280, 1283, 1285. The Officers continued to struggle to handcuff Plaintiff, because his right hand was still tucked under his body near his waistband. *Id.* at 1283; City Ex. 3, Spee Depo. at 59:24-61:25. Officers Spee and Knuth testified that they still believed Plaintiff was attempting to reach for a weapon and there was still an imminent risk to their safety. *See* City Ex. 3, Spee Depo. at 23:17-24; 58:17-59:23 (testifying that "I think the control is never going to be truly achieved with that hand underneath his waistband," and recounting a case where an individual was able to fire their weapon from inside their waistband); City Ex. 2, Knuth Depo. at 88:6-14 ("[W]e thought that he might still have a weapon underneath him in his waistband."). Officer Spee repeatedly ordered Plaintiff to stop moving and stop resisting. Pf. Ex. 24 at 1283; City Ex. 3, Spee Depo. at 21:2-15; 45:22-46:9; 61:1-6; 72:6-10. At this time, Officer Walsh, who was positioned at Plaintiff's head, determined that Plaintiff was not complying with the other Officers' commands to give up his hands, and delivered two knee strikes to Plaintiff's head and face

area, in order to gain compliance. Pf. Ex. 24 at 1285; City Ex. 4, Walsh Depo. at 138:3-139:21; 142:7-145:1. These knee strikes are the basis of Plaintiff's claim of excessive force against Officer Walsh, as well as the basis of his *Monell* and *Canton* claims against the City. *See* Am. Compl. ¶¶ 127-41 (Count I), 187-203 (Count V), 204-15 (Count VI).

### B. <u>The February Warrant and Search of Plaintiff's Home.</u>

Plaintiff's second set of claims relates to Officer Partyka's investigation into Plaintiff's narcotics activity in early 2020, prompted, at least in part, by information Officer Partyka received from a confidential informant. *See, e.g.*, Pf. Ex. 3 at 3-5. The investigation culminated in a search of Plaintiff's home and criminal charges against Plaintiff for aggravated possession of methamphetamine and unlawful possession of a firearm. *See* City Ex. 5 at 1. In a post-*Miranda* statement, Plaintiff admitted that more than 900 grams of methamphetamine and a handgun found in his home belonged to him. *See* Pf. Ex. 12 at 3-4. However, during the course of his case, Plaintiff filed a *Franks* motion to suppress the evidence seized in the search. Judge Scoggin ultimately granted the motion to suppress, and the criminal charges against Plaintiff were dismissed and Plaintiff was released from detention. *See* Pf. Ex. 12. Plaintiff alleges emotional distress damages associated with his incarceration. *See* City Ex. 6. Plaintiff has made no *Monell* or *Canton* claim against the City based on these allegations.

### C. <u>The City's Investigation of the Incidents.</u>

On October 6, 2020, Plaintiff submitted a complaint to the City regarding the December 2019 traffic stop. *See* City Ex. 7. Although Plaintiff was contacted several times by the investigator assigned to the case, he did not appear for his scheduled interview

and otherwise declined to participate in the investigation. *See* City Ex. 8. The investigation nonetheless proceeded, and ultimately resulted in Officer Walsh receiving a 40-hour suspension for his use of force during the traffic stop. *See* City Ex. 9. [redacted]

**D. <u>The MDHR Investigation into Race Discrimination.</u>**

After the murder of George Floyd in May 2020, the Minnesota Department of Human Rights ("MDHR") commenced a department-wide investigation into the MPD, pursuant to MDHR's authority under the Minnesota Human Rights Act, to determine whether probable cause existed to believe that the MPD was engaged in a pattern or practice of race discrimination from 2010 to present, in violation of Minn. Stat. § 363A.12. *See* Pf. Ex. 33 at 5. On June 8, 2020, the Hennepin County District Court approved a temporary consent order agreed to between MDHR and the City, which required immediate changes to certain MPD policies and procedures. Those policy changes began on June 9, 2020, with a prohibition on neck restraints and choke holds, and continued to be made throughout 2020 and beyond. *See id.* at 5-6.

[redacted]

Over the course of the next several months, MDHR sought extensive documentation from the City regarding policies, training, procedures, and files related to specific incidents going back to 2010. *See id.* at 6. As relevant to this motion, the City produced to MDHR 300 files related to reported uses of force over an eleven-year period, as well as 125 IA and 164 OPCR files, spanning the period between January 2014 to May 2021. *See id.* at 11, 53. On April 27, 2022, MDHR released a report detailing its probable cause findings. Pf. Ex. 33.

## IV. ARGUMENT

Federal Rule of Civil Procedure 26(b) allows parties to discover any nonprivileged information relevant to a claim or defense. Fed. R. Civ. P. 26(b)(1). "But this broad disclosure standard is not boundless; parties can discover only that information which is 'proportional to the needs of the case,' considering 'the importance of the issues,' 'the amount in controversy,' 'the parties' relative access to relevant information,' their resources, how important the discovery is in resolving the issues, and 'whether the burden or expense of the proposed discovery outweighs its likely benefit.'" *In re: EpiPen Direct Purchaser Litig.*, No. 20-CV-827, 2023 WL 2675134, at *3 (D. Minn. Mar. 29, 2023).

