# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Andre Moore,<br><br>Plaintiff,<br><br>v.<br><br>Officer Tony Partyka, in his individual capacity, Officer Neal Walsh, in his individual capacity, Officer John Doe No. 1, in his individual capacity, and Officer John Doe No. 2, in his individual capacity,<br><br>Defendants. | Civil File No. Civil File No. 22-cv-1477 PAM/TNL<br><br>**PLAINTIFF'S NOTICE OF SUBPOENA *DUCES TECUM* TO CITY OF MINNEAPOLIS** |

PLEASE TAKE NOTICE that, pursuant to Rule 45 of the Federal Rules of Civil Procedure, Plaintiff Andre Moore will subpoena the production of documents from nonparty City of Minneapolis in the above-captioned matter. A copy of the subpoena *duces tecum* is attached hereto as **Exhibit A**.

Dated: October 12, 2022

**SAUL EWING ARNSTEIN & LEHR LLP**

By: *s/ Douglas Anderson*
Courtland Merrill (MN #311984)
Matthew Veenstra (MN #392517)
Douglas Anderson (MN #0402494)
33 South Sixth Street, Suite 4750
Minneapolis, MN 55402
Telephone: (612) 225-2800
Email: courtland.merrill@saul.com
matthew.veenstra@saul.com
douglas.anderson@saul.com

***Attorneys for Plaintiff Andre Moore***

# EXHIBIT A

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Minnesota

| | | |
|---|---|---|
| Andre Moore,<br>*Plaintiff*<br>v.<br>Officer Tony Partyka, in his individual capacity, Officer Neal Walsh, in his individual capacity, et al.<br>*Defendant* | ) | Civil Action No. 22-cv1477 PAM/TNL |

**SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION**

To: City of Minneapolis, City Hall, 350 South Fifth Street, Suite 210, Minneapolis, MN 55415

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

See Attachment A.

| Place: | Date and Time: |
|---|---|
| Saul Ewing Arnstein & Lehr LLP<br>33 South Sixth Street, Suite 4750<br>Minneapolis, MN 55402 | On or before 5:00 p.m. October 28, 2022 |

❒ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 10/12/2022

*CLERK OF COURT*

_______________________
*Signature of Clerk or Deputy Clerk*

OR

s/ Douglas Anderson
*Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Andre Moore, who issues or requests this subpoena, are:
Douglas D. Anderson, Saul Ewing Arnstein & Lehr LLP, 33 South Sixth Street, Suite 4750, Minneapolis, MN 55402, douglas.anderson@saul.com, 612.225.2941

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 22-cv1477 PAM/TNL

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* ______________________

on *(date)* ____________ .

❒ I served the subpoena by delivering a copy to the named person as follows: ______________

______________________________________________________________________

______________________________________ on *(date)* ______________ ; or

❒ I returned the subpoena unexecuted because: ______________________________

______________________________________________________________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ ________________ .

My fees are $ ____________ for travel and $ ____________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ____________

______________________________________
*Server's signature*

______________________________________
*Printed name and title*

______________________________________
*Server's address*

Additional information regarding attempted service, etc.:

# Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# ATTACHMENT A

Pursuant to Rule 45 of the Federal Rules of Civil Procedure, Plaintiff Andre Moore requests that the City of Minneapolis produce the documents identified in this subpoena *duces tecum* for inspection and copying either electronically or at the offices of Saul Ewing Arnstein & Lehr LLP, 33 South Sixth Street, Suite 4750, Minneapolis, MN 55402. This subpoena relates to a lawsuit between Moore and several Minneapolis police officers.

## DEFINITIONS

1. "City" refers to the City of Minneapolis, Minnesota.

2. "MPD" refers to the Minneapolis Police Department.

3. "Moore" refers to Plaintiff Andre Moore.

4. You" and "Your" refer to the City, any administrative subdivision of the City including, including the MPD, and those persons acting on the City's behalf, including but not limited to its attorneys.

5. "Communication" means the transmittal of information by any means.

6. "Document" is synonymous in meaning and equal in scope to the usage of the term "document" in Federal Rule of Civil Procedure 26.

7. The phrase "related to" means pertaining to, describing, referring to, evidencing, reflecting, discussing, showing, supporting, contradicting, refuting, constituting, embodying, containing, concerning, identifying, or in any way logically or factually connected with the matter discussed.

## INSTRUCTIONS

1. Pursuant to Fed. R. Civ. P. 26(e), you are under a duty seasonably to supplement any response to this request for production for which you learn that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to us during the discovery process or in writing.

2. All documents that respond, in whole or in part, to any part or clause of any paragraph of these document requests shall be produced in their entirety, including all attachments and enclosures. Only one copy need be produced of documents that are responsive to more than one paragraph or are identical except for the person to whom it is addressed if you indicate the persons or group of persons to whom such documents were distributed. Documents that in their original condition were stapled, clipped, or otherwise fastened together shall be produced in such form.

3. For any document withheld under a claim of privilege, submit a sworn or certified statement from your counsel or one of your employees in which you identify the document by author, addressee, date, number of pages, and subject matter; specify the nature and basis of the claimed privilege and the paragraph of this demand for documents to which the document is responsive; and identify each person to whom the document or its contents, or any part thereof, has been disclosed.

4. For any document responsive to these document requests which is known to have been destroyed or lost, or is otherwise unavailable, identify each such document by author, addressee, date, number of pages, and subject matter; and explain in detail the events leading to the destruction or loss, or the reason for the unavailability of such document, including the location of such document when last in your possession, custody, or control, and the date and manner of its disposition.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

**REQUEST NO. 1:** All documents related to Moore.

**REQUEST NO. 2:** All documents related to the December 7, 2019 traffic stop and arrest of Moore.

**REQUEST NO. 3:** All documents related to the February 2020 investigation and arrest of Moore.

**REQUEST NO. 4:** All Documents related to any review or investigation into compliance with MPD's policies and procedures related to MPD's interactions with Moore, including but not limited to the December 7, 2019 traffic stop and arrest of Moore, and the February 2020 investigation and arrest of Moore.

**REQUEST NO. 5:** All Documents related to policies and procedures related to the investigation of narcotics trafficking.

**REQUEST NO. 6:** All Documents related to policies and procedures related to retrieval of evidence from garbage and recycling containers.

**REQUEST NO. 7:** All Documents related to policies and procedures related to applications for search warrants.

**REQUEST NO. 8:** All Documents related to policies and procedures related to the use of confidential informants.

**REQUEST NO. 9:** All Documents related to policies and procedures related to the receiving, maintaining, storing, and reporting of citizen complaints of alleged officer misconduct.

**REQUEST NO. 10:** All Documents related to citizen complaints about Neal Walsh and Tony Partyka, and any action taken in connection with such complaints, including but not limited to discipline, training, or coaching.

**REQUEST NO. 11:** All Documents related to the hiring of Neal Walsh and Tony Partyka.

# EXHIBIT 5

Filed in District Court
State of Minnesota
6/15/2020 9:00 AM

| | |
|---|---|
| STATE OF MINNESOTA | DISTRICT COURT |
| COUNTY OF HENNEPIN | FOURTH JUDICIAL DISTRICT |

State of Minnesota, MNCIS No. 27-CR-20-4146

Plaintiff,

v.

**ORDER DENYING DEFENDANT'S MOTION TO COMPEL CRI IDENTITY**

Andre Lamar Moore,

Defendant.

The above-entitled matter came before the Honorable Paul R. Scoggin on the motion of Defendant, Andre Lamar Moore ("Moore"), to compel the identity of the Confidential Reliable Informant ("CRI").

State of Minnesota is represented by Allison E. Reyerson.

Andre L. Moore is represented by Tanya M. Bishop and Alicia L. Granse.

## PRELIMINARY MATTERS

Andre Lamar Moore ("Moore") is charged with one count of aggravated controlled substance crime in the first degree, in violation of Minn. Stat. §152.021, subd. 2b (1), and one count of possession of ammo/firearm—conviction or adjudicated for crime of violence, in violation of Minn. Stat. §624.713, subd. 1 (2).

Moore filed a Motion to Compel CRI Identity on May 13, 2020 and a supporting memorandum on May 18, 2020. The State filed a Memorandum in Opposition to Defendant's Motion to Compel Evidence on May 21, 2020. Moore filed a Reply to State's Response Regarding Motion Compel Identity of CRI. The parties appeared for a hearing on June 5, 2020.

The Court ordered the warrant affiant, Minneapolis Police Department Officer Tony John Partyka ("Officer Partyka"), appear in chambers for an *in camera* review of the file**.**

Having considered the record and information from the *in camera* review, the Court makes the following findings of fact and Order.

## FINDINGS OF FACT

1. After the hearing and notice to the parties, this Court ordered an *in camera* review of the informant's identity and any benefits or inducements used to obtain information used in the affidavit underlying the search warrant in this case.

2. On June 11, 2020 at 11 am, Officer Partyka appeared in this Court's chambers and was placed under oath.

3. Officer Partyka stated the informant was a real person who relayed the information in the affidavit to the officer.

4. The informant was not paid or given a benefit in a criminal charge in exchange for this information.

5. Officer Partyka confirmed that the remaining information in the warrant affidavit is true.

6. Officer Partyka stated he was involved in a traffic stop of Moore and others; Officer Partyka primarily dealt with another passenger. Officer Partyka was unaware of the outcome of the case arising out of that stop.

## ORDER

The material outlined above does not provide a basis to believe Officer Partyka's averments are suspect. As such, the motion to reveal the informant's identity is **DENIED**.

**IT IS SO ORDERED.**

BY THE COURT:

Date: June 15, 2020

Paul R. Scoggin
Judge of District Court

# EXHIBIT 13

Filed in District Court
State of Minnesota
6/15/2020 3:23 PM

| | |
|---|---|
| STATE OF MINNESOTA | DISTRICT COURT |
| COUNTY OF HENNEPIN | FOURTH JUDICIAL DISTRICT |

State of Minnesota, MNCIS No. 27-CR-20-4146

Plaintiff,

v. **ORDER**

Andre Lamar Moore,

Defendant.

The above-entitled matter came before the Honorable Paul R. Scoggin for a hearing on June 5, 2020.

Allison E. Reyerson appeared on behalf of the State of Minnesota.

Alicia L. Granse appeared on behalf of Andre Lamar Moore ("Defendant").

MINNESOTA JUDICIAL BRANCH

## FINDINGS OF FACT

1. Defendant filed a Notice of Motion and Motion to Compel CRI Identity on May 13, 2020 and a Memorandum in Support on May 18, 2020. The State filed a Memorandum in Opposition to Defendant's Motion to Compel CRI Identity on May 21, 2020. Subsequently, Defendant filed a response to the State's memorandum on May 25, 2020.

2. After reviewing the submissions of the parties, the Court finds Defendant has not met his initial burden of showing the CRI is a material witness in the charged crime, or is necessary to present a defense.

3. Defendant meets the minimal threshold for an *in camera* review of the CRI's identity and the standard associated with reviewing the CRI's case file concerning the CRI's track record and any benefit offered to the CRI.

**ORDER**

The Hennepin County Attorney's Office shall, within fourteen (14) days, appear in chambers with Officer Tony Partyka, the standard case file, the CRI's identity, track record, and any benefits received in exchange for information.

**IT IS SO ORDERED.**

BY THE COURT:

Date: June 15, 2020

Paul R. Scoggin
Judge of District Court

# EXHIBIT 14

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Minnesota

Andre Moore,
*Plaintiff*
v.
Officer Tony Partyka, in his individual capacity, Officer Neal Walsh, in his individual capacity, et al.
*Defendant*

Civil Action No. 22-cv1477 PAM/TNL

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Minnesota Attorney General, 445 Minnesota Street, Suite 1400, St. Paul, MN 55101, c/o Minnesota Department of Human Rights, 540 Fairview Avenue North, Suite 201, St. Paul, MN 55104

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

See Attachment A.

| Place: Saul Ewing Arnstein & Lehr LLP<br>33 South Sixth Street, Suite 4750<br>Minneapolis, MN 55402 | Date and Time:<br>On or before 5:00 p.m. December 13, 2022 |
|---|---|

❒ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 11/28/2022

*CLERK OF COURT*

*Signature of Clerk or Deputy Clerk*

OR

s/ Matthew R. Veenstra
*Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Andre Moore, who issues or requests this subpoena, are:
Matthew R. Veenstra, Saul Ewing Arnstein & Lehr LLP, 33 South Sixth Street, Suite 4750, Minneapolis, MN 55402, matthew.veenstra@saul.com, 612.225.2942

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 22-cv1477 PAM/TNL

## PROOF OF SERVICE

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* ______________________
on *(date)* ____________ .

❒ I served the subpoena by delivering a copy to the named person as follows: ______________________
______________________ on *(date)* ____________ ; or

❒ I returned the subpoena unexecuted because: ______________________
______________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ ____________ .

My fees are $ ________ for travel and $ ________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ____________

______________________
*Server's signature*

______________________
*Printed name and title*

______________________
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# ATTACHMENT A

Pursuant to Rule 45 of the Federal Rules of Civil Procedure, Plaintiff Andre Moore requests that the Minnesota Department of Human Rights produce the documents identified in this subpoena *duces tecum* for inspection and copying either electronically or at the offices of Saul Ewing Arnstein & Lehr LLP, 33 South Sixth Street, Suite 4750, Minneapolis, MN 55402. This subpoena relates to a lawsuit between Moore and several Minneapolis police officers and the City of Minneapolis.

## DEFINITIONS

1. "MNDHR" refers to the Minnesota Department of Human Rights.

2. "MPD" refers to the Minneapolis Police Department.

3. "Moore" refers to Plaintiff Andre Moore.

4. You" and "Your" refer to the MNDHR, any administrative subdivision of the MNDHR including, and those persons acting on the MNDHR's behalf, including but not limited to its attorneys.

5. "Communication" means the transmittal of information by any means.