The initial burden is on the party moving to compel discovery to show that the information requested is relevant and proportional. The burden then shifts to the party opposing discovery to show that it is not relevant or is unduly burdensome. *Id.* (citing *Patterson Dental Supply, Inc. v. Pace*, No. 19-CV-1940, 2020 WL 10223625, at *20 (D. Minn. June 17, 2020)). Because Plaintiff has failed to show that his discovery requests

seek information that is relevant and proportional to the needs of this case, Plaintiff's motion should be denied in its entirety.

### A. **Information Tending to Disclose the Identity of the Confidential Informant is Not Discoverable.**

While the majority of Plaintiff's arguments regarding the confidential informant are directed at Officer Partyka, the City also opposes any disclosure of information that would tend to disclose the identity of the confidential informant, including Plaintiff's request to take a deposition of the confidential informant. *See* Pf. Ex. 4 at 4 (City's objection to RFP seeking information related to the confidential informant); Pf. Ex. 38 (letter from City's counsel objecting to Plaintiff's Notice of Deposition for the confidential informant). The informant's privilege allows the government "to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." *Roviaro v. United States*, 353 U.S. 53, 59 (1957). The privilege serves to protect "the public interest in effective law enforcement," because when individuals' anonymity is protected, they are more likely to cooperate and disclose knowledge of crimes with law enforcement. *Id.*

As the Eighth Circuit has recognized, the privilege is limited. In criminal cases, "[w]here the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Id.* at 60-61. In civil cases, however, the plaintiff must show a "clear need for the informant's identity, weighed against the government's interest in protecting confidential informants' identities." *Elnashar v. Speedway*

*SuperAmerica, LLC*, 484 F.3d 1046, 1052 (8th Cir. 2007). Moreover, "the government's interest is more likely to prevail in civil cases . . . because the countervailing constitutional guarantees assured to criminal defendants are not present." *Id.* at 1053; *see also McKinney v. United States*, No. 17-cv-4156, 2020 WL 7334411, at *3 (D. Minn. Dec. 14, 2020) (declining to compel the production of unredacted copies of FBI documents "in light of the serious need to keep the information confidential. This is especially true given the fact that the informer's privilege is stronger in civil cases such as this.").

Helpfully for this Court, this issue is essentially decided. In Plaintiff's criminal case, his attorneys sought disclosure of the informant's identity. On June 15, 2020, the Hennepin County District Court judge held that Plaintiff failed to meet his "initial burden of showing the CRI is a material witness in the charged crime, or is necessary to present a defense." City Ex. 13. Instead, the Judge ordered Officer Partyka to present information regarding the informant for in-camera review. *Id.* Pursuant to that review, the Judge concluded that the informant was a real person, was not paid or given a benefit in a criminal charge for the information, and noted at a subsequent hearing that Officer Partyka had shown him a cover sheet containing the relevant information about the informant, as well as a summary sheet of information received on various cases from that informant. Pf. Ex. 12 at MPLS0000655; Pf. Ex. 9 at 5:2-9; *see also* City Ex. 5. Even after this, Plaintiff's public defender continued to request additional information about the informant, which the Court again denied. *See* Pf. Ex. 9 at 29. Accordingly, any request to disclose the identity of the confidential informant in the present case is foreclosed—because Plaintiff's need for the information was not established in the underlying criminal case after being thoroughly

litigated, he cannot establish a need for the information now in his civil case, which is based on the exact same underlying conduct by Officer Partyka. Plaintiff's motion should be denied in its entirety.

**B. <u>The Documents Provided to MDHR Are Not Relevant and Their Production and Review is Unduly Burdensome.</u>**

Plaintiff's document requests numbers 7 through 10 seek the production of thousands of pages and hundreds of gigabytes of data the City produced to MDHR in connection with its investigation into the MPD. As described above, MDHR's investigatory report indicated that the agency relied, in part, on two categories of documents that Plaintiff now seeks to compel the City to produce. First, the agency relied on 300 use of force files, comprising what MDHR determined was a representative sample of all the City's use of force files spanning an eleven-year period, and second, the agency relied on 125 IA files and 164 OPCR files dated between January 2014 and May 2021, also comprising what MDHR determined was a "sample" of the City's IA and OPCR files. *See* Pf. Ex. 33 at 11, 53. The City objected to Plaintiff's requests for these documents and declined to produce them.[4] *See* Pf. Ex. 4 at 7-11. The Court should deny Plaintiff's motion to compel their production.

---

[4] Plaintiff omits from his brief the fact that he also served a subpoena on MDHR seeking all of MDHR's work product, including that of its expert, showing how it arrived at its conclusions in the Report. *See* City Ex. 14. MDHR refused to produce these documents to Plaintiff. *See* City Ex. 15.

1. The MDHR Report and Its Findings Are Distinct from Plaintiff's *Monell* Claims.

Plaintiff's brief is clear: he seeks the full universe of files sent to MDHR because he believes the conclusions MDHR drew from its review of those files prove his *Monell* claim. Indeed, in the meet-and-confer process, Plaintiff's counsel specifically stated that he did not want the City to undertake a relevance review of these files—because he wanted *all* the files.[5] Plaintiff's argument that he is entitled to the documents suffers from numerous flaws, not least of which is the fact that MDHR's Report is the result of an investigation into an entirely different set of allegations arising under a different legal framework than Plaintiff's claims.