6. "Document" is synonymous in meaning and equal in scope to the usage of the term "document" in Federal Rule of Civil Procedure 26.

7. The "Report" means the April 27, 2022 Findings from the Minnesota Department of Human Rights from the Investigation into the City of Minneapolis and the Minneapolis Police Department.

8. The "Investigation" means the "extensive investigation of the City of Minneapolis and the Minneapolis Police Department" referenced on page 6 of the Report, and includes but is not limited to investigative activities and procedures described on pages 6 to 8 of the Report.

9. "OPCR" means the Office of Police Conduct Review.

10. "PCOC" means the Police Conduct Oversight Commission.

11. The phrase "related to" means pertaining to, describing, referring to, evidencing, reflecting, discussing, showing, supporting, contradicting, refuting, constituting, embodying, containing, concerning, identifying, or in any way logically or factually connected with the matter discussed.

## INSTRUCTIONS

1. Pursuant to Fed. R. Civ. P. 26(e), you are under a duty seasonably to supplement any response to this request for production for which you learn that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to us during the discovery process or in writing.

2. All documents that respond, in whole or in part, to any part or clause of any paragraph of these document requests shall be produced in their entirety, including all attachments and enclosures. Only one copy need be produced of documents that are responsive to more than one paragraph or are identical except for the person to whom it is addressed if you indicate the persons or group of persons to whom such documents were distributed. Documents that in their original condition were stapled, clipped, or otherwise fastened together shall be produced in such form.

3. For any document withheld under a claim of privilege, submit a sworn or certified statement from your counsel or one of your employees in which you identify the document by author, addressee, date, number of pages, and subject matter; specify the nature and basis of the claimed privilege and the paragraph of this demand for documents to which the document is responsive; and identify each person to whom the document or its contents, or any part thereof,

has been disclosed.

4. For any document responsive to these document requests which is known to have been destroyed or lost, or is otherwise unavailable, identify each such document by author, addressee, date, number of pages, and subject matter; and explain in detail the events leading to the destruction or loss, or the reason for the unavailability of such document, including the location of such document when last in your possession, custody, or control, and the date and manner of its disposition.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1. The 125 Internal Affairs files and 164 OPCR files reviewed in connection with the Investigation as referenced on page 53 of the Report.

2. All MPD Academy training materials and MPD's written training materials reviewed in connection with the Investigation, including but not limited to:

   a. the training materials referenced on pages 39 and 40 of the Report;

   b. the "15-minute PowerPoint presentation" that "highlight[s] some of the changes made to the Use of Force Policy in and around the fall of 2020" as reference on page 41 of the Report.

3. All Documents related to incidences of MPD officers' use of force that were reviewed in connection with the Investigation, including but not limited to:

   a. Documents related to (1) "MPD's data on all recorded used of force incidents across MPD's five precincts from January 1, 2010 to December 31, 2020" as refenced on page 6 of the Report; and (2) "MPD's and the City's data from January 1, 2017 to May 24, 2020 on traffic stops and prosecutions, including searches, arrests, and citations stemming from those stops" as referenced on pages 7 and 20 of the Report;

   b. the 300 use of force files from January 1, 2010 to December 31, 2020 as referenced on page 11 of the Report;

   c. Officer body camera video files related to use of force incidents referenced on pages 12, 13, 14, 15, 19, 21, 38, 43, 45, and 46.

4. All recordings, transcripts, and notes of all interviews with MPD patrol officers, sergeants, lieutenants, command staff, inspectors, current and former Police Chiefs, current and former Assistant and Deputy Chiefs, current and former Mayors and City Council Members, Minneapolis Department of Civil Rights staff, members of the Police Conduct Oversight Commission, prosecutors from the City Attorney's Office, and prosecutors from the Hennepin County Attorney's Office conducted in connection with the Investigation as described on page 7 of the Report.

5. All Documents and/or reports containing analyses and/or opinions provided to MNDHR by Greg Ridgway as referenced on page 7 of the Report.

6. Documents sufficient to show all statistical analyses of MPD data are referenced in the Report, including but not limited to analyses substantiating the following assertions in the Report:

a. Page 10: People of color and indigenous individuals comprise 93% of all MPD officer-involved deaths between January 1, 2020 and February 2, 2020;

b. Page 11: MPD officers used unnecessary and inappropriate levels of force in 52.6% of incidents in which they used a neck restraint and in 37.1% of incidents in which they sprayed chemical irritants;

c. Page 11: Between January 1, 2010 and December 31, 2020, 63% of all use of force incidents that MPD officers recorded were against Black individuals;

d. Page 13: Between January 1, 2010 and December 31, 2020, MPD officers recorded using neck restraints in 1.4% of use of force incidents involving Black individuals and 0.8% of incidents involving white individuals;

e. Page 14: Between January 1, 2010 and December 31, 2020 MPD officers recorded using chemical irritants in 25.1% of incidents involving Black individuals and 18.2% of incidents involving white individuals;

f. Page 16: Where disorderly conduct is the recorded primary offense, MPD officers use chemical irritants in 51.4% of cases involving Black individuals compared to 39.3% of cases involving white individuals;

g. Page 17: In obstruction cases, MPD officers are more likely to use soft tactics against white individuals (59%) than Black individuals (49%) and more likely to use chemical irritants against Black individuals (17%) than white individuals (10%);

h. Page 18: Between January 1, 2010 and December 31, 2020 MPD officers recorded using soft tactics in 40.4% of use of force incidents involving Black individuals and in 46.7% of use of force incidents involving white individuals in similar circumstances;

i. Page 20: 33% of MPD officer-initiated traffic stops involved white individuals between 2017 and 2020;

j. Page 21: MPD officers were 12% more likely to stop a vehicle occupied by a person of color when it was light outside;

k. Page 23: From January 1, 2017 to May 24, 2020, 78% of all searches conducted by MPD officers were searches of Black individuals or their vehicles during officer-initiated traffic stops in MPD's five precincts;

l. Page 24: When comparing Black and white individuals in similar circumstances, MPD officers are almost two times as likely to search Black individuals or their vehicles;

m. Page 25: From January 1, 2017 to May 24, 2020, 55% of all citations MPD officers issued were to Black individuals;

n. Page 28: From January 1, 2017 to May 24, 2020, 80% of traffic stops where an MPD officer recorded using force involved Black individuals.

o. Page 28: From January 1, 2017 to May 24, 2020, 71% of all arrests MPD officers made during traffic stops were arrests of Black individuals;

p. Page 29: When comparing Black and white individuals in similar circumstances, MPD officers are 1.4 times more likely to arrest Black individuals during traffic stops;

q. Page 21: From 2010 to 2020, approximately 66% of all disorderly conduct and obstruction citations issued by MPD officers were to Black individuals;

r. Page 42: MPD supervisors failed to complete a thorough and sufficient review of an officer's use of force in 48.2% of cases";

s. Page 42: In 23.9% of use of force files, there is evidence in the file that contradicts or disputes the information that an officer recorded in their use of force report;

t. Page 45: In 56.8% of cases, MPD officers fail to de-escalate when it would otherwise by appropriate to do so;

u. Page 45: MPD officers improperly escalate situations in 32.7% of cases;

v. Page 45: MPD officers used tactics that escalated a situation in 65.4% of incidents in which officers used a neck restraint and in 35.5% of incidents in which they used chemical irritants;

w. Page 46: MPD officers used unnecessary and inappropriate levels of force in 28.6% of incidents in which they recorded using force;

x. Page 46: In 76.5% of incidents in which MPD officers inappropriately used force, another officer should have but failed to intervene;

y. Page 46: In 27.9% of all use of force incidents, MPD officers failed to request or provide medical attention to people who required it;

z. Page 54: OPCR improperly investigates 50% of police misconduct complaints;

aa. Page 54: Of cases that OPCR inadequately investigates, OPCR clears 40% of those cases;

bb. Page 54: Internal Affairs improperly investigates 25% of police misconduct complaints;

cc. Page 54: Of cases that Internal Affairs inadequately investigates, Internal Affairs clears 25% of those cases;

dd. Page 56: In 37% of cases that were referred for coaching in 2014-2018, supervisors did not coach MPD officers and no corrective action occurred.

# EXHIBIT 15

DEPARTMENT OF HUMAN RIGHTS

Minnesota Department of Human Rights
540 Fairview Ave N, Suite 201
St. Paul, MN 55104

December 7, 2022

Matthew R. Veenstra
Saul Ewing Arnstein & Lehr LLP
33 South Sixth Street, Suite 4750
Minneapolis, MN 55402

***Re: Moore v. Partyka, et. al.,* 22-CV-1477 (PAM/TNL) (D. Minn.) - Rule 45 Non-Party Subpoena**

Mr. Veenstra,

On December 2, 2022, the Minnesota Department of Human Rights (MDHR) received the Rule 45 Non-Party Subpoena that you served related to the above-captioned matter. As explained further below, MDHR objects to the subpoena because MDHR is prevented by state law from providing the requested data; the request is overbroad and unduly burdensome; and seeks documents protected from disclosure by the attorney-client privilege, the attorney work product doctrine, the deliberative process privilege, and the common interest privilege. Additionally, forcing MDHR to produce documents responsive to this subpoena would irreparably harm MDHR's ongoing investigation, prejudice preparations for anticipated litigation, and disrupt and derail ongoing settlement negotiations between MDHR and the City of Minneapolis. The burden and harm imposed on MDHR from this subpoena is self-evident, and ultimately unnecessary: Your client can obtain much of the same information through the civil discovery process from the defendants in your lawsuit to the extent the information is proportional to the needs of the case.

**State Law Prevents MDHR from Providing the Requested Information**

As you likely know, on June 2, 2020, MDHR Commissioner Rebecca Lucero announced the filing of a Commissioner's charge of discrimination to investigate whether the City of Minneapolis Police Department has been engaged in pattern or practice of race-based policing in violation of the Minnesota Human Rights Act. On April 27, 2022, MDHR Commissioner Lucero announced MDHR's findings from this investigation. Since that time, MDHR and the City of Minneapolis have been engaged in conciliation efforts to resolve this case through a negotiated, court-enforceable settlement agreement. Although MDHR has issued its investigative findings, the data contained in MDHR's investigative is still contained in an "open case file," as defined under the MHRA, pending final resolution of the matter. *See*, Minn. Stat. § 363A.03, subd. 26. Under the MHRA, data contained in an open case file are classified as confidential data on individuals or protected nonpublic data, as defined under the Minnesota Government Data Practices Act (MGDPA). See, Minn. Stat. §§ 363A.35, subd. 2; 13.03, subds. 3 and 13. These are the most restrictive data classifications under Minnesota state law, and neither you nor your client are among the few permitted access. Under both the MHRA and the MGDPA, therefore, MDHR is prohibited from providing your client with any of the several categories of information sought by this subpoena.

Additionally, data that is potentially responsive to this subpoena includes highly sensitive personal information about hundreds of witnesses, including crime victims, community members, people suspected of crimes but never charged, and police officers. Accordingly, MDHR objects to producing documents responsive to the subpoena because doing so would violate state law and raise significant privacy concerns for the subjects of this data.

**Complying with the Subpoena would Unduly Burden MDHR and Consume Valuable Resources from an Agency with Limited Resources**

MDHR also objects to complying with the subpoena because it imposes immense undue burden and expense on MDHR, is overly broad, and not proportional to the needs of your case. Complying with the subpoena would be a labor-intensive, time-consuming, and expensive process. Your subpoena seeks an enormous amount of data that was produced to MDHR during the course of a two-year administrative investigation. MDHR and the City of Minneapolis required the assistance of two major, international law firms in the investigation and relied on their personnel, equipment, and expertise to assist in the data collection, review, and production and acquisition process. Critically, these law firms provided these services pro bono, or at significantly reduced rates; services and rates that are no longer available to MDHR.

In order to produce data responsive to this subpoena, MDHR would need to shift its personnel away from other statutorily-required duties – such as investigating hundreds of other charges of discrimination – to review hundreds of thousands of pages of documents, review hundreds of hours of video and audio footage, and expend significant resources identifying, redacting, and creating privilege logs to protect its privileged communications and work product. Simply stated, MDHR cannot afford to comply with this subpoena.

**Complying with the Subpoena would Unnecessarily Harm and Disrupt Settlement Negotiations, and Preparations for Potential Litigation**

MDHR also objects to complying with the subpoena because doing so would unnecessarily harm and disrupt its ongoing efforts to negotiate a court-enforceable settlement agreement that would remedy the discriminatory practices identified in its April 27, 2022 investigative findings. Critically - and this is not mere speculation - turning over MDHR's open investigative file *before* MDHR's administrative investigative process has concluded would disrupt efforts to complete ongoing negotiations. Further, should negotiations be unsuccessful, MDHR will likely initiate a lawsuit to obtain necessary remedial measures. Prematurely disclosing this evidence, including internal analyses prepared in anticipation of litigation, in a separate case where the City of Minneapolis is a party would prejudice MDHR and impair Commissioner Lucero's ability to meet her statutory obligation to enforce the MHRA.

**Relevant Evidence Can be Obtained from the City in Civil Discovery**

MDHR understands that your client is currently engaged in ongoing civil litigation with the City of Minneapolis, among other parties. Most, if not all, of the non-privileged data you seek was provided to MDHR from the City of Minneapolis during our investigation under the parameters imposed by the MHRA. Accordingly, it appears that these requests should more appropriately be addressed to the City of Minneapolis.

In sum, MDHR respectfully objects to the subpoena because it seeks documents protected from disclosure by the attorney-client privilege, the attorney work product doctrine, the deliberative process privilege, and the common interest privilege, and in addition to the objections regarding overbreadth, undue burden, and lack of proportionality described above, MDHR reserves the right to amend or supplement these objections in the event we are unable to resolve this informally and we are forced to address this before the court. For all of these reasons, MDHR requests that you withdraw the subpoena.