To prevail on his *Monell* claims, Plaintiff must prove a pattern of unconstitutional misconduct, that is *the same as* the unconstitutional misconduct alleged to have been conducted by the individual officer vis-à-vis Plaintiff. *See Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999) (summary judgment appropriate where plaintiff "produced no evidence regarding the factual background of . . . previous complaints," and did not show

[5] In subsequent conversations, Plaintiff asked the City to create "a spreadsheet of the information about the files that the city used to negotiate with MDHR to reach agreement on the files that were produced. "I would like the complete list of all files with a separate column to indicate which ones were provided to the state, including all of the information that was given to the state." Pf. Ex. 34 at 2. Plaintiff's request was not a meaningful attempt to engage in a narrowing of Plaintiff's request for documents but rather was intended to force the production of attorney work product involving an additional, burdensome review of every single use of force and IA/OPCR file from which MDHR selected its sample, to further Plaintiff's efforts to obtain the underlying documents. The City declined to undertake this task or waive attorney work product, and informed Plaintiff that if he sought this type of information (rather than a newly created document) from the City, he needed to request it in an interrogatory or document request. Plaintiff did not do so.

"that the incidents giving rise to these complaints bear any factual similarity to" the incident at issue in her case, among other things); *see also Russell v. Hennepin Cnty.*, 420 F.3d 841, 849 (8th Cir. 2005) (finding that in order to prove a custom of failing to follow a policy caused the plaintiff's detention, he must show "at the time of his prolonged detention, there was a widespread and persistent *failure to follow the relevant . . . policy*, that some county policymaker was aware of this failure and was either deliberately indifferent to or tacitly approved of such conduct and that his prolonged detention was caused by this custom of failing to follow [the] policy" (emphasis added)); *Evenstad v. Cnty. of Hennepin*, No. 04-1124, 2006 WL 8445284, at *7 (D. Minn. May 22, 2006), *report and recommendation adopted*, 2006 WL 8445281 (D. Minn. July 20, 2006) (noting that to hold the County liable under *Monell* for a First Amendment retaliation claim, the plaintiff would have to prove "the existence of a widespread, persistent pattern of unconstitutional misconduct (*First Amendment retaliation*) by the County employees" and that "Plaintiff provide[d] no evidence of a widespread pattern of First Amendment retaliation" (emphasis added)).

In order to hold the City responsible under *Monell* for the conduct of Officer Walsh during the traffic stop, Plaintiff must prove (1) the existence of a pattern of the same type of misconduct, *i.e. use of knee strikes that amount to unconstitutional uses of force*, similar to the type used against Plaintiff, (2) that prior to the incident involving Plaintiff, the City was aware of this pattern and was deliberately indifferent to, or tacitly approved the pattern of conduct; and (3) that this deliberate indifference or tacit approval of the pattern of conduct caused Plaintiff's injuries. *See Monell v. Dep't of Social Servs. of the City of N.Y.*,

436 U.S. 658, 694 (1978); *see also Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996) (affirming summary judgment on the grounds that there was "no evidence that the city ever had received, or had been deliberately indifferent to, complaints of violence or sexual assault . . . prior to the time [Defendant] raped [Plaintiff]" and distinguishing other cases where the prior complaints "were quite similar to the type of officer misconduct" at issue); *Kruse v. City of Elk River*, No. CV 21-01262, 2022 WL 4387994, at *6 (D. Minn. Sept. 22, 2022) ("The allegations do not rise above genericism by alleging specific facts or constitutional violations against her and other students or parent[s] 'on multiple occasions, under circumstances similar to those alleged [in the complaint]' and do not otherwise describe how the District's alleged custom was the moving force behind her and her children's alleged constitutional deprivations."); *Haggins v. City of St. Paul*, No. 09-cv-537, 2010 WL 1380134, at *6 (D. Minn. Mar. 1, 2010) (recommending summary judgment for *Monell* claim where incidents plaintiff relied upon to establish policy or custom bear no factual similarity to the issue in the current suit, among other things), *report and recommendation adopted as modified*, 2010 WL 1379913 (D. Minn. Mar. 31, 2010); *Clardy v. City of St. Paul*, No. 01-cv-1275, 2003 WL 21805203, at *7 (D. Minn. Aug. 4, 2003) ("Clardy, does not point to specific facts indicating that the prior complaints against the City of St. Paul police officers were for constitutional violations akin to those he asserts against the City of St. Paul police officers, or were in other ways factually similar to the case at hand.").