Sincerely,

Nick Pladson

Nick Pladson
General Counsel

Cc: Megan McKenzie, Assistant Attorney General, Minnesota Attorney General's Office

*Equal Opportunity Employer*

# EXHIBIT 17

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Andre Moore,

Plaintiff,

v.

Officer Tony Partyka, in his individual capacity, Officer Neal Walsh, in his individual capacity, Officer John Doe No. 1, in his individual capacity, and Officer John Doe No. 2, in his individual capacity, and the City of Minneapolis

Defendants.

Court File No. No. 22-cv-1477 PAM/TNL

**PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO THE CITY OF MINNEAPOLIS**

---

To: Defendant City of Minneapolis and its attorneys Charles Nauren and Rachel Kitze Collins Lockridge, Grindal, Nauren P.L.L.P. 100 Washington Avenue S Suite 2200, Minneapolis MN 55401.

Pursuant to Fed. R. Civ. P. 34, the Plaintiff Andre Moore ("Moore") requests that Defendant City of Minneapolis ("the City") produce the documents listed in this request within thirty (30) days of service of this request.

**INSTRUCTIONS**

1. Pursuant to Fed. R. Civ. P. 26(e), you are under a duty seasonably to supplement any response to this request for production for which you learn that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to us during the discovery process or in writing.

2. All documents that respond, in whole or in part, to any part or clause of any paragraph of these document requests shall be produced in their entirety, including all attachments and enclosures. Only one copy need be produced of documents that are responsive to more than one paragraph or are identical except for the person to whom it is addressed if you indicate the

persons or group of persons to whom such documents were distributed. Documents that in their original condition were stapled, clipped, or otherwise fastened together shall be produced in such form.

3. For any document withheld under a claim of privilege, submit a sworn or certified statement from your counsel or one of your employees in which you identify the document by author, addressee, date, number of pages, and subject matter; specify the nature and basis of the claimed privilege and the paragraph of this demand for documents to which the document is responsive; and identify each person to whom the document or its contents, or any part thereof, has been disclosed.

4. For any document responsive to these document requests which is known to have been destroyed or lost, or is otherwise unavailable, identify each such document by author, addressee, date, number of pages, and subject matter; and explain in detail the events leading to the destruction or loss, or the reason for the unavailability of such document, including the location of such document when last in your possession, custody, or control, and the date and manner of its disposition.

**DEFINITIONS**

1. "You," "Your," and "the City" refer to Defendant City of Minneapolis.

2. "MPD" means the Minneapolis Police Department.

3. "MNHDR" means the Minnesota Department of Human Rights.

4. "OPCR" means the Office of Police Conduct Review.

5. "Communication" means the transmittal of information by any means.

6. "Document" is synonymous in meaning and equal in scope to the usage of the term "document" in Federal Rule of Civil Procedure 26 and includes, without limitation, video and

audio recordings.

7. The phrase "related to" means pertaining to, describing, referring to, evidencing, reflecting, discussing, showing, supporting, contradicting, refuting, constituting, embodying, containing, concerning, identifying, or in any way logically or factually connected with the matter discussed.

**DOCUMENTS REQUESTED**

**REQUEST NO. 1.** All Documents related to the alleged confidential reliable informant described in the search warrant application at MPLS_MOORE001466, including but not limited to the documents that were presented to Judge Scoggin for in camera review at an evidentiary hearing on July 21, 2020 in connection with Moore's motion to suppress evidence.

**REQUEST NO. 2.** Physical inspection of all evidence allegedly found pursuant to the garbage pulls allegedly conducted at Moore's residence in or around February 2020.

**REQUEST NO. 3.** All MPD training materials related to the use of force and race-based policing.

**REQUEST NO. 4.** All MPD Academy training materials related to the use of force and race-based policing.

**REQUEST NO. 5.** All MPD training materials related to the training of MPD officers in supervisory roles.

**REQUEST NO. 6.** All MPD training materials related to the training of MPD field officers.

**REQUEST NO. 7.** All 300 MPD use of force files provided to MNHDR in connection with MNHDR's investigation of MPD.

**REQUEST NO. 8.** Documents sufficient to show all MPD data on recorded use of force incidents from January 1, 2010 to December 31, 2020 that was provided to MNHDR in connection with MNHDR's investigation of MPD.

**REQUEST NO. 9.** Documents sufficient to show all MPD data on traffic stops from January 1, 2017 to May 24, 2020 provided to MNHDR in connection with MNHDR's investigation of MPD.

**REQUEST NO. 10.** All 125 Internal Affairs files and 164 OPCR files from January 2014 to May 2021 that were provided to MNHDR.

**REQUEST NO. 11.** Documents sufficient to show all training received by the following officers and the dates of such training: Tony Partyka, Neal Walsh, Brandon Knuth, Dirk Spee, Nicholas Englund, and Derek Chauvin.

**REQUEST NO. 12.** All OPCR Annual Reports.

**REQUEST NO. 13.** All Documents related to Derek Chauvin's alleged use of excessive force, including but not limited to incidents on the following dates described in the attached **Exhibit A**:

a. March 15, 2014;

b. February 15, 2015;

c. August 22, 2015;

d. April 22, 2106;

e. June 25, 2017;

f. September 4, 2017;

g. March 12, 2019;

h. July 6, 2019.

Dated: December 21, 2022

SAUL EWING LLP

By: *s/Matthew Veenstra*
Courtland Merrill (MN #311984)
Matthew Veenstra (MN #392517)
Douglas Anderson (MN #0402494)
33 South Sixth Street, Suite 4750
Minneapolis, MN 55402
Telephone: (612) 225-2800
Email: courtland.merrill@saul.com
matthew.veenstra@saul.com
douglas.anderson@saul.com

***Attorneys for Plaintiff Andre Moore***

# EXHIBIT A

**to**

**Plaintiff's First Set of Requests for Production of Documents to the City of Minneapolis**

December 21, 2022

Filed in District Court
State of Minnesota
10/12/2020 4:26 PM

STATE OF MINNESOTA DISTRICT COURT

COUNTY OF HENNEPIN FOURTH JUDICIAL DISTRICT

Case Type: Criminal
Court File No. 27-CR-20-12646

State of Minnesota,

Plaintiff,

vs.

**STATE'S MEMORANDUM OF LAW IN SUPPORT OF OTHER EVIDENCE**

Derek Michael Chauvin, Court File No. 27-CR-20-12646

J. Alexander Kueng, Court File No. 27-CR-20-12953

Thomas Kiernan Lane, Court File No. 27-CR-20-12951

Tou Thao, Court File No. 27-CR-20-12949

Defendants.

TO: Eric J. Nelson, Halberg Criminal Defense, 7900 Xerxes Avenue South, Suite 1700, Bloomington, MN 55431; Thomas Plunkett, U.S. Bank Center, 101 East Fifth Street, Suite 1500, St. Paul, MN 55101; Earl Gray, 1st Bank Building, 332 Minnesota Street, Suite W1610, St. Paul, MN 55101; Robert Paule, 920 Second Avenue South, Suite 975, Minneapolis, MN 55402.

## INTRODUCTION

On September 25, 2020, the State filed a notice of intent to offer evidence of other acts pursuant to Minn. R. Evid. 404(b). The State submits this memorandum of law in support of the admissibility of that evidence. It submits a single memorandum of law addressing the evidence with respect to all four Defendants because the State will seek to admit all of the evidence in each of the cases. Because accomplice liability requires the State to establish that another person committed a crime, the Rule 404(b) evidence of other acts by the other Defendants will bear on whether the other Defendants are liable as well, directly or as accomplices.

Filed in District Court
State of Minnesota
10/12/2020 4:26 PM

The evidence of other acts is plainly admissible. Under Rule 404(b), evidence of prior acts may be admissible to establish, among other things, intent, knowledge, modus operandi, or a common scheme or plan. Here, each of the prior acts the State listed in its September 25 notice is offered for one of those permissible purposes. The evidence identified in the notice is plainly relevant in establishing the Defendants' mens rea and also to rebut the Defendants' reasonable use-of-force defense, and the potential prejudice from admitting this evidence does not outweigh its probative value. The evidence should be admitted at trial.

## STATEMENT OF FACTS

The following statement of facts is drawn from the complaint filed on June 3, 2020, and has been supplemented with other available record evidence. The State incorporates here the statement of probable cause and finding of probable cause contained in the complaint.

### A. The Events of May 25, 2020

**1.** At approximately 8 p.m. on May 25, 2020, Derek Chauvin and Tou Thao—both police officers at the time—were dispatched to Cup Foods at the corner of 38th Street and Chicago Avenue in Minneapolis on a report that an individual was suspected of using a counterfeit bill. (Thao, Bureau of Criminal Apprehension ("BCA") Interview at 25:38-26:05.) Before they could make their way to the scene, however, dispatch informed them that J. Alexander Kueng and Thomas Lane would handle the call instead. (Thao, BCA Interview at 25:40-57.)

At approximately 8:08 p.m., Kueng and Lane arrived at Cup Foods. When they entered the store, the manager showed them a $20 bill that he believed was counterfeit. He stated that the man who had passed the $20 bill was sitting in a blue vehicle across the street. (Kueng & Lane, Body-Worn Camera ("BWC") at 20:08:47-20:09:06.) Kueng and Lane did not inspect the bill. (Lane, BCA Interview at 42:49-52.) Instead, they immediately approached the vehicle. (Kueng & Lane, BWC at 20:09:06-28.)

Filed in District Court
State of Minnesota
10/12/2020 4:26 PM

George Floyd was sitting in the vehicle's driver's seat. Lane approached and tapped on the window, startling Floyd. (Lane, BWC at 20:09:28-32.) Floyd cracked the door open and apologized. Lane instructed Floyd to show his hands. (Lane, BWC at 20:09:32-40.) Seconds later, Lane pulled his firearm on Floyd, pointed it at Floyd, and yelled at him to "put your fucking hands up right now." (Lane, BWC at 20:09:41-44.) Visibly shaken, Floyd asked Lane what he had done wrong, put his hands up, and placed them on the steering wheel, complying with Lane's instructions. Instead of answering Floyd's question, Lane continued to curse at Floyd, telling him to "keep your fucking hands on the wheel." (Lane, BWC at 20:09:45-58.) Floyd immediately complied. Lane instructed Floyd to put his hands on his head, and Floyd again complied. Lane then lowered his gun. (Lane, BWC at 20:10:20-22.)

Floyd, clearly upset, continued to apologize to Lane, and explained repeatedly that he had been shot before. (Lane, BWC at 20:09:36-20:10:09.) Sobbing, he pleaded: "Mr. Officer, please don't shoot me." (Lane, BWC at 20:10:35-37.) As he pleaded for his life, he also told Lane that "I just lost my mom." (Lane, BWC at 20:10:35-20:11:02.)

Lane told Floyd to step out of the car. At this point, Lane asked dispatch for backup. (Lane, BWC at 20:10:45; Lane, BCA Interview at 58:00-15; Thao, BCA Interview at 27:30-35.) In response, Chauvin and Thao drove to Cup Foods with their squad car lights and sirens activated. (Thao, BCA Interview at 27:40-51; Thao, BWC at 20:11:30-20:12:14.)

After Floyd stepped out of the car, Kueng came around to the driver's side, and he and Lane handcuffed Floyd's arms behind his back. (Kueng, BWC at 20:11:10-49.) From this moment on, and for all of the remaining minutes of his life, Floyd's hands remained cuffed.

Kueng walked Floyd to the sidewalk and told him to sit down on the ground. Floyd did so, immediately becoming calmer and saying "thank you" to Kueng three times. (Kueng, BWC

Filed in District Court
State of Minnesota
10/12/2020 4:26 PM

at 20:11:49-20:12:15.) While Floyd was seated on the sidewalk, Lane interviewed the other two passengers. (Lane, BWC at 20:11:43-20:14:02; Kueng, BWC at 20:12:14-20:13:54.) One of the passengers explained that Floyd was scared of the police, and was likely scared when Lane pulled out his weapon because Floyd had been shot before. (Lane, BWC at 20:12:52-20:13:07.)

While speaking with the passengers, Lane reported a "Code 4" to dispatch, which meant that the "[s]ituation [was] under control" and that "[r]esponding squads that have not arrived may clear." Minneapolis Police Department Policy and Procedure Manual, § 7-103. (Lane, BWC at 20:12:14-16.) Dispatch therefore told Chauvin and Thao that the request for backup had been canceled. Chauvin and Thao, however, continued to the scene anyway. (Thao, BCA Interview at 27:54-28:40; Thao, BWC at 20:12:14-27.)

**2.** Although Floyd remained compliant and conversant while seated on the sidewalk, Kueng and Lane decided to detain Floyd in their squad car. (Kueng, BWC at 20:13:32-36.) As they walked over to the squad car, Lane asked whether Floyd was "on something right now," and Kueng said Floyd was "acting real erratic" while walking in handcuffs. (Lane, BWC at 20:14:10-13.) Floyd responded that he was "scared." (Kueng, BWC at 20:14:13.)

When they reached the squad car, Floyd pleaded to talk with the officers. Kueng refused, telling him: "Man, you ain't listening to nothing we're saying, so we're not going to listen to nothing you're saying." (Kueng, BWC at 20:14:14-20:15:01.) Floyd told Kueng and Lane several times that he was scared to get into the squad car, and he stated five times that he was "claustrophobic." (Lane, BWC at 20:14:47-20:15:06.) But Kueng and Lane insisted they would have a conversation with Floyd only after he got into the squad car. They pinned Floyd against the squad car and patted him down. While being patted down, Floyd stated: "I'm not resisting,

Filed in District Court
State of Minnesota
10/12/2020 4:26 PM

man. I'm not." (Kueng, BWC at 20:15:11-15.) Kueng found a small pipe in Floyd's pocket, but found no weapons on his person. (Kueng, BWC at 20:15:15-54.)