As much as Plaintiff would like the Court to believe otherwise, the MDHR Report does not tend to prove any prong of his *Monell* claim. The MDHR Report is focused on

an entirely different question—namely, whether there are disparities in how different populations are treated by MPD—and that question arises under an entirely different legal framework—namely, the Minnesota Human Rights Act, and its broad language prohibiting discrimination in public services. *See* Minn. Stat. § 363A.12, subd. 1. The Report expressly disclaims any other conclusion under any other law: "Because [MDHR] completed a pattern or practice investigation, it did not focus its investigation on individual incidents or individual officers. Furthermore, [MDHR] *did not determine whether the City and MPD violated any federal laws or any state or federal constitutional provisions*." Pf. Ex. 33 at 5 n.3 (emphasis added).[6]

Plaintiff's attempt to rely on two cases where a defendant was ordered to produce documents that it had provided to the government in connection with a governmental investigation is not persuasive. In those cases, the government and the private plaintiffs were involved in parallel investigations premised on the same violations of law. In *United States ex rel. Luke v. Healthsouth Corp.*, the plaintiff had brought a False Claims Act complaint, and was therefore "stepp[ing] into the Government's shoes" to litigate the case. No. 2:13-cv-01319, 2018 WL 3186941, at *8 (D. Nev. June 28, 2018). The Court accordingly found the plaintiff was entitled to the documents the defendants had produced

[6] Plaintiff also lumps together conclusions in MDHR's report to attempt to support his document requests, including MDHR's conclusion that the City "teach[es] an approach to policing that emphasizes aggression." Pf. Ex. 33 at 44. To be clear, the City disagrees with this characterization. But to the extent Plaintiff intends to show that the City is liable based on deficient training, document requests 7-10 are not relevant to that argument. Instead, Plaintiff will need to rely on documents reflecting the actual training that the officers received; and those documents have *already been produced* in this matter. *See* Kitze Collins Decl. ¶ 4.

to the government in the course of the government's investigation of plaintiff's claim. *Id.* at *9. In *In re Broiler Chicken Antitrust Litigation*, both the plaintiffs and the government were investigating potential anticompetitive conduct in the chicken industry—in other words, they were investigating and/or litigating the same conduct under the same law. No. 1:16-cv-08637, 2017 WL 4417447, at *4 (N.D. Ill. Sept. 28, 2017) (noting almost all of the government's requests "seek documents related to potential anticompetitive conduct," and ultimately limiting the production order to a *subset* of the documents provided to the government, noting that "*reflexive production of documents previously provided to governmental entities is not appropriate.*" (emphasis added)). And in both cases, the plaintiff's complaint preceded the government's investigation; not the other way around. This is not an analogous situation. The MDHR Report is focused on a different issue arising under a different legal framework than Plaintiff's claims. For these reasons, Plaintiff's argument that the documents provided to MDHR are relevant solely on the basis that they were used by MDHR cannot stand under Rule 26.

2. <u>The Specific Documents Requested by Plaintiff Are Not Relevant.</u>

Turning to each document request individually, Plaintiff first requests: "All 300 MPD use of force files provided to MNHDR [sic] in connection with MNHDR's [sic] investigation of MPD." Pf. Ex. 4 at 7. In the course of its investigation, MDHR requested these files from the City because it believed they constituted a representative sample of all recorded use of force incidents for a eleven-year period, "in terms of the type of force used by an officer, the race of the individual against whom the officer used force, and whether the incident was coded as a crisis intervention incident involving an individual

experiencing a mental or behavioral health crisis." Pf. Ex. 33 at 46 n.65. By design, this representative sample includes records related to use of force incidents that bear no relationship to the type of force at issue in this matter: knee strikes. MDHR's report does not offer specific details about what types of cases are included in these 300 files, but its report makes two major conclusions regarding two specific types of force: the use of neck restraints and the use of chemical irritants. *Id.* at 12-14. Neither type of force is at issue in this case. Additionally, based on MDHR's own analysis, at least 70% of the files involved uses of force that are reasonable, *see* Pf. Ex. 33 at 46, and therefore, cannot possibly support Plaintiff's claim that there was a pattern of engaging in unconstitutionally excessive force similar to the force allegedly used against him. *See Fancher v. Klann*, No. 13-cv-435, 2014 WL 4294960, at *5 (D. Minn. Aug. 28, 2014) ("Such bare statistics alone, however—without additional evidence regarding the similarity of the conduct in such cases, the relative strength of the claims or the chief's decision-making process—are insufficient to present a triable issue on the *Monell* claim."). Accordingly, the substantial majority of these 300 files would likely be of no use to Plaintiff in terms of showing a pattern of unconstitutional force through knee strikes similar to the force used against him. Plaintiff's motion to compel the production of these 300 files should be denied.