As Floyd stood outside the squad car, he begged Kueng and Lane not to leave him alone in the car. He stated that he would not do anything to hurt them. And he begged them not to "leave me by myself, man, please. I'm just claustrophobic." (Kueng, BWC at 20:15:34-40.) In response, Lane told Floyd: "Well, you're still going in the car." (Lane, BWC at 20:15:39-41.)

Kueng and Lane then began forcing Floyd inside the open rear driver's side door of the squad car. (Lane, BWC at 20:16:20.) Floyd exclaimed: "I'ma die in here, I'ma die man." (Lane, BWC at 20:16:40-43.) Floyd also noted that he "just had COVID," and that he didn't "want to go back to that." (Lane, BWC at 20:16:44-46.) And he asked Kueng and Lane to allow him to count to three before getting into the back of the squad car, insisting that he was not trying to "win." (Lane, BWC at 20:17:20-26.)

**3.** At 8:17 p.m., Chauvin and Thao arrived on the scene. (Thao, BWC at 20:17:07.) As they approached, they saw Kueng and Lane trying to force Floyd into the back of the squad car, and heard a bystander yelling to Floyd that he should get in the car because "you can't win." (Thao, BWC at 20:17:19-48.) Floyd responded he was not "trying to win," and told the officers four times that he was claustrophobic and that he wanted to speak to them outside the squad car. (Thao, BWC at 20:17:22-47.) Floyd also pleaded for the officers to allow him to get on the ground or do "anything" other than get in the car. (Thao, BWC at 20:17:25-29.)

The officers, however, ignored Floyd's pleas. Chauvin watched from the sidewalk as Kueng pushed Floyd into the back seat from the driver's side. (Thao, BWC at 20:17:37-59.) Chauvin then circled to the passenger's side of the car and instructed Lane to pull Floyd into the car. (Thao & Lane, BWC at 20:17:59-20:18:05.) During this time, Floyd continued to plead

with the officers, repeating "please, Mr. Officer, please" and "I'm not a bad guy." (Thao, BWC at 20:17:49-20:18:00.) Floyd also exclaimed: "I can't breathe, Mr. Officer. Please." (Thao, BWC at 20:18:05-08.)

Floyd fell partway through the rear passenger's side door, and he asked to be laid on the ground. (Thao, BWC at 20:18:15-20.) Chauvin and Lane, however, pinned Floyd against the passenger's side back seat, while Thao watched from the driver's side. (Thao, BWC at 20:18:22-29; Thao, BWC at 20:18:30-48; Thao, BCA Interview at 32:34-40.) During this time, Floyd continued to yell "please," and repeatedly said he couldn't breathe, explaining that he "just had COVID" and telling the officers "I'm not going to run." (Kueng, Thao, & Lane, BWC at 20:17:59-20:19:01.) But the officers dismissed his complaints. Chauvin told him: "You're talking. . . . It takes a lot of oxygen to . . . say 'I can't breathe.'" (Thao, BWC at 20:18:40-46.)

When the other officers were unable to lift Floyd into the squad car, Thao said: "We're just going to have to hogtie him." (Thao, BWC at 20:18:48-50.) He then circled to the passenger's side and repeated: "We're just gonna have to tie him." (Thao, BWC at 20:18:52-53.) Lane agreed, telling Chauvin and Kueng: "Let's take him out and just MRT"—referring to the Maximal Restraint Technique, which utilizes the Hobble device to "secure a subject's feet to their waist in order to prevent the movement of legs."[1] MPD Policy & Procedure Manual 5-316 § III. (Lane, BWC at 20:19:02-04.) The others agreed, and Chauvin and Kueng took Floyd to the ground. (Thao, BWC at 20:19:06-11.)

MINNESOTA JUDICIAL BRANCH

[1] A Hobble "limits the motion of a person by tethering both legs together." MPD Policy & Procedure Manual 5-316 § III. The Maximal Restraint Technique is accomplished using two Hobbles connected together. *Id.* § IV.A.2. MPD policy, however, also specifically provides: "*Do not* tie the feet of the subject directly to their hands behind their back. This is also known as a hogtie." MPD Policy & Procedure Manual 5-316 § IV.A.2.d (emphasis added).

**4.** At 8:19 p.m., Chauvin, Kueng, and Lane pinned Floyd to the pavement face-down. Chauvin pressed his knee into the back of Floyd's neck and held down Floyd's left hand. Kueng knelt on Floyd's back, and held down Floyd's handcuffed left wrist with his hand. Lane restrained Floyd's legs, kneeling on them and pressing them down with his hands. (Lane, BWC at 20:19:14-45.) Shortly after they pinned Floyd to the ground, Lane called in an EMS "Code 2," signaling that emergency medical services were needed but that emergency personnel were not required to use their sirens to reach the scene.[2] (Lane, BWC at 20:19:48-52.)

As Chauvin took up his position atop Floyd's neck, he asked the other officers whether they had their Hobble. (Kueng, BWC at 20:19:18-23.) Thao then began searching for a Hobble in the back of the squad car. (Thao, BWC at 20:19:17-23.) While Thao searched for a Hobble, Floyd pleaded with Chauvin that he could not breathe, and called for his recently deceased mother. (Thao, BWC at 20:19:24-20:20:24.) He also cried "I'm dead," and told the officers that what they were doing to him was "cold blooded." (Thao, BWC at 20:19:20-20:20:18.) Chauvin responded sarcastically: "Yeah, you're doing a lot of talking though." (Thao, BWC at 20:20:18-19.) He also told Floyd that he was "going to jail." (Kueng, BWC at 20:19:50-57.)

After Thao found a Hobble, he asked whether the other officers still "want to Hobble at this point then." (Thao, BWC at 20:20:25-31.) When the other officers did not answer immediately, Thao suggested "why don't we just hold him until EMS" arrives, and added that "if we Hobble a Sergeant's going to have to come over."[3] (Thao, BWC at 20:20:32-39.) The

[2] Thao later upgraded that to an EMS code 3, requiring emergency services to use red lights and sirens to reach the scene. (Thao, BWC at 20:21:12-27.)

[3] Under MPD policy, whenever a Hobble is used in connection with the Maximal Restraint Technique (MRT), "[a] supervisor shall be called to the scene where a subject has been restrained," and the supervisor is required to "complete a Supervisor's Force Review." MPD Policy & Procedure Manual 5-316(IV).

Filed in District Court
State of Minnesota
10/12/2020 4:26 PM

officers—Chauvin included—decided against using the Hobble. Chauvin, Kueng, and Lane therefore continued to maintain their positions directly on top of Floyd. Indeed, when Lane asked whether the other officers wanted to "get [Floyd's] legs up," Chauvin and Kueng both responded: "Just leave him." (Kueng, BWC at 20:20:47-52.) Thao, meanwhile, stood watch and guarded against any interference with the officers' actions by, among other things, positioning himself between the other officers and the gathering group of concerned citizens, which included several children. (Thao, BWC at 20:21:38-20:22:40.)

For the first five minutes the officers pinned Floyd to the ground, Floyd repeatedly cried for help. He yelled "I can't breathe" more than *twenty* times. He called for his deceased mother almost a *dozen* times. He pleaded with Chauvin, who continued to kneel on his neck:

> I can't breathe. Please, your knee in my neck.

(Lane, BWC at 20:21:53-59.) Floyd screamed that he was in significant pain:

> My knee, my neck . . . I'm claustrophobic. My stomach hurt. My neck hurt. Everything hurt.

(Lane, BWC at 20:22:16-29.) He asked the officers to "tell my kids I love them." (Lane, BWC at 20:20:07-08.) And he told the officers almost ten times that he feared he would die while lying on the ground, saying:

> I'll probably just die this way. . . . I'm through, I'm through. . . . They're gonna kill me, they gonna kill me, man.

(Lane, BWC at 20:21:45-47, 20:22:19-22, 20:22:42-45.)

The officers, however, ignored Floyd's desperate pleas for help. Chauvin, who continued to press his knee into Floyd's neck, responded dismissively: "You're doing a lot of talking, a lot



MINNESOTA JUDICIAL BRANCH

of yelling. It takes a heck of a lot of oxygen to say things." (Lane, BWC at 20:22:39-50.) Kueng reacted to Chauvin's comment with a smirk. (Thao, BWC at 20:22:48-51.)

As Floyd yelled that he could not breathe, the bystanders shouted for Chauvin to take his knee off Floyd's neck. One bystander yelled: "You can get off his neck, man. That's wrong right there." (Thao, BWC at 20:22:49-20:23:00.) Another bystander observed that Floyd was "not even resisting arrest." (Thao, BWC at 20:23:05-09.) Chauvin heard the bystanders' pleas and periodically looked up at the crowd. (Darnella Frazier Facebook Video 2:38-43, 2:53, 3:21, 3:30-3:32.) But even as the bystanders pleaded with Chauvin to remove his knee from Floyd's neck, Chauvin rolled his knee back and forth, pressing it into Floyd's neck and maintaining pressure on Floyd's breathing. Thao, meanwhile, stood guard. He watched the other officers while telling the crowd: "He's talking, so he's fine" and "This is why you don't do drugs, kids." (Thao, BWC at 20:23:00-26.) And when one bystander expressed concern that Chauvin was "trapping" and "stopping" Floyd's breathing, Thao responded: "He's talking. . . . It's hard to talk if you're not breathing." (Thao, BWC at 20:23:40-20:24:04).

After four minutes, Floyd's cries for help became softer. His screams turned into grunts, and his grunts into mumbles. Floyd then said what would be his final words: "I can't breathe." (Lane & Kueng, BWC at 20:23:58-20:24:00.) He soon fell silent and lost consciousness.

But even after Floyd went limp, Chauvin continued to restrain him, pressing his knee into Floyd's neck and restraining Floyd's left hand. Kueng and Lane continued to restrain Floyd's back and legs. And Thao continued to stand between the other officers and the bystanders gathered on the sidewalk, pushing back anyone who stepped off the sidewalk and moved toward Floyd and the other officers. As Floyd lost consciousness, Lane asked the other officers: "Should we roll him on his side?" Chauvin rejected that option out of hand, telling Lane and

Kueng to "stay[] put where you got him." (Kueng, BWC at 20:23:48-52.) Kueng agreed with Chauvin and told Lane: "No, just leave him." (Kueng BWC, 20:23:49-51.)

By this point, the half-dozen or so bystanders gathered on the sidewalk had begun yelling at the officers, expressing concern that Floyd was struggling to breathe. One bystander yelled that Floyd was "not even resisting arrest right now." (Thao, BWC at 20:24:40-44.) He also yelled that Chauvin was responsible for "stopping [Floyd's] breathing." (Thao, BWC at 20:25:08-10.) When a bystander screamed that Floyd was about to "pass out," Lane remarked—in apparent agreement with the bystander—that Floyd was indeed "passing out." (Lane & Kueng, BWC at 20:24:43-48.) But Chauvin continued to maintain his position, pressing his knee into the back of Floyd's neck. (Darnella Frazier Facebook Video 3:42-4:00.) In fact, rather than checking to see whether Floyd was still breathing, Chauvin asked Lane, who was still restraining Floyd's legs, whether *Lane* was "alright." (Lane, BWC at 20:24:59-20:25:00.) Lane responded: "My knee might be a little scratched, but I'll survive." (Lane, BWC at 20:25:00-04.) Meanwhile, when a bystander said that Floyd was not "breathing right now," Kueng and Lane both responded: "He's breathing." (Lane & Kueng, BWC at 20:25:10-15.) But the body camera videos appear to show that Floyd's shallow breaths stopped about 10 seconds later. (Kueng, BWC at 20:25:20-31.)

At 8:25 p.m., a concerned bystander stepped toward Floyd, and asked Thao whether he was "just gonna let [Chauvin] choke [Floyd] like that?" (Thao, BWC at 20:25:17-19.) Chauvin pulled the mace from his belt and pointed it at the bystanders, while Thao moved to shield Chauvin. (Darnella Frazier Facebook Video 4:28-37.)

About ten seconds later, an off-duty Minneapolis firefighter arrived on the scene. After identifying herself as a firefighter, she asked to provide Floyd with medical assistance, and asked

whether Floyd had a pulse. Chauvin—mace still in hand—warned her twice: "Don't come over here." (Darnella Frazier Facebook Video 4:33-46; Kueng, BWC at 20:25:26-20:26:47.) Lane and Thao likewise refused to allow her to tend to Floyd, with Thao shouting "back off" and Lane telling her to go "up on the sidewalk" (Thao & Kueng, BWC at 20:25:26-20:26:47.) Given the witnesses' concerns about Floyd's lack of responsiveness, Lane asked again whether the officers should "roll him on his side." (Lane, BWC at 20:25:39-41.) No one responded. The officers maintained their positions—Chauvin on Floyd's neck, Kueng on his back, Lane on his legs, and Thao standing guard. (Lane, BWC at 20:25:40-20:26:00.)

As the bystanders grew increasingly vocal about Floyd's lack of responsiveness, the off-duty firefighter urged the officers to take Floyd's pulse. (Thao, BWC 20:25:53-20:26:03.) Another bystander also repeatedly pleaded for Thao to check Floyd's pulse. (Thao, BWC 20:25:53-20:26:03.) After hearing the bystanders' pleas to check Floyd for a pulse, Lane asked Kueng whether he could find a pulse. Kueng checked and said "I can't find one." (Kueng & Lane, BWC at 20:25:45-20:26:00.) Chauvin responded: "Huh?" Kueng clarified for Chauvin that he was "check[ing] [Floyd] for a pulse." (Kueng & Lane, BWC at 20:26:00-05.) Kueng then continued to check Floyd for a pulse. About ten seconds later, Kueng sighed, leaned back slightly, and repeated: "I can't find one." (Kueng & Lane, BWC at 20:26:07-12.) After learning that Kueng could not find a pulse, Chauvin squeezed Floyd's fingers. Floyd did not respond. (Lane, BWC at 20:26:12-18.) But Chauvin continued to kneel on Floyd's neck.