Plaintiff's next request seeks: "Documents sufficient to show all MPD data on recorded use of force incidents from January 1, 2010 to December 31, 2020 that was provided to MNHDR [sic] in connection with MNHDR's [sic] investigation of MPD." Pf. Ex. 4 at 8. This broad and far-reaching request is supposedly for information regarding every use of force incident involving MPD for a ten-year period. Although Plaintiff now

describes these as "compilation" documents, that is not clear from the language of the requests. Even if the City were capable of producing a single spreadsheet listing all use of force incidents over the past eleven years, this request is, again, seeking vast quantities of irrelevant data, and preparation of the spreadsheet would impose a tremendous burden, and even if the City were to undertake that effort, the spreadsheet would not be subject to discovery in response to this document request. Plaintiff argues that this entire data set is relevant because MDHR concluded that "63% of all use of force incidents that MPD officers recorded were against Black individuals" and that "MPD officers are more likely to use soft tactics on white individuals than Black individuals in similar circumstances." Pf. Ex. 33 at 11, 18. But Plaintiff has not made a discrimination claim in this case, and MDHR's conclusions are not relevant to the claims he has made because they do not indicate whether there was a pattern or practice of using unconstitutionally excessive force when making arrests, and, in any event, a *Monell* claim cannot be proved by statistical analysis. *See Perkins v. Hastings*, 915 F.3d 512 (8th Cir. 2019) (affirming summary judgment in part on the basis that the plaintiff's expert report "could not establish a pattern because his opinion was based only on his statistical analysis and not on actual incidents involving excessive force" and finding "no error in the court's conclusion that those statistics alone were insufficient to present a triable issue on [plaintiff's] failure-to-investigate claim"); *see also Strauss v. City of Chicago*, 760 F.2d 765, 768-69 (7th Cir. 1985) (explaining that evidence that the police department sustained only six to seven percent of all registered complaints "indicate[d] nothing" without identifying what made the prior conduct illegal and without "showing that a similar illegality was involved in [the

plaintiff's] case"); *Fancher*, 2014 WL 4294960, at *5; *Evenstad*, 2006 WL 8445284, at *9 (citing *Strauss*, 760 F.2d at 768-69).

Similarly, the traffic stop data requested in RFP No. 9 is irrelevant. *See* Pf. Ex. 4 at 9. Although Plaintiff makes numerous assertions about the reason and motive for the traffic stop on the evening of December 7, 2019, he has not actually pleaded a claim that the traffic stop violated his constitutional rights. Rather, Plaintiff claims that Officer Walsh used unnecessary force, and that the subsequent search of his vehicle unlawfully expanded the stop. Am Compl. ¶¶ 127-155 (Counts I and II alleging excessive force against Walsh and John Doe No. 1); 156-177 (Count III alleging illegal search of the trunk of Moore's vehicle). Data regarding the reason for traffic stops and the race of the driver is not relevant to Plaintiff's claims, and, once again, a mere spreadsheet of data cannot show a pattern of *unconstitutional* uses of force.

Finally, Plaintiff asks for "All 125 Internal Affairs files and 164 OPCR files from January 2014 to May 2021 that were provided to MNHDR [sic]." Pf. Ex. 4 at 10. The City objected to this request due to its overbreadth, the burden of reviewing and producing all of the requested files, and because many of the files may be wholly unrelated to Plaintiff's claims. *See Wright v. City of Chicago*, No. 09-c-3489, 2010 WL 4875580, at *2-3 (N.D. Ill. Nov. 23, 2010) ("Apparently, [Plaintiff] believes that his *Monell* claims permit him to litigate what he believes is the ineffectiveness of the police disciplinary system for all types of misconduct . . . [Plaintiff's] *Monell* claims must be limited to policies and practices that are the *moving force* behind the specific constitutional violations allegedly inflicted on [Plaintiff]."). To be clear, Plaintiff has not requested a subset of files

involving investigations of incidents relevant to his allegations of a pattern or practice of using excessive force, such as knee strikes used in an excessive manner, and has refused to limit the scope of his requests to such responsive documents. As this Court has held, "the only IAU investigations relevant to Plaintiff's claim of an unconstitutional policy of excessive force . . . are the investigations into excessive-force complaints." *See Her v. Pacolt*, No. 11-cv-808, 2013 WL 4053218, at *7 (D. Minn. Aug. 12, 2013). Similarly, in the Western District of New York case Plaintiff cites, the Court allowed production of 168 files after the plaintiffs "narrowed their request to only those IAD files that are likely to be relevant to their claims." *Black Love Resists in the Rust, by and through Soto v. City of Buffalo*, 334 F.R.D. 23, 34 (W.D.N.Y. 2019); *see also Wright*, 2010 WL 4875580, at *3 (limiting discovery to specific policies and practices at issue in the case, and holding, "[t]he City will not be required to answer interrogatories or respond to document requests that seek information about disciplinary practices in general or the investigation of complaints of police misconduct that is not focused on the particular practices at issue here"). But here, instead of requesting documents relevant to his case, Plaintiff has requested all of the files, regardless of their subject matter or type of force asserted, simply because they were analyzed by MDHR. This request should be denied.