The bystanders' pleas, meanwhile, grew more frantic: "He's not fucking moving." (Thao, BWC at 20:27:11-17.) "What are you doing? He's dying." (Thao, BWC at 20:27:35-36.) "Why is he still on him? Y'all see that he's not . . . what is wrong with you?" (Thao, BWC at 20:27:36-40.) "Get off of his fucking neck, bro." (Thao, BWC at 20:27:41-42.) "You're still

on him . . . why?" (Thao, BWC at 20:27:44-46.) Through it all, Chauvin never attempted to place Floyd on his side in the recovery position. Instead, he continued to press his knee into the back of Floyd's neck, ignoring the crowd's pleas. The officers also ignored the off-duty firefighter's plea for them to begin chest compressions. (Thao, BWC at 20:28:39-48.) Indeed, none of the officers ever attempted CPR while Floyd was on the ground.

**5.** At 8:27 p.m., an ambulance arrived on scene. Chauvin, Kueng, and Lane maintained their positions atop Floyd, and Thao continued to block bystanders from intervening. (Lane & Thao, BWC at 20:27:00-24.) Even as Lane explained to emergency personnel that Floyd was "not responsive right now," Chauvin continued to press his knee into Floyd's neck. (Lane, BWC at 20:27:36-38.) And even while emergency personnel leaned down and attempted to check Floyd's neck for a pulse, Chauvin did not remove his knee from Floyd's neck. (Lane, BWC at 20:27:43-50; Darnella Frazier Facebook Video 6:50-59.)

The crowd, which had grown to nearly a dozen horrified onlookers, continued to plead with the officers, asking Thao whether he was "gonna let [Chauvin] kill that man in front of you." (Thao, BWC at 20:28:05-13.) Yet the officers continued to maintain their positions: For over a full minute after emergency personnel arrived, Chauvin and Kueng continued to press Floyd face-down into the pavement, Lane knelt over Floyd's legs, and Thao continued to push back the crowd. (Lane, Kueng & Thao, BWC at 20:27:25-20:28:45.)

At 8:28 p.m., when the stretcher was ready, Chauvin finally removed his knee from Floyd's neck. (Lane, BWC at 20:28:45.) Chauvin, Kueng, and Lane then rolled Floyd, who was still unresponsive, onto the stretcher and loaded him into the ambulance.

All told, Floyd was pinned to the ground—with Chauvin's knee pressing into his neck, Kueng and Lane atop his back and legs, and Thao standing watch nearby—for approximately

Filed in District Court
State of Minnesota
10/12/2020 4:26 PM

nine minutes. For over four and a half of those minutes, Floyd was silent. For at least three of those minutes, Floyd appeared not to be breathing. And for at least two and a half minutes, the officers were unable to locate Floyd's pulse. After Floyd fell silent, the crowd alerted the officers ten times that Floyd was no longer moving, warned them nine times that Floyd was unresponsive, and pleaded with them nearly *thirty* times to check Floyd's pulse. But over that entire time period, the officers remained in the same position: Chauvin knelt on Floyd's neck, Kueng and Lane remained atop Floyd's back and legs, and Thao continued to prevent the crowd of concerned citizens from interceding.

**6.** Floyd was pronounced dead at the hospital later that evening. According to the Hennepin County Medical Examiner, Floyd's death resulted from "cardiopulmonary arrest complicating law enforcement subdual, restraint, and neck compression," Hennepin County Medical Examiner's Office, Autopsy Report for George Floyd, at 1 (June 1, 2020) ("Hennepin County Autopsy Report"), and the "manner of death" was "homicide," Hennepin County Medical Examiner, Press Release Report (June 1, 2020). A separate autopsy review by the federal Armed Forces Medical Examiner System concluded that Floyd's "death was caused by the police subdual and restraint," and that the "subdual and restraint had elements of positional and mechanical asphyxiation." Armed Forces Medical Examiner System, Autopsy Report for George Floyd, at 2 (June 10, 2020) ("Armed Forces Medical Examiner Autopsy Report").

### B. Minneapolis Police Department Policies and Training

As officers in the Minneapolis Police Department (MPD), Chauvin, Kueng, Lane, and Thao held a position of public trust and were trained not to "willfully mistreat or give inhumane treatment to any person held in custody." MPD Policy & Procedure Manual 5-107.3. All officers agree to abide by a code of ethics that binds them to "enforce the law courteously and appropriately" and to "never employ[] unnecessary force or violence." *Id.* at 5-102.

"Sanctity of life and the protection of the public" are "the cornerstones of the MPD's use of force policy." *Id.* at 5-301.A. Consistent with those principles, it is "the duty of every sworn employee present at any scene where physical force is being applied to either stop or attempt to stop another sworn employee when force is being inappropriately applied or is no longer required." *Id.* at 5-303.01(B).[4] Officers are also permitted to use only "the amount of force that is objectively reasonable in light of the facts and circumstances known to that employee at the time force is used," and their use of force must "be consistent with current MPD training." *Id.* at 5.301.01. Before using force, officers are required to consider using various de-escalation tactics short of force. *Id.* at 5-304(B). And in evaluating whether the use of force is appropriate, officers must "[c]onsider whether a subject's lack of compliance is a deliberate attempt to resist or an inability to comply based on factors including, but not limited to": (i) medical conditions; (ii) mental impairment; (iii) developmental disability; (iv) physical limitation; (v) language barrier; (vi) influence of drug or alcohol use; or (vii) behavioral crisis. *Id.* at 5-304(B)(1)(b).

Under MPD policies in effect at the time of Floyd's death, the most extreme uses of force—MRT, Neck Restraints, and Deadly Force—are reserved for the most extreme situations. Officers are trained to use the MRT only "where handcuffed subjects are combative and still pose a threat to themselves, officers or others, or could cause significant damage to property if not properly restrained." *Id.* at 5-316(IV)(A)(1). "As soon as reasonably possible, any person restrained using the MRT who is in the prone position"—that is, on his or her stomach—"shall be placed" in "the side recovery position" if "the hobble restraint device is used." *Id.* at 5-316(IV)(B)(1). Officers are instructed that, "as soon as possible," they must "[p]lace a restrained

[4] This policy, which was in effect when Floyd died, was subsequently updated on June 16, 2020.

Filed in District Court
State of Minnesota
10/12/2020 4:26 PM

subject on their side in order to reduce pressure on his/her chest and facilitate breathing." 2019 MPD Use of Force Manual, at 3.

Officers are also trained not to employ a "neck restraint"—"[d]efined as compressing one or both sides of a person's neck with an arm or leg"—"against subjects who are passively resisting." MPD Policy & Procedure Manual 5-311(I), (II)(C). MPD policy defines "passive resistance" as "behavior initiated by a subject, when the subject does not comply with verbal or physical control efforts, yet the subject does not attempt to defeat an officer's control efforts." *Id.* at 5-302. "An officer who has used a neck restraint or choke hold shall inform" emergency medical personnel "accepting custody of the subject[] that the technique was used on the subject." *Id.* at 5-311(II)(D)(2). And if unconsciousness occurs, officers are to "request EMS immediately by radio." 2019 MPD Use of Force Manual, at 2.

In applying a Neck Restraint, MRT, or any other use of force, officers must render medical aid when their use of force necessitates it. All MPD officers who "use[] force shall," "[a]s soon as reasonably practical," "determine if anyone was injured and render medical aid consistent with training and request Emergency Medical Service (EMS) if necessary." MPD Policy & Procedure Manual 5-306.[5] And they are trained to check the subject's "airway [and] breathing," and "start CPR if needed." 2019 MPD Use of Force Manual, at 2, 4.

**ARGUMENT**

As outlined in the State's September 25 notice, the State intends to introduce evidence of 18 prior incidents involving Defendants Chauvin, Kueng, and Thao. The evidence is admissible.

Minn. R. Evid. 404(b) prohibits the admission of evidence of "another crime, wrong, or act" – often called *Spreigl* evidence – only if it is offered to "prove the character of a person in

[5] This policy, which was in effect when Floyd died, was subsequently updated on July 17, 2020.

Filed in District Court
State of Minnesota
10/12/2020 4:26 PM

order to show action in conformity therewith."[6] The rule, however, prohibits admission of such evidence only if offered to prove the character of the person to suggest action in conformity therewith. The evidence may be admissible for other purposes, such as to establish motive, intent, absence of mistake or accident, identity, modus operandi, or common scheme or plan. *State v. Bartylla*, 755 N.W.2d 8, 20 (Minn. 2008); *State v. Ness,* 707 N.W.2d 676, 687-88 (Minn. 2006); *Kennedy*, 585 N.W.2d at 389; Minn. R. Evid. 404(b).

A district court has broad discretion in weighing the admissibility of *Spreigl* evidence. *State v. Asfeld*, 662 N.W.2d 534, 542 (Minn. 2003). In criminal cases, the evidence is not admissible unless:

> 1) the prosecutor gives notice of its intent to admit the evidence consistent with the rules of criminal procedure; 2) the prosecutor clearly indicates what the evidence will be offered to prove; 3) the other crime, wrong, or act and the participation in it by a relevant person are proven by clear and convincing evidence; 4) the evidence is relevant to the prosecutor's case; and 5) the probative value of the evidence is not outweighed by its potential for unfair prejudice to the defendant.

Minn. R. Evid. 404(b). Each of these requirements has been satisfied here. The State has given notice, and has indicated what the evidence will be offered to prove. The State will be able to prove the conduct by clear and convincing evidence through witnesses identified in the reports and, for some of the incidents, body camera video. The evidence is relevant to prove essential elements of the State's case against the four Defendants and to refute the Defendants' defenses. And the probative value of the evidence is not outweighed by the potential of unfair prejudice to the Defendants. Here, because there cannot be a meaningful dispute as to the first three of these

---

[6] In criminal cases, evidence of another crime, wrong, or act offered under Rule 404(b) is commonly referred to as *Spreigl* evidence because of the supreme court's opinion in *State v. Spreigl*, 139 N.W.2d 167 (Minn. 1965). *See State v. Kennedy*, 585 N.W.2d 385, 389 (Minn. 1998).

requirements, the State focuses primarily on the last two of these requirements – relevance and potential prejudice.

## I. The State's *Spreigl* evidence is Relevant And Is Offered For A Permissible Purpose.

The threshold question for admissibility of evidence is whether the evidence is relevant. *State v. Tanksley*, 809 N.W.2d 706, 709 (Minn. 2012); Minn. R. Evid. 402. In the context of other act evidence under Rule 404(b), the court must first identify the specific fact to which the evidence would be relevant. *State v. Fardan*, 773 N.W.2d 303, 317 (Minn. 2009). It must then determine whether the evidence is offered for a permissible purpose, such as to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," rather than to "prove the character of a person in order to show action in conformity therewith." Minn. R. Evid. 404(b). Here, the State's *Spreigl* evidence is plainly relevant in establishing the Defendants' mens rea and in rebutting the Defendants' reasonable use-of-force defense. As a result, it will be offered for a permissible purpose, not as character evidence.

### A. The disputed facts are elements and defenses.

Each of the charged offenses contains a state of mind element that will be disputed at trial. For the second-degree unintentional murder, the State will be required to prove that the defendant committed a felony offense. Minn. Stat. § 609.19, subd. 2(1). The felony offense that gives rise to the second-degree murder charge in this case is third-degree assault. A person is guilty of third-degree assault if he "assaults another and inflicts substantial bodily harm." Minn. Stat. § 609.223, subd. 1. An assault requires an intentional act that causes bodily harm. Minn. Stat. § 609.02, subd. 10(2); *State v. Dorn*, 887 N.W.2d 826, 830 (Minn. 2016) (assault-harm requires proof of intent to commit the physical act). The operative state of mind is the intent to commit the physical act that causes harm.

Liability for third-degree murder arises when a person "without intent to effect the death of any person, causes the death of another by perpetrating an act eminently dangerous to others and evincing a depraved mind, without regard for human life. . . ." Minn. Stat. § 609.195(a). The operative state of mind element here is the depraved mind; an awareness that the acts are dangerous to others and the person disregarded that risk. *See* CRIMJIG 11.38.[7]

The statute governing second-degree manslaughter provides: "A person who causes the death of another . . . by the person's culpable negligence whereby the person creates an unreasonable risk, and consciously takes chances of causing death or great bodily harm to another" is "guilty of manslaughter in the second degree." Minn. Stat. § 609.205(1). Second-degree manslaughter requires proof of (i) "objective gross negligence on the part of the actor"; and (ii) "subjective 'recklessness in the form of an actual conscious disregard of the risk created by the conduct.'" *State v. McCormick*, 835 N.W.2d 498, 507 (Minn. Ct. App. 2013) (quoting *State v. Frost*, 342 N.W.2d 317, 320 (Minn. 1983)). The objective gross negligence component "is satisfied by demonstrating that the act was 'a gross deviation from the standard of care that a reasonable person would observe in the actor's situation.'" *Id.* (quoting *Frost*, 342 N.W.2d at 319). The subjective recklessness component requires proof of the "actor's state of mind." *Id.* That is usually established through circumstantial evidence, "by inference from words or acts of the actor both before and after the incident." *Id.* (quoting *State v. Johnson*, 616

---

[7] As the comment to CRIMJIG 11.38 explains, the words "depraved mind" in the statute are "not susceptible of definition, except in terms of an 'eminently dangerous' act and the lack of regard for human life." CRIMJIG 11.38 n.2. And because "the further use of the words 'depraved mind' is unnecessary and possibly prejudicial," the model jury instructions do not use them. *Id.* In *State v. Coleman*, the court of appeals held that the mens rea element requires that the defendant was aware that his conduct created a substantial and unjustifiable risk of death to another person and consciously disregarded that risk. 944 N.W.2d 469, 479 (Minn. Ct. App. 2020), *rev. granted* (Minn. June 30, 2020).