3. <u>The Burden of Reviewing the Documents is Disproportionate to the Needs of the Case.</u>

Even if Plaintiff could demonstrate that this broad universe of files bears some relevance to his claims, producing and reviewing these files would be extraordinarily burdensome. As the City's supplemental responses to discovery state, the 300 use of force

files include 2,889 documents, totaling 7,890 pages, plus 548 gigabytes of body camera footage and other video. Pf. Ex. 4 at 8. The IA and OPCR files include 6,466 files, totaling 24,236 pages, plus 195 gigabytes of body camera footage and other video. *Id.* at 10-11. As explained in the City's supplemental response, 700 gigabytes of video is equal to approximately 700 hours of video (a fact notably absent from Plaintiff's brief). *See* Pf. Ex. 4 at 8, 10-11. Even if the Court were to order the City to produce these documents *in toto* without a relevance review, the City's counsel would still be required to review these files to fulfill their ethical duty to adequately represent their client and prepare for litigation. It is likely that the Defendant Officers' counsel would also have to review the files. And of course, Plaintiff's attorney would review the files. In total, the sweeping production Plaintiff requests would involve at least 2,100 hours of attorney review time, costing hundreds of thousands of dollars in fees just to review body camera video which Plaintiff hopes may somehow support his case. This is grossly disproportionate to the sole claim at issue—Plaintiff's use of force claim,[7] which Plaintiff has stated is worth $10,000 in compensatory damages. City Ex. 6. Even assuming some premium for punitive damages (for which the City is not liable under *Monell*), forcing the parties to review 700 hours of body camera video related to hundreds of incidents, many of which will have no relevance to Plaintiff's claim, is simply not proportional to the amount in controversy, the issues in this case, and the importance of this discovery.

[7] Plaintiff has made no *Monell* claim related to the February warrant and search of his home. *See* Am. Compl. ¶¶ 187-215 (Counts V and VI).

Plaintiff also mischaracterizes the City's other burden arguments. Although the City has conceded that, at least at the time they were produced to MDHR, these files were in one place, that does not eliminate all burden associated with their production. First, the files are no longer stored on an e-discovery system and would have to be re-uploaded to such a system and then reviewed for production, in accordance with the discovery protocol in this case. Kitze Collins Decl. ¶ 26. In addition, 700 gigabytes of video cannot be transmitted via an FTP link and would instead have to be uploaded to external hard drives and distributed to counsel. Thus, Plaintiff's characterization that they can be produced at the "touch of a button" is inaccurate, and the City has never represented that to be the case.

Finally, Plaintiff misrepresents the arguments the City has made regarding the Minnesota Government Data Practices Act. The City is not arguing that the files are not discoverable because they contain non-public data. Rather, the City has told Plaintiff that it has an obligation under the Data Practices Act to redact sensitive personal information before producing the documents to Plaintiff, which further compounds the burden of reviewing these documents for production. And although the protective order in this case contemplates the production of not-public data, that order was entered into before the City was a party to the litigation, before the *Monell* claims were added, and before anyone contemplated the production of thousands of pages of documents related to hundreds of community members that are not Plaintiff—including suspects, victims, and minors— and that have not consented to the release of their data. A confidentiality designation, or even an AEO designation, is insufficient to produce these documents without redaction, absent a further order from the Court. Furthermore, the protective order expressly contemplates

that personnel data may be withheld. Dkt. 19 ¶ 6. Because these files include information regarding other City employees, under the terms of the protective order the City will have to review the files to ensure such information is redacted. In particular, IA and OPCR files will likely include personal addresses and other information for MPD Officers wholly unconnected with this case. This information is not relevant and Plaintiff has no right to it. It is unduly burdensome to require the City to review and redact these files, particularly given their marginal relevance, if any, to the case. For all of these reasons, the Court should deny Plaintiff's motion to compel production of documents responsive to requests 7 through 10.

### C. Chauvin's Records are Not Relevant.

Plaintiff asks for two categories of documents related to Derek Chauvin—his training records and "all documents" related to eight different incidents involving use of force by Chauvin. *See* Pf. Ex. 4 at 11-12. Chauvin's training records are plainly irrelevant. To the extent Plaintiff is making a deficient training claim, he must rely on the training actually received by the Officers who interacted with him. Those documents have already been produced. Plaintiff cannot even make the stretch claim that Chauvin's training impacted these particular Defendant Officers, because none of these Officers worked with Chauvin. The City has provided lists of their field training officers, and Chauvin is not on that list. *See* City Ex. 16 at 5-6 (listing field trainers for Officers Walsh and Partyka). In fact, they worked in entirely different precincts. There is no line to draw between Chauvin's training and the Defendant Officers, and this request should be denied. *See* *Evenstad*, 2006 WL 8445284, at *7 ("To prove a local governmental entity is liable for

failure to train, a plaintiff must (1) establish that policymakers acted with deliberate indifference in failing to train employees; (2) identify a specific deficiency in the training program; and (3) establish that the deficiency is so closely related to the ultimate injury that it actually caused the constitutional deprivation. Inferences of inadequate training must be based on more than the fact that the alleged constitutional violation occurred in the first place." (citing *City of Canton v. Harris*, 489 U.S. 378, 390-92 (1989)).

The other category of documents requested is eight files related to use of force incidents involving Derek Chauvin. The incidents are described in detail in the State's brief in support of its motion to introduce *Spreigl* evidence during Chauvin's murder trial. *See* City Ex. 17 at Ex. A. But these incidents are not relevant to Plaintiff's claims in this case, and Plaintiff provides no explanation for why each incident is relevant, other than that they involved Chauvin. It is Plaintiff's burden under Rule 26 to demonstrate the relevance of the evidence he seeks to discover. Other than an inflammatory assertion that Chauvin is a "poster-child" for MPD, Plaintiff makes no effort to demonstrate the relevance of this evidence. And Plaintiff cannot make the excuse that he lacks sufficient information to explain why each of these incidents are relevant, because the State's brief, which is attached to Plaintiff's first set of requests for production of documents, describes each incident in detail. *See* City Ex. 17 at Ex. A.