N.W.2d 720, 726 (Minn. 2000)). In conducting this inquiry, the fact-finder may infer that "a person intends the natural and probable consequences of their actions." *Id.* at 507 (quoting *Johnson*, 616 N.W.2d at 726). The operative state of mind is this subjective recklessness: an actual disregard of the objective risks. But also with regard to the manslaughter charge, the evidence is relevant to the objective component: that the act was a gross deviation from a reasonable standard of care.

Defendants Kueng, Lane, and Thao are charged as accomplices. "A person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime." Minn. Stat. § 609.05, subd. 1. The phrase "intentionally aids" encompasses two "important and necessary" mens rea elements. *State v. Milton*, 821 N.W.2d 789, 805 (Minn. 2012).

*First*, the defendant must know that his "alleged accomplices were going to [commit] or were committing a crime." *State v. Smith*, 901 N.W.2d 657, 661 (Minn. Ct. App. 2017) (internal quotation mark omitted). Critically, the defendant does not need to have "knowledge of an accomplice's criminal intent before the crime commences." *Id.* at 662. Because the statute only "requires knowledge of the crime at the time of the acts or presence amounting to aid," "[a] defendant who acquires the requisite knowledge while the accomplice is in the process of committing the offense" can be found liable for aiding and abetting. *Id.*[8]

---

[8] To have "knowledge of the crime," the defendant must know that his accomplice satisfies the elements of the crime. The defendant need not know, however, that his accomplice's conduct was criminal at the time it was committed. *See* Minn. Stat. § 609.02, subd. 9(5) (noting that the law "does not require proof of knowledge of the existence or constitutionality of the statute under which the actor is prosecuted or the scope or meaning of the terms used in that statute"); *see also* 1 Wayne R. LaFave, Substantive Criminal Law § 5.6 (3d ed. 2019 update).

*Second*, the defendant must "intend[] his presence or actions to further the commission of that crime." *Milton*, 821 N.W.2d at 808 (internal quotation mark omitted). In other words, the defendant must "make[] the choice to aid in its commission either through [his] presence or [his] actions." *Smith*, 901 N.W.2d at 662. "[A]ctive participation in the overt act which constitutes the substantive offense," however, "is not required." *State v. Ostrem*, 535 N.W.2d 916, 924 (Minn. 1995). In evaluating the defendant's intent, the jury may properly "infer the requisite state of mind for accomplice liability through circumstantial evidence," including, for example, "the defendant's presence at the scene of the crime" or "a close association with the principal offender before and after the crime." *State v. McAllister*, 862 N.W.2d 49, 53 (Minn. 2015).

Accordingly, to establish accomplice liability for Kueng, Lane, and Thao, the State will have to prove that Chauvin committed the charged crimes and that each co-defendant knew that Chauvin was intentionally committing that crime and intentionally aided in the commission of that crime.

Finally, it is fully anticipated that the defendants will argue the reasonable use of force as a defense. Minnesota law allows police officers to use reasonable force in performing lawful duties. Minn. Stat. § 609.06, subd. 1(1). Whether the force used was reasonable is determined by evaluating a totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 396 (1989). The Minneapolis Police requires that any force applied be reasonable in accord with these standards. MPD Policy & Procedure Manual 5-303. Thus, an operative element at trial will be whether the force the officers used was reasonable under the totality of circumstances.

**B. The evidence is relevant to those disputed elements.**

As noted above, Rule 404(b) generally excludes evidence of other crimes, wrongs, or acts "to prove the character of a person in order to show action in conformity therewith." The rule is

a specific application of Rule 403's requirement of balancing the probative value of evidence against its unfair prejudice, adding that regardless of the balancing of those concepts the evidence is not admissible when its relevance is simply the bad character of the criminal defendant. It is based on the recognition that evidence of other crimes, wrongs, or acts may fit the technical definition of relevance – that is, the evidence may tend to show that the person committed the charged crime – but that limited probative value is far outweighed by the potential unfair prejudice to the defendant. *See Michelson v. United States,* 335 U.S. 469, 475-76 (1948); *Spreigl,* 139 N.W.2d at 172 (quoting 1 Wigmore, Evidence (3d ed.) §§ 193, 194). That prejudice arises from the concerns that the jury will use the evidence to believe that the defendant has a mere propensity to commit crimes apart from any relevance to the charged crime or that the defendant is a proper candidate for punishment because of other crimes in their past. *See, e.g., Ness,* 707 N.W.2d at 685; *Spreigl,* 139 N.W.2d at 172. When offered for these purposes, its relevance is only for an improper purpose; "inferring propensity from character." *State v. Frisinger,* 484 N.W.2d 27, 32 (Minn. 1992). In *State v. Wermerskirchen,* the supreme court referred to the "improper purpose of showing the defendant was a bad person in order to raise an inference that he acted in conformity with his bad character or to persuade the jury to convict on some improper basis." 497 N.W.2d 235, 241-42 (Minn. 1993).

But when the evidence has probative value and relevance other than for these improper purposes, it's admission is not barred by Rule 404(b).[9] The supreme court has long recognized at common law "various exceptions to this general exclusionary rule" of evidence of other crimes, wrongs, or acts where the evidence is not offered for this improper purpose. *Ness,* 707

---

[9] In *Wermerskirchen,* the supreme court noted that Rule 404(b) is a "specific application of the 'rule of multiple admissibility'" – evidence that may not be admissible for one purpose should not be excluded if it is properly admissible for some other purpose. 497 N.W.2d at 239-40.

Filed in District Court
State of Minnesota
10/12/2020 4:26 PM

N.W.2d at 685.[10] Under these exceptions, evidence of other crimes or acts may be admitted for the proper purposes. *Id.*

One of these exceptions is the common scheme or plan, which includes evidence of a common modus operandi in the other acts and the charged crime to prove the charged crime and disprove defenses. *Ness,* 707 N.W.2d at 687-88; *Kennedy,* 585 N.W.2d at 391; *State v. Rainer,* 411 N.W.2d 490, 497 (Minn. 1987); *Spreigl,* 139 N.W.2d at 170. This proper purpose of the evidence of other crimes, wrongs, or acts applies when the other crimes, wrongs, or acts are "substantially similar to the charged offense" in terms of time, place, and modus operandi. *Kennedy,* 585 N.W.2d at 390. While the other crimes, wrongs, or acts do not need to be identical in every way to the charged crime, they must be markedly similar. *Ness,* 707 N.W.2d at 688.

To satisfy the marked similarity requirement, the *Spreigl* acts need not be a "signature" crime, *State v. Blom*, 682 N.W.2d 578, 612 (Minn. 2004), nor does it need to be identical in every way to the charged crime. *Ness*, 707 N.W.2d at 688; *Kennedy*, 585 N.W.2d at 391. Evidence that a criminal defendant committed other acts in a manner markedly similar to the conduct in question is relevant to proving the crime in question, including refuting similar defenses. *See, e.g., Ness,* 707 N.W.2d at 687-88; *State v. Robinson,* 427 N.W.2d 217, 227 (Minn. 1988); *State v. Morrison,* 310 N.W.2d 135, 137 (Minn. 1981); *State v. Makela,* 309 N.W.2d 295, 298 (Minn. 1981). When the defendant's other crimes or acts are markedly similar to the charged crime, the evidence of the other crimes or acts establishes a modus operandi that is relevant to proving the charged crime. *Robinson,* 427 N.W.2d at 227 (holding the other crimes evidence was admissible because the "evidence shows a pattern of operation.") The evidence of

[10] Technically speaking, of course, these are not exceptions to the rule. Rather, if the evidence is offered for a legitimate purpose, rather than the "forbidden purpose of inferring propensity from character," Rule 404(b) does not apply at all. *Frisinger,* 484 N.W.2d at 32.

markedly similar crimes is relevant to corroborate the commission of the charged crime and to disprove or refute defenses because it establishes this common modus operandi. *State v. Welle*, 870 N.W.2d 360, 364-65; *Ness,* 707 N.W.2d at 688.

Another proper purpose of such evidence is to prove knowledge. *See State v. Coleman*, 944 N.W.2d 469, 481-82 (Minn. Ct. App. 2020), *rev. granted* (Minn. June 30, 2020). For example, in *Coleman* the defendant was charged with third-degree "depraved mind" murder after he consumed alcohol and drove his snowmobile at a high rate of speed on a frozen lake and killed a child and seriously injured the child's father. 944 N.W.2d at 474-75. One element of the depraved mind murder charge is the defendant's awareness that their conduct "created a substantial and unjustifiable risk to human life." *Id.* at 479. The court of appeals upheld the admission of Coleman's previous alcohol-related offense because it was "relevant to Coleman's knowledge of the dangers of driving while intoxicated." *Id.* at 481.

Another proper purpose for such evidence is to prove the person's intent. *Fardan*, 773 N.W.2d at 317. In *Fardan*, a murder prosecution, evidence that somebody with Fardan had fired the gun earlier in the evening was properly admitted to prove Fardan intentionally fired the gun in the murder. *Id.* at 318. In this context, the evidence can also be relevant to the state of mind requirement by rebutting a defense. *See State v. Grilli*, 230 N.W.2d 445, 450-51 (Minn. 1975). The court in *Grilli* held that evidence of other drug sales was admissible to prove predisposition in rebuttal of the entrapment defense. The evidence related to the intent statutory element because the essence of the entrapment defense is the claim that the defendant had no intent to commit the crime until the government entrapped him. *Id.* at 451.

**1. The March 15, 2014 incident.** Chauvin was working off-duty at the Midtown Global Market. At about 12:30 p.m., security guards there notified Chauvin that two males had been

drinking alcohol in the men's restroom and the males were "escorted from the property." About four hours later, a security guard notified Chauvin that a male was sleeping near one of the restaurants. Chauvin recognized the male as one of the men who had been escorted from the property earlier. Chauvin woke the male, and began walking the male to his squad car with the intention of taking the male to detox.

As they walked outside the building, the male "pulled his arm forcefully away from" Chauvin, and Chauvin grabbed the male's jacket sleeve and pulled the male toward him. The male then spun around and fell forward on the sidewalk, landing with his "left arm out and his right arm tucked under his body." Chauvin used his radio to call for an ambulance and a supervisor. According to his report, Chauvin "told [the male] to put his hands behind his back and used body weight against his upper body/head area to control his movements." Chauvin then put a handcuff on the male's left wrist and "was able to move him around to handcuff his other wrist." Chauvin then sat the male up. The male sustained an injury to his forehead that was bleeding. Bates 26570.

Evidence of this incident is relevant to Chauvin's knowledge and intent and to rebut his claim of reasonable force. In the present case, Chauvin placed his knees on George Floyd's neck and arm while Floyd was already handcuffed, for a long time after Mr. Floyd presented any resistance, and for many minutes after Floyd stopped moving at all. The state has to prove that Chauvin's conduct constituted an assault, which is an intentional act that causes bodily harm. Chauvin committed intentional acts by pinning Floyd prone to the ground with his body weight with the assistance of the three other officers. Bodily injury is more than apparent from Mr. Floyd's repeatedly saying that he was in pain and could not breathe until he stopped breathing. In defense, Chauvin will argue that he used reasonable force to subdue Mr. Floyd. Chauvin's

MINNESOTA JUDICIAL BRANCH

knowledge that the use of force was unreasonable helps establish Chauvin's intent to commit an assault. Chauvin's knowledge of his proper use of force – proved through prior incidents when he did so – rebuts his claim of reasonable force.

That the use of other acts to prove knowledge and intent in this case is proper is equally apparent for the third-degree murder statute, as that requires proof of the person's knowledge that their conduct created a substantial and unjustifiable risk to human life. *Coleman*, 944 N.W.2d at 479. Likewise, an element of the manslaughter charge is that the person has consciously disregarded the risk created by their conduct. *McCormick*, 835 N.W.2d at 507.

In the March 15, 2014 incident, Chauvin decided to forcefully remove an intoxicated male from private property to take him to a detox facility. Chauvin got into a physical struggle with the male, forced him to the ground, and placed his body weight on the male to get him handcuffed. Once the male was handcuffed, Chauvin allowed the male to move from the prone position to a seated position. The incident is relevant to show Chauvin's knowledge that the reasonable use of force is to remove body weight from the person and move the person from the prone position to a seated position once they are in handcuffs and are not actively resisting. This incident is also relevant to show Chauvin's knowledge of the risk to human life by keeping his body weight on Mr. Floyd long after he was handcuffed and stopped moving for the third-degree murder statute as well as his conscious disregard of the risk to human life by his conduct. It also demonstrates the objective element of a deviation from the standard of care for the manslaughter statute.

**2. The February 15, 2015 incident.** While working off-duty at the El Nuevo Rodeo nightclub, Chauvin confronted a male who was trying to re-enter the nightclub area after closing time. The male refused to leave, so Chauvin took ahold of the male's right elbow and tried to

direct him towards the exit stairwell. The male yelled that Chauvin was trying to push him down the stairs, although they were still three feet from the stairwell according to Chauvin. Two other males then tried to calm the first male and even said "sorry" to Chauvin as they walked the first male to the stairs. After getting partway down the stairs, the male produced a coat check medallion and Chauvin gave it to security to retrieve the male's coat. Bates 26581-82.

Once at the bottom of the stairs, the male was directed to leave the establishment. The male yelled "racist white bitch" and other curse words as his friends tried to get him to leave. The male refused to leave and also stated: "What are you going to do, arrest me?" According to his report, Chauvin "believed that [the male] would continue to refuse to leave the area and continue to cause anger or alarm in those involved" and told the male "he was under arrest and for him to place his hands behind his back." The male did put his hands behind his back, but when Chauvin grabbed him to "get him into a handcuffing position," the male "immediately pulled his left arm toward his front and attempted to spin around to face [Chauvin]." According to Chauvin's report, Chauvin then "attempted to move him back away from me by applying pressure toward his Lingual Artery which is located below his chin bone." Chauvin repeated "several more times" that the male was under arrest and to put his hands behind his back. Chauvin characterized the male as a "large individual" with a "muscular type build," later noting that the male's driver's license listed him as 6'1" tall and weighing 250 pounds. Believing that the male was displaying "active resistance" to efforts to take him into custody, Chauvin attempted to move around him while the male "was pressed against a wall to escalate force levels to gain compliance" from the male. Chauvin then applied "a neck restraint to [the male] and applied pressure." The male did not comply with "verbal direction" to place his hands behind his back and was still yelling, so Chauvin "pulled [the male] to the ground and was rolled on

Filed in District Court
State of Minnesota
10/12/2020 4:26 PM

onto his stomach and place [sic] in handcuffs with the assistance of other security staff." Chauvin used his radio to request additional squads and a supervisor. During that time, several males approached Chauvin and asked if they could take the male home; Chauvin told them to "back away from us." Bates 26582.