Reviewing the State's brief makes it abundantly clear that the incidents do not involve similar circumstances or similar uses of force such that they are relevant to Plaintiff's claims. Indeed, in three of these incidents, the State sought to introduce them because they showed that Chauvin *did know* what reasonable force was and/or showed that

he knew that a handcuffed person should be rolled into a seated position, and thus the State intended to use them to show that what Chauvin did to Floyd was different and thus intentional. City Ex. 17 at 23-25, 28-31, 37-38. In the other cases, the State sought to introduce the evidence because Chauvin had employed neck restraints and/or continued to pin someone to the ground after they were handcuffed, showing his modus operandi. *Id.* at 25-28, 31-32, 32-34, 34-35, 35-37. None of these incidents are relevant to this case. They did not involve the Defendant Officers and they did not involve similar circumstances or similar uses of force, *i.e.*, knee strikes. None of these incidents occurred at traffic stops, and there is no evidence that a neck restraint was used against Plaintiff or that Plaintiff was kept pinned in the prone position after he was handcuffed. Accordingly, because Plaintiff failed to meet his initial burden to demonstrate relevance, and because he seeks to introduce these incidents purely for shock value, his motion to compel should be denied.

### D. **Discovery of ESI Related to Policy Changes is Not Relevant and is Unduly Burdensome.**

Plaintiff asserts that the City has refused to produce "documents reflecting the City's awareness of the need for changes" to its policies concerning the use of force. This is a generous (and inaccurate) characterization of the documents Plaintiff actually seeks in further response to requests number 15 and 16, all of which are either irrelevant or disproportionate to the needs of the case. *See* Pf. Ex. 5 at 5.

Plaintiff's motion centers on two categories of documents: (1) "revised training materials" put in place after the events at issue in this case; and (2) unspecified documents "related to" revisions to MPD's use of force policies, which the City understands to be a

request for a custodial search of emails and other internal discussions about actual and potential policy revisions. According to Plaintiff, these documents are relevant because "[p]ost-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right." Dkt. 55 at 54 (quoting *Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989)). Plaintiff does not need documents relating to changes in MPD's policies and trainings in order to identify the policies that existed when the alleged deprivation of his constitutional rights occurred because the City has produced all relevant policies in place at the time of the December 2019 traffic stop. Plaintiff offers no additional explanation for why these documents could be relevant to his claims, because they are not.

First, to succeed on any claim premised on the City's alleged failure to train its police officers, Plaintiff must show that his injuries were caused by "some specific deficiency in the City's training policy, which evidences a deliberate disregard for the constitutional rights of its citizens and visitors." *Randle v. City of Minneapolis Police Dep't*, No. 06-cv-859, 2007 WL 2580568, at *9 (D. Minn. Sept. 5, 2007). The City has already produced training materials through 2019—*i.e.*, all materials that could have caused any alleged deprivation of rights at Plaintiff's December 2019 traffic stop. *See* Kitze Collins Decl. ¶ 4. Plaintiff does not appear to argue there was any defect with the City's written training or policies, and he does not explain how subsequent changes to the written training or policies would provide evidence of the City's deliberate indifference to a prior unwritten custom. On the contrary, the City's decision to reexamine and update its written training policies cuts against any claim of deliberate indifference. *See Hunziker as*

*Tr. for ALH v. Doherty*, No. 20-CV-2188, 2021 WL 3146529, at *6 (D. Minn. July 26, 2021) (explaining that county's decision to commission a report examining concerns over its child protection practices cut against allegation that county was deliberately indifferent to those practices).

Plaintiff's brief also makes a vague reference to "warrior-style training," suggesting that he seeks additional materials related to such training. Dkt. 55 at 31. Setting aside that Plaintiff did not raise "warrior-style training" in the parties' meet and confers related to the present disputes, there is no basis to compel the City to produce any materials on this topic. In response to requests that more specifically address "warrior-style training" (and which are not at issue in this motion), the City objected on the grounds that the term "warrior-style training" is vague and that the City does not and has not offered "warrior-style training," as that term is defined under Minnesota law, at any point during the relevant time period. City Ex. 18 at 6-7 (RFP 22); City Ex. 19 at 3-5 (ROGs 3 and 4); Minn. Stat. § 626.8434, subd. 1. Plaintiff's citation to the MDHR Report does not get around this problem, as the report itself does not provide any factual or legal citation for its reference to "warrior-style training." *See* Pf. Ex. 33 at 40.