Chauvin kept the male "on his stomach due to his uncooperative behavior until further assistance could be given." Chauvin told the male to "roll over onto his backside so he could be stood up," and the male was "then stood up and walked over to [his] squad car." Chauvin directed the male to sit in the backseat, but the male kept yelling and put his foot up against the door frame and pushed back. The male had to be "pulled inside by his arms and was laying on his back across the seat." Bates 26582.

Evidence of this incident is admissible under the common scheme or plan because it is markedly similar in regards to Chauvin's unreasonable use of force. In this incident, Chauvin tried to take an intoxicated male into custody. Believing that the male was actively resisting because he would not permit handcuffing, Chauvin applied pressure to the male's neck, then pushed the male against a wall, and applied a neck restraint. Chauvin then forced the male to the floor in a prone position. Despite being able to handcuff the male, Chauvin kept the male in the prone position until other officers could arrive.

This evidence demonstrates the common method Chauvin employs when dealing with individuals larger than himself who may be intoxicated. He does not use reasonable force in such incidents. The common scheme purpose is relevant to demonstrate how a defendant acts to situations or classes of people in a similar way. For example, in *State v. Berry*, the supreme court upheld the admission of three prior assaults in a first-degree murder case, holding that "[e]ach of the three incidents is relevant because of the similarity of the way [Berry] behaved

when trying to maintain control of the people with whom he worked. If he thought someone had snitched on him, Berry resorted to threats and to acts of violence against that person." 484 N.W.2d 14, 17 (Minn. 1992). Further, in *Rainer*, the supreme court upheld the admission of Rainer's six past incidents of violence toward women in a first-degree murder case, recognizing that the evidence was presented to disprove his assertion that the gun's discharge was accidental and, in each prior instance, Rainer responded to jealousy or anger with violence. 411 N.W.2d at 497. Thus, the evidence showed "a repeating pattern of very similar conduct not merely a propensity toward violence." *Id.*; *see also State v. DeBaere*, 356 N.W.2d 301, 305 (Minn. 1984) (upholding admission of other act evidence where "[t]he other-crime evidence showed a pattern of similar aggressive sexual behavior by defendant against other women in the community").

This incident shows a common way of dealing with suspected intoxicated people who Chauvin believes are not perfectly complying with his demands. Rather than using reasonable force, Chauvin applies his body weight to hold the person in the prone position until transferring the person to somebody else, regardless of the reasonableness of the force used against the person. This evidence therefore shows "a repeating pattern of very similar conduct," *Rainer*, 411 N.W.2d at 497, and demonstrates that his use of force was not reasonable.

**3. The August 22, 2015 incident.** Officers were dispatched on a call about a possible emotionally disturbed person who was screaming in an apartment building. When officers arrived, they observed the male in an enclosed porch area "screaming in an unknown gibberish language foreign to officers." The male would walk from the porch area to the main living area and back, continually screaming. The male was unresponsive to the officers, "with a flat affect on his face and appearing to be completely unaware of his surroundings." Bates 26592.

MINNESOTA JUDICIAL BRANCH

Other officers arrived, including Chauvin. Chauvin observed that the male "was yelling and making sounds that did not sound like actual language" and "was clenching his fists as he stood up and was not wearing a shirt." Chauvin took up a position at the front door as other officers arrived. Bates 26590.

A sergeant arrived, and after other officers briefed him, the sergeant concluded that the male was "a danger to himself and to others" and authorized a forced entry into the apartment. When the officers entered the apartment, the male retreated to a bathroom in the rear of the apartment. The bathroom was very small and the bathtub was full of water. As the officers commanded the male to exit the bathroom, the "male was clenching his fists and standing in a fighting stance towards the bathroom mirror as he continued an unknown biblical style chant." Bates 26590. An officer told the male several times to come out of the bathroom and lie on the ground, but the male would "just yell and talk gibberish." An officer moved toward the male and told him to get on the ground or the officer would deploy his Taser. The officer told the male he would count to three and then deploy the Taser, but after the officer counted to three, the male still did not comply; the male "just stood there yelling, flexing all of his muscles with his fists clenched." Bates 26591.

The sergeant ordered an officer to use his Taser on the male because of "the confines of the bathroom, the males [sic] demeanor, the bath tub that was full of water, the fact that the male was not wearing any clothing other than boxers, and his muscular build, as well as other factors." The officer deployed his Taser on the male, which appeared to have little affect even after "several cycles." Bates 26590, 26591. Chauvin observed that Taser had "very little effect" on the male. Bates 26590.

The officer then grabbed the male and tried to take him to the ground. The male "tensed up every muscle in his body and started resisting officers and refused to go to the ground." One officer grabbed the male's arm and tried to force the male to the ground, but the officer slipped on the wet floor and fell. Other officers joined in and were eventually able to get the male handcuffed. Bates 26591-92.

According to the sergeant, after "a minute long struggle, Officers and I were able to place the male into handcuffs. The male was then immediately placed in the rescue position and ambulance and rescue were requested code 3." Bates 26590. Another officer noted that the male "was eventually handcuffed and placed on his side and kept in that position until paramedics arrived." Bates 26593. The sergeant noted that the "male was so excited that he was chemically sedated by on scene paramedics for his own safety." Chauvin observed as the officer used his Taser on the male "and secured after a struggle with the male." Chauvin described the male as being in an "extremely agitated state." Bates 26590.

The next day, the sergeant submitted a recommendation for a Lifesaving Award for the officers involved in the incident, including Chauvin. The sergeant had learned from hospital staff that the male's condition could have turned fatal if the officers had not taken the necessary steps to get the male to the hospital safely, and that the male's "elevated cardiac condition could have been fatal if officers on scene would have prolonged the detention or if they would have done nothing at all." The sergeant noted that "Officer Bjork placed the male in the rescue position where he was monitored by Officer [sic] Merrill, Dean and Chauvin until medical arrived." Bates 3746-47.

Evidence of this incident is relevant to proving Chauvin's knowledge about the importance and propriety of moving a handcuffed person from the prone position to the "rescue

position" and his intent for the assault. *See supra* at 24-25. It demonstrates his knowledge of reasonable force, especially given that a peer recommended an award for the officers' conduct. It also demonstrates his intent to commit an assault because in this incident he was commended for moving the person into the "rescue position" but did not move George Floyd into the "rescue position," he instead held him in the prone position with the body weight of three officers on him long after George Floyd was motionless and non-responsive. It also demonstrates his deviation from the objective standard of care for the manslaughter statute. Finally, it shows his knowledge that failing to move somebody into the recovery position is unreasonable and carries with it a serious risk of harm.

**4. The April 22, 2016 incident.** Chauvin was working off-duty at the Midtown Global Market. Security guards at the property advised Chauvin of a male who had threatened one of the security guards and was refusing to leave the premises. The male continued to threaten the security guard even as Chauvin stood there, and the male refused to leave. Chauvin escorted the male out of the building and told the male he was not to return to the property or he would be arrested. The male stated he did not care about being arrested, as he would be out by Monday anyway, and continued to threaten to spit on the victim. Bates 26606.

Because of the male's multiple threats, Chauvin "feared [the male] would immediately go back inside the property to assault or attempt to spit on" the victim, so Chauvin "closed distance with [the male] and secured his neck/head area with [his] hands with one front and one toward the rear." Chauvin then applied pressure to "the sides" of the male and forced him backwards on to the sidewalk. While the male kept yelling, security guards assisted in handcuffing the male, "who was generally on his right side." The male was then "stood up and he started yelling his information toward a small crowd of white males and females who had approached on the

Filed in District Court
State of Minnesota
10/12/2020 4:26 PM

sidewalk that were possibly videotaping." Chauvin then walked the male to his squad car, called for a supervisor to come to the scene, and "also requested an ambulance to check on [the male] since he claimed to have asthma." The male later refused medical attention. Bates 26606.

Evidence of this incident is relevant to a common scheme or plan through modus operandi. *See supra* at 27-28. This incident is markedly similar in that Chauvin was confronting a person he did not believe was following Chauvin's commands, so Chauvin used a neck restraint to subdue the individual. Again, Chauvin used force beyond that which was necessary to restrain an individual.

**5. The June 25, 2017 incident.** Chauvin was dispatched to a domestic assault call. The victim reported to Chauvin and another officer that she had gotten into an argument with her adult daughter, who may have been intoxicated, and her daughter then tried to strangle her with an extension cord. The victim reported that her daughter had left the residence. While speaking with the victim, a female entered the back door and the victim identified the female has the daughter who had assaulted her. Chauvin told the female to put out her cigarette and that she was under arrest. As the female walked past the officers, Chauvin grabbed her left arm and the other officer grabbed one of her arms as well. The female pulled her arms away and turned to face the officers. The other officer pushed her chest against the wall. Chauvin put a handcuff on the female's left wrist. According to Chauvin, the female "kept twisting her body and trying to pull her arms in front of her," so he "pulled her down to floor face first and kneeled on her to pin her body so we could finish handcuffing her." The two officers were able to fully handcuff her at that time. Bates 27883, 27884.

Chauvin then told the female to stand up, but she did not. As they tried to get her to stand and walk out, the female dragged her feet on the ground and at one point hooked her foot behind

a television stand. The two officers carried the female through and outside the house. Bates 27883, 27884. The body worn camera video shows the officers carried her face down, with her hands cuffed behind her back, by the arms and feet while other family members were in the home. Once outside the house, the officers placed her face down on the ground. In Chauvin's report, he wrote that she was "set down on the grass near the sidewalk in front of the house." Bates 27883. In the other officer's report, he wrote that the female was "placed safely onto the grass." Bates 27884. But the body camera video shows that the officers placed her face down mostly on the cement sidewalk. Chauvin wrote in his report that he "kept body weight" on the female to "pin" her down while the other officer moved the squad car closer. The body worn camera video shows that Chauvin kneeled on the female's back during this time, even though she was offering no physical resistance at all. Chauvin directed the other officer to apply a Hobble restraint around her wrists and ankles even though the female was not being physically aggressive. The body worn camera video shows that Chauvin directed the other officer to apply the Hobble restraint in the "hog-tie" position, and Chauvin can be heard saying "perfect." After applying the Hobble restraint, the officers placed the female in the back seat of the squad car on her side. Bates 27883, 27884, 26427.

In his report, Chauvin indicated that the female was 5'6" tall with a "LI" build.[11] For the field requesting the "Type of Resistance Encountered," Chauvin entered "Commission of Crime." Bates 27880.

This evidence is relevant to common scheme or plan through modus operandi. *See supra* at 27-28. In this incident, Chauvin told the woman she was under arrest and then grabbed her as

[11] It is not clear from the report what "LI" means, but it is clear from the body camera video that the female was very thin and of slight build.

Filed in District Court
State of Minnesota
10/12/2020 4:26 PM

she walked by. When she did not fully comply, Chauvin and the other officer forced her to the ground to handcuff her. Chauvin used his body weight to pin her to the ground while she was handcuffed. When she did not voluntarily walk out of the house, Chauvin picked her up by the arms and carried her out of the house. The only resistance she offered was dragging her feet on the ground and briefly hooking a foot behind the television stand. The other officer picked up her legs. When they got her out of the house, Chauvin placed her in the prone position on the sidewalk and kneeled on her back. Chauvin also directed the other officer to hog tie her. All this despite the fact that the female was not making any threats at the officers and was not physically aggressive in the least towards the officers. This is entirely consistent with Chauvin's behavior towards Mr. Floyd, who was fully handcuffed and offering little to no physical aggression toward the officers. It shows a common way of acting to people he believes may be intoxicated and takes into custody and who show any level of noncompliance: Chauvin disregards any consideration of the circumstances for determining the reasonable amount of force and simply fully restrains the person until he can turn them over to somebody else without regard to their well-being.

In this way, the incident also demonstrates his intent to assault Mr. Floyd and to rebut his reasonable use of force defense. It shows Chauvin does not consider circumstances at all when deciding how much force to use and simply holds such arrestees in the prone position, even to the point of hog-tying the person, to restrain them.

**6. The September 4, 2017 incident.** Chauvin was dispatched to a domestic assault call. The alleged victim told the officers that she had been assaulted by her two minor children, a son and daughter. The officers located the juvenile male laying on the floor in the back of the house. The officers advised the juvenile male that he was under arrest, but he did not comply with

Filed in District Court
State of Minnesota
10/12/2020 4:26 PM

commands and directions from the officers. According to Chauvin, the juvenile male "then displayed active resistance to efforts to take him into custody" by "flailing his arms around." The juvenile male, whom Chauvin described as "approximately 6'2" and at least 240 pounds," backed himself into a corner and "stretched his legs forward." Chauvin attempted to grab the juvenile male's arms, but he would "continue to struggle and flail his arms around." In his report, Chauvin wrote that he believed the juvenile male would "escalate his efforts to not be arrested," and because of the juvenile male's large size, Chauvin "deliver[ed] a few strikes to [the juvenile male] to impact his shoulders and hopefully allow control to be obtained." Chauvin believed the juvenile male was "still providing active resistance," but another officer was able to get one handcuff on the juvenile male. As the male kept pulling his arms in front of his body, Chauvin "applied a neck restraint," and then was "able to roll [the juvenile male] onto his stomach and grab his left wrist so that cuffing could be completed." Chauvin then "used body weight to pin [the juvenile male] to the floor." During this time, the alleged victim came into the room and yelled at the officers. The juvenile male had blood coming from his left ear, so the officers requested an ambulance. Paramedics determined that the juvenile male needed stitches, and he was transported to the Hennepin County Medical Center. Bates 26632-33.

This incident is relevant to common scheme or plan through modus operandi. *See supra* at 27-28. This is another incident in which Chauvin believed the person was not adequately complying with his commands, so he applied a neck restraint and then held the person to the floor with his body weight. The struggle and restraint was of such a nature that the male had blood coming from his ear and the alleged assault victim yelled at the officers.

**7. The March 12, 2019 incident.** Chauvin and another officer were speaking with a citizen about a stolen vehicle report. A male unrelated to the conversation approached the

officers and asked for a ride. The officers told him they were busy and would talk with him later. The male initially backed away, but then approached again and demanded a ride. As the man was pacing around with his hands in his pockets, the other officer directed the male to remove his hands from his pockets, but the male refused. The male again walked up to them, and Chauvin told the male to back away. The male said "don't tell me what to do, what are you talking about bro" and did not move away. Bates 25828.

The body worn camera video shows that Chauvin then walked directly at the male and grabbed him. The male began to pull away and "flail his arms wildly." In a struggle with the other officer, the male's sweatshirt was pulled off. Chauvin delivered a burst of mace towards the male's face and the other officer told the male to get onto his stomach or he would be "tazed." The male went down to his knees, but would not go further, so Chauvin "applied a neck restraint to help control" the male. Chauvin told the other officer to secure one of the male's arms. Although Chauvin was having difficulty seeing because of the burst of mace, Chauvin was still "able to direct [the male] face down on the ground and pin[] him down by sitting on his lower back area." The officers then placed handcuffs on the male. Bates 25824, 25828. The body worn camera video shows that Chauvin placed his right knee on the male's lower back and his left knee on the ground alongside the male's left arm. Shortly thereafter, two other officers kneeled on the male's upper body and waist area while the male physically struggled, and when the male tried to rise up, the officer twisted his ankles and pulled his legs up. The officer who had kneeled on the male's upper back area then got off the male's body. After the male stopped kicking his legs and trying to rise up, the officers allowed him to roll on his side and eventually sit up.

This incident is relevant to common scheme or plan through modus operandi. *See supra* at 27-28. Chauvin initiated contact with the male when the male disregarded Chauvin's command and verbally challenged Chauvin. This started a physical confrontation in which Chauvin applied a neck restraint, forced the male to the ground, and placed his own body weight on top of the male to restrain him. Similar to his conduct with Mr. Floyd, Chauvin placed his right knee on the male's back and his left knee near the male's left arm.

**8. The July 6, 2019 incident.** Officers were dispatched to a domestic disturbance involving weapons. The officers received information that the adult male suspect had poured gasoline all over the home, was screaming at his mother, and had a knife. A caller also reported that the male was emotionally disturbed. Chauvin enter the home with his gun drawn and immediately smelled the odor of gasoline. Chauvin also saw a male standing in the living room, and a female sitting nearby identified the male as the suspect. Chauvin pointed his gun at the male and told him to turn around. When the male did not turn around, Chauvin approached him. Bates 25863.

The male raised his hands briefly and then dropped them down. Chauvin tried to grab the male's right arm while holstering his weapon, and then "delivered a single kick to [the male's] lower midsection to back him up as he had not been searched for a knife." In addition, Chauvin did not want to allow the male to reach for the scissors and other sharp objects on a nearby table. Chauvin gave verbal commands to get his hands back and the male "started to tense," so Chauvin "applied a neck restraint to [the male] and had to reposition." Chauvin told the male to get his hands behind his back. Another officer was able to get a cuff on the male's left arm. Chauvin heard the male "make a brief snoring noise," and during the "brief time [the male] was

rendered unconscious [Chauvin] brought his right arm back so he could be handcuffed." Bates 25863.

In his report, Chauvin wrote: "With the reported involvement of a knife, the gasoline poured inside the house by a reported EDP, I didn't believe lower level techniques would have been effective in immediately rendering the scene safe for [the victim] and ourselves." Bates. 25863. In an interview later with a supervisor, Chauvin stated that he believed the male lost consciousness. Chauvin added that the male was placed in the recovery position and came to. Bates 25868.

This incident is relevant to proving knowledge and intent. *See supra* at 24-25. This demonstrates that Chauvin had knowledge of the recovery position and that a person should be placed in that position, rather than left prone on the ground. Even though the male only briefly lost consciousness while Chauvin was trying to handcuff him, Chauvin told his sergeant that he placed the male in the recovery position and the male recovered. Here, by contrast, Chauvin did not place Floyd in the recovery position, even after Floyd lost consciousness and stopped breathing. This incident is also relevant to the objective standard in the manslaughter statute because it demonstrates that Chauvin's actions in kneeling on Floyd's neck and in failing to move him into the recovery position deviated from the appropriate standard of care.

This incident is also relevant to common scheme or plan through modus operandi. *See supra* at 27-28. This is another incident in which Chauvin applied a neck restraint to render a person unconscious so that Chauvin could restrain him.

**9. The December 23-24, 2019 incident.** Just before midnight on December 23, 2019, officers received a call of an assault at the VFW. When officers arrived, the male victim was not there. Just after midnight, the officers received another call that the male victim was at a nearby

Filed in District Court
State of Minnesota
10/12/2020 4:26 PM

intersection. Officers went to that location and observed the male standing in the street. The male had blood coming from his nose and was on the phone. As one officer got closer to him, the male started yelling and walked away. According to that officer, the male "seemed to want to be combative," appeared intoxicated, and was "yelling curse words." As the two squad cars drove off, the male jumped into the street and tried to kick one of the squad cars. The same officer noted that the male "appeared that he wanted to be combative towards officers and was yelling." The officers observed as the male walked into the VFW. Bates 25903.

Shortly after, the officers received a call of an unwanted male at the VFW. As defendant Kueng and officers approached the VFW, they saw a group coming out of the VFW which included the male they had previously encountered (the officers recognized him partly because of his Vikings sweater). The officers then saw the male throwing punches at another male and employees of the VFW broke up the scuffle and restrained the male. Bates 25903.

The employees of the VFW took the male into the entryway of the VFW and the officers assisted with restraining the male. Specifically, Kueng and the other officers grabbed the male and put him on the ground. Bates 25907, 25904. The male was "still yelling and screaming, saying he was 'army' and a 'combat vet," which caused one of the officers to think that the male knew how to fight and was not afraid to. Bates 25904. While on the ground, the male would not listen to commands and provide his hands for cuffing, so one officer "delivered a series of knee strikes to his torso" and then they were able to get the male handcuffed. The officers then held the male on the ground "with [their] body weight" as the male "continued to yell, kick his feet and flop around whenever [the officers] tried sitting him up." Bates 25904. Another officer described it this way: "I placed my knee on [the male's] back and on the back of his neck and used my body weight to pin [the male] to the ground so he could be placed in handcuffs, as he

was resisting officers [sic] attempts to handcuff him by moving his arms." Bates 25905. The officers kept the male on the ground so as to prevent injury to the male until he was escorted to a squad car. Bates 25904.

In the summary portion of his report, Kueng described the male as "a person in crisis" and that the male was "aggressive" before being placed in handcuffs. Bates 25906. The body worn camera videos show that the male was physically resisting and yelling at the officers as they tried to handcuff him. The videos also show that once they got the male handcuffed, the officers briefly got off the male. The male then tried to kick at the officers and get up, so the officers restrained him again with their body weight. However, as soon as the male stopped any physical activity, the officers allowed him to move into a sitting position. Bates 34286.

This incident is relevant to knowledge and intent. *See supra* at 24-25. This demonstrates that Kueng knew, even with an intoxicated male who was physically threatening and aggressive with officers, the proper procedure is to move the person from the prone position to a side or sitting position. This is relevant in establishing Kueng intended to assault Floyd while holding down his body in the prone position as Floyd repeatedly said that he was in pain and could not breathe. It also demonstrates his knowledge that Chauvin was likewise committing an assault, which is a necessary element in order to prove that Kueng aided and abetted second-degree murder. This incident also demonstrates that Kueng deviated from the reasonable standard of care, as is necessary for the second-degree manslaughter statute, and that he knew Chauvin was deviating from the reasonable standard of care, as is necessary for aiding and abetting second-degree manslaughter.

**10-18. Incidents 10 to 18** all involve the work of Defendant Thao as a police officer. Incidents 10 through 17 occurred from April through July of 2012 when Thao was working with

Filed in District Court
State of Minnesota
10/12/2020 4:26 PM

a Field Training Officer (FTO), and are memorialized in reports by his FTO criticizing his conduct. Incident 18 occurred on August 17, 2017. Each incident demonstrates a desire on Thao's behalf to avoid work by not following proper procedures and policies.

- On April 27, 2012, Thao sat idly in his squad car while other officers finished other tasks that obviously had to be done on the call they were at. Bates 14739-40.
- On May 4, 2012, Thao pulled up to a house on a loud party call and instead of getting out of his squad to talk with individuals, he simply used the squad's radio system to yell at the people outside the residence. Thao did not verify the address until later and never spoke to the owner or renter of the property. Bates 14751-52.
- On June 3, 2012, Thao filed a false police report claiming he has canvassed a neighborhood when in fact he had not. He later admitted that he forgot to do the canvass and lied in the report to avoid getting into trouble. Bates 14793.
- Also on June 3, 2012, Thao tried to manipulate a domestic abuse victim to respond to questions in a manner which would allow Thao to avoid generating a specific report. Bates 14793-96.
- The next day, June 4, 2012, Thao's FTO reported that Thao frequently forgot details given to him, and "guesses and adds things into his reports that are wrong." Bates 14799-14802.
- The next day, June 5, 2012, his FTO indicated that Thao responded dismissively and insubordinately to feedback from his FTO and refused to respond to training efforts. Bates 14806-09.

Filed in District Court
State of Minnesota
10/12/2020 4:26 PM

- On July 1, 2012, his FTO reported that Thao on multiple occasions intentionally avoided responding to situations which clearly necessitated a police response, including observed law violations, and then later claimed he did not see the violations. The FTO added that Thao appeared to lack candor about his observations. Bates 14888-92.
- On July 7, 2012, Thao, on at least three occasions, attempted to speak to citizens in a manner which demonstrated that Thao was not listening to victims and was "attempting to talk his way out of [filing] legitimate reports." Thao's field-training time was extended because of these issues. Bates 14900-02.
- Finally, on August 17, 2017, Thao tried to manipulate a domestic abuse victim to respond to questions in a manner which would relieve Thao of the responsibility to write a domestic assault report. Bates 4549-50.

These incidents are relevant to common scheme or plan through modus operandi. *See supra* at 27-28. While working, Thao failed to act according to reasonable police standards when confronted with situations that required more work. In the same way, when he observed that the other officers were holding down Mr. Floyd with their body weight, preventing him from breathing, Thao did what he could to avoid work. When it was suggested that the officers use a Hobble device on Mr. Floyd, Thao decided against it only because it would create more work. But if he had, the officers would have been required to put Mr. Floyd in the rescue position as that is specifically part of the Hobble procedures. This evidence is relevant to show his intent to aid the continued assault of Mr. Floyd, and his intent to aid in the commission of second-degree manslaughter.

MINNESOTA JUDICIAL BRANCH

Filed in District Court
State of Minnesota
10/12/2020 4:26 PM

## II. The potential prejudice does not outweigh the probative value.

When considering whether the probative value of other acts evidence outweighs the potential for unfair prejudice, courts are to "balance the relevance of the [other acts], the risk of the evidence being used as propensity evidence, and the State's need to strengthen weak or inadequate proof in the case." *State v. Scruggs*, 822 N.W.2d 631, 644 (Minn. 2012). The question is whether the evidence is *unfairly* prejudicial, meaning that it "persuades by illegitimate means," *State v. Schultz*, 691 N.W.2d 474, 478 (Minn. 2005).

As discussed above, the incidents are highly relevant to the disputed facts. The evidence bears directly on elements and defenses, not tangential facts or issues. This is not the typical case. The jury will be presented with complex legal and factual issues. The evidence will help the jury understand the facts and circumstances regarding the elements and defenses because of the relevance of the evidence. The direct relevance to the disputed issues weighs heavily on the probative side of the scale.

The trial court's instructions will alleviate any potential unfair prejudice. Undoubtedly this Court will give a cautionary instruction, which will tell the jurors not to use the evidence for an improper purpose. *See State v. Robinson*, 604 N.W.2d 355, 363-64 (Minn. 2000) (court should give cautionary instruction before the other acts evidence is admitted and in the final jury instructions); *Kennedy*, 585 N.W.2d at 392 (the trial court's cautionary instructions lessened the probability of prejudice). Courts presume that jurors follow the court's instructions. *Fardan*, 773 N.W.2d at 320. The slight potential for prejudice cannot outweigh the probative value of the evidence.

Filed in District Court
State of Minnesota
10/12/2020 4:26 PM

## CONCLUSION

For all the foregoing reasons, the State respectfully requests that the Court admit the other acts evidence at the trial of the above captioned matter.

Dated: October 12, 2020

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

**/s/ Matthew Frank**
MATTHEW FRANK
Assistant Attorney General
Atty. Reg. No. 021940X
445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
(651) 757-1448 (Voice)
(651) 297-4348 (Fax)
matthew.frank@ag.state.mn.us

ATTORNEYS FOR PLAINTIFF

MINNESOTA
JUDICIAL
BRANCH

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on December 21, 2022, a true and correct copy of the foregoing document was served on Defendant City of Minneapolis, through its counsel of record, at the address for its counsel, via electronic mail, pursuant to an agreement allowing for service by electronic mail.

*s/ Matthew Veenstra*
Matthew R. Veenstra