The relevance argument is even weaker for the principal focus of Plaintiff's motion: internal discussions about changes to MPD use of force policies in the summer of 2020. Cases like *Bordanaro*—the one piece of authority Plaintiff cites for this request—only address the relevance of subsequent "events relating to the very incident in question," *i.e.*, the incident forming the basis of a plaintiff's claim. *Chalmers v. Petty*, 136 F.R.D. 399, 405 (M.D.N.C. 1991); *see also, e.g.*, *Bordanaro*, 871 F.2d at 1166 (addressing relevance

of inadequate internal investigation of officer conduct at issue); *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) (same). Plaintiff cannot reasonably argue that emails and other discussions about policy revisions that began in June 2020 relate to his December 2019 traffic stop. Not only did these revisions occur six or more months after the traffic stop, but they also came after the murder of George Floyd and a court order that required the City to change its policies. *See* Pf. Ex. 33 at 5-6. It is pure speculation for Plaintiff to assert that emails between City employees regarding court-ordered revisions to the City's written policies in June 2020—most of which are likely to be privileged—will shed light on the nature of alleged unwritten customs (purportedly about traffic stops or knee strikes) in effect half a year earlier.

In the unlikely event that Plaintiff's requests could lead to any marginally relevant, non-privileged information, they still would not be proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). Plaintiff makes a sweeping request for "all" responsive documents, "including" those found in the email of unspecified City document custodians. Dkt. 55 at 54. Plaintiff has never attempted to narrow or further articulate the nature of this request, leaving the City unable even to assess the burden in responding. Furthermore, the requests appear relevant only to Plaintiff's claims regarding the December 2019 traffic stop which, according to Plaintiff's initial disclosures, amount to only $10,000 in compensatory damages—a small fraction of his total claimed damages. City Ex. 6. The

Court should not give Plaintiff free rein to require an open-ended and likely fruitless search for relevant information in the City's electronic files.[8]

### E. Plaintiff's Motion to Compel a Different Response to Interrogatory 8 is Premature and Meaningless.

At the end of his brief, Plaintiff argues that the City's response to Plaintiff's Interrogatory No. 8 is deficient because it does not state "that the City [has] no knowledge of any other database query of Moore other than what is reflected in the known records." Dkt. 55 at 50. Plaintiff's attempted re-writing of the City's interrogatory response is both inaccurate and premature.

Interrogatory No. 8 asks the City to "identify" database queries of Plaintiff's name beyond those reflected in documents that have already been produced. *See* Pf. Ex. 37 at 5. Unsurprisingly, the interrogatory prompted the City to conduct a diligent search of its records to ensure it provides a response that accurately reflects the facts available to it. *See* Richard L. Marcus, *Federal Practice and Procedure* § 2177 (3d ed. Apr. 2023 Update) ("In answering interrogatories, a party is charged with knowledge of . . . what is in records available to it . . . ."). As the City's response makes clear, its search remains ongoing, and

---

[8] To the extent Plaintiff intends to seek a custodial search for documents predating MPD's 2020 policy revisions—a request never spelled out in Plaintiff's brief—the result should be no different. As the City has explained, there were no relevant policy revisions before June 2020. At best, Plaintiff is just hoping to trawl for evidence of contemplated changes that were never made. But even this would not resolve the logical gap in Plaintiff's argument: how contemplated changes to written policies are supposed to shed light on the City's awareness of alleged unwritten customs. Courts are clear that *Monell* liability cannot be premised upon a failure to implement a policy that would have prevented an unconstitutional act. *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1216 (8th Cir. 2013). The Court should not give Plaintiff license to search for irrelevant evidence.

it will provide any responsive information—whether in the form of a document production or a narrative interrogatory response—as soon as it can, consistent with its discovery obligations. *See* Fed. R. Civ. P. 26(e)(1); *see also* Pf. Ex. 37 at 5; City Ex. 20. Plaintiff's argument that the City has not properly identified documents under Rule 33(d) misses the point; the City is still working to determine whether any documents even exist. Because that search is incomplete, it would be incorrect for the City to state that it "has no knowledge" of responsive queries. Nothing in Rule 33 requires the City to state definitively that it is unaware of any responsive information before it has completed its search for such information. Indeed, such a requirement would only fuel Plaintiff's propensity for leveling unfounded accusations that the City is concealing information and changing its story.

Plaintiff's motion is also premature given the status of the case. Plaintiff served Interrogatory No. 8 on March 6, 2023, slightly over one month before filing this motion. As of this writing, nearly six months remain in the fact discovery period, leaving the City ample time to supplement its response with the results of its search. *See* Dkt. 39. Moreover, the City is making efforts at this moment to complete the search, and does not intend to wait until the closing moments of discovery to supplement its response. There is simply no basis to conclude, as Plaintiff suggests, that the City is hiding behind the ruse of a perpetual search in order to avoid responding to the interrogatory. On the contrary, the City's response is both reasonable and consistent with Rule 33. The Court should reject Plaintiff's invitation to compel an inaccurate, temporary, and *pro forma* amendment to that response.

## V. CONCLUSION

For all of the above reasons, the City respectfully requests the Court deny Plaintiff's motion to compel in its entirety.

Dated: April 19, 2023

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

s/Rachel A. Kitze Collins
Charles N. Nauen (#121216)
David J. Zoll (#0330681)
Rachel A. Kitze Collins (#0396555)
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401-2159
(612) 339-6900
cnnauen@locklaw.com
djzoll@locklaw.com
rakitzecollins@locklaw.com

**ATTORNEYS FOR DEFENDANT CITY OF MINNEAPOLIS